# EXHIBIT 1

# PURCHASE AND CONTRIBUTION AGREEMENT

by and between

## QUALITY LEASE SERVICE, LLC

## QUALITY LEASE RENTAL SERVICE, LLC

## QLS HOLDCO, INC.

## DAVID MICHAEL MOBLEY

## YVETTE MOBLEY

and

## QUALITY LEASE AND RENTAL HOLDINGS, LLC

dated as of

December 31, 2012

# TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS ........................................................................................................2

**ARTICLE II** PURCHASE AND SALE..........................................................................11

Section 2.01 Purchase and Sale.................................................................. 11

Section 2.02 Purchase Price. ...................................................................... 11

Section 2.03 Transactions to be Effected at the Closing. ........................... 11

Section 2.04 Purchase Price Adjustment................................................... 12

Section 2.05 Closing. ................................................................................. 14

Section 2.06 Withholding Tax.................................................................... 15

Section 2.07 The Sellers' Agent................................................................. 15

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER...................16

Section 3.01 Organization and Authority of Seller. .................................... 16

Section 3.02 Organization, Authority and Qualification of QLS and QRS................. 16

Section 3.03 Capitalization........................................................................ 17

Section 3.04 No Subsidiaries..................................................................... 18

Section 3.05 No Conflicts; Consents.......................................................... 18

Section 3.06 Financial Statements............................................................. 18

Section 3.07 Undisclosed Liabilities. ......................................................... 19

Section 3.08 Absence of Certain Changes, Events and Conditions.............. 19

Section 3.09 Material Contracts. ............................................................... 21

Section 3.10 Title to Assets; Real Property................................................. 22

Section 3.11 Condition And Sufficiency of Assets. ..................................... 23

Section 3.12 Intellectual Property. ............................................................. 24

Section 3.13 Inventory. .............................................................................. 25

Section 3.14 Accounts Receivable............................................................. 26

Section 3.15 Customers and Suppliers. ...................................................... 26

Section 3.16 Insurance. ............................................................................. 27

Section 3.17 Legal Proceedings; Governmental Orders............................... 27

i

Section 3.18 Compliance With Laws; Permits. ............................................................. 28

Section 3.19 Environmental Matters. ........................................................................... 28

Section 3.20 Employee Benefit Matters. ...................................................................... 30

Section 3.21 Employment Matters. .............................................................................. 33

Section 3.22 Taxes. ...................................................................................................... 34

Section 3.23 Books and Records. ................................................................................. 36

Section 3.24 Brokers. ................................................................................................... 36

Section 3.25 Full Disclosure. ....................................................................................... 36

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER .................... 37

Section 4.01 Organization and Authority of Buyer. ..................................................... 37

Section 4.02 No Conflicts; Consents. ........................................................................... 37

Section 4.04 Legal Proceedings. .................................................................................. 37

**ARTICLE V** COVENANTS ......................................................................................... 38

Section 5.01 Conduct of Business Prior to the Closing. ............................................... 38

Section 5.02 Access to Information. ............................................................................. 39

Section 5.03 No Solicitation of Other Bids. ................................................................. 39

Section 5.04 Notice of Certain Events. ........................................................................ 40

Section 5.05 Resignations. ........................................................................................... 40

Section 5.06 Confidentiality. ....................................................................................... 40

Section 5.07 Non-competition; Non-solicitation .......................................................... 41

Section 5.08 Governmental Approvals and Consents ................................................... 42

Section 5.09 Books and Records. ................................................................................. 44

Section 5.10 Closing Conditions .................................................................................. 44

Section 5.11 Public Announcements. ........................................................................... 44

Section 5.12 Further Assurances. ................................................................................. 45

Section 5.13 Release. .................................................................................................... 45

Section 5.14 Environmental Issues. .............................................................................. 45

**ARTICLE VI** TAX MATTERS .................................................................................... 46

Section 6.01 Tax Covenants. ........................................................................................ 46

Section 6.02 Termination of Existing Tax Sharing Agreements. ................................... 47

ii

Section 6.03 Tax Indemnification. .................................................................................................. 47

Section 6.04 Straddle Period. ......................................................................................................... 47

Section 6.05 Tax Allocation of Purchase Price ............................................................................. 48

Section 6.06 Contests. ..................................................................................................................... 48

Section 6.07 Cooperation and Exchange of Information. .............................................................. 48

Section 6.08 Tax Treatment of Indemnification Payments. ........................................................... 49

Section 6.09 Survival. ..................................................................................................................... 49

Section 6.10 Overlap. ...................................................................................................................... 49

**ARTICLE VII** CONDITIONS TO CLOSING ............................................................................. 49

Section 7.01 Conditions to Obligations of All Parties. ................................................................. 49

Section 7.02 Conditions to Obligations of Buyer. ......................................................................... 50

Section 7.03 Conditions to Obligations of Seller. ......................................................................... 52

**ARTICLE VIII** INDEMNIFICATION ....................................................................................... 53

Section 8.01 Survival. ..................................................................................................................... 53

Section 8.02 Indemnification By Seller. ......................................................................................... 53

Section 8.03 Indemnification By Buyer. ......................................................................................... 54

Section 8.04 Certain Limitations. ................................................................................................... 54

Section 8.05 Indemnification Procedures. ..................................................................................... 55

Section 8.06 Payments. ................................................................................................................... 57

Section 8.07 Tax Treatment of Indemnification Payments. ........................................................... 58

Section 8.08 Effect of Investigation. .............................................................................................. 58

**ARTICLE IX** TERMINATION ................................................................................................... 58

Section 9.01 Termination. ............................................................................................................... 58

Section 9.02 Effect of Termination. ................................................................................................ 59

**ARTICLE X** MISCELLANEOUS ................................................................................................ 59

Section 10.01 Expenses. .................................................................................................................. 59

Section 10.02 Notices. ..................................................................................................................... 59

Section 10.03 Interpretation. .......................................................................................................... 60

Section 10.04 Headings. .................................................................................................................. 61

Section 10.05 Severability. .............................................................................................................. 61

Section 10.06 Entire Agreement. ................................................................................................... 61

Section 10.07 Successors and Assigns. .......................................................................................... 61

Section 10.08 No Third-party Beneficiaries.................................................................................... 61

Section 10.09 Amendment and Modification; Waiver. .................................................................... 62

Section 10.10 Dispute Resolution. ................................................................................................. 62

Section 10.11 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ........................... 63

Section 10.11 Specific Performance................................................................................................ 64

Section 10.12 Counterparts. ........................................................................................................... 64

## PURCHASE AND CONTRIBUTION AGREEMENT

This Purchase and Contribution Agreement (this "**Agreement**"), dated as of December 31, 2012, is entered into between QUALITY LEASE SERVICE, LLC., a Texas limited liability company ("**QLS**" and a "**Target**"), QUALITY LEASE RENTAL SERVICE, LLC, Texas limited liability company ("**QRS**," a "**Target**," and together with QLS, the "**Targets**"), QLS HoldCo, Inc., a Texas corporation ("**QS HoldCo**" and a "**Seller**"), GRETA YVETTE MOBLEY, a resident of the State of Texas ("**YMobley**" and a "**Seller**"), DAVID MICHAEL MOBLEY, a resident of the State of Texas, individually and in his capacity as trustee and authorized agent of YMobley pursuant to that certain Final Decree of Divorce entered on August 20, 2012 ("**DMobley**" and a "**Seller**," together with YMobley, the "**Owners**," together with QS HoldCo and YMobley, the "**Sellers**," and together with QLS, QRS, YMobley and QS HoldCo, the "**Seller Parties**"), David Michael Mobley, not in his individual capacity, but as attorney-in-fact and agent for and on behalf of the Sellers as contemplated by this Agreement (the "**Sellers' Agent**"), and QUALITY LEASE AND RENTAL HOLDINGS, LLC, a Delaware limited liability company ("**Buyer**").

### RECITALS

WHEREAS, the Owners together own all of the issued and outstanding shares of common stock, no par value, of QS HoldCo;

WHEREAS, QS HoldCo was recently formed and all of the shares (the "**QLS Shares**") of Quality Lease Service, Inc., a Texas corporation (which was converted (the "**Conversion**") into QLS (sometimes "**QLS LLC**")), were contributed to QS HoldCo (the "**QS HoldCo Contribution**"), and such that QLS came to be 100% owned by QS HoldCo (the membership interests in QLS being the "**QLS LLC Interests**");

WHEREAS, immediately prior to Closing, the Owners will contribute all of the QRS LLC Interests to QS HoldCo such that QRS will be a wholly owned subsidiary of QS HoldCo; and

WHEREAS, Buyer wishes to buy, and QS HoldCo wishes to sell to Buyer, the QLS LLC Interests and the QRS LLC Interests.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I:**

"**Acquisition Proposal**" has the meaning set forth in **Section 5.03(a).**

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Statement**" has the meaning set forth in **Section 6.05.**

"**Amended and Restated Buyer LLC Agreement**" means that certain Amended and Restated Limited Liability Company Agreement of Buyer.

"**Audited Financial Statements**" has the meaning set forth in **Section 3.06.**

"**Balance Sheet**" has the meaning set forth in **Section 3.06.**

"**Balance Sheet Date**" has the meaning set forth in **Section 3.06.**

"**Benefit Plan**" has the meaning set forth in **Section 3.20(a).**

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Tampa, Florida are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Basket Exclusions**" has the meaning set forth in **Section 8.04(a).**

2

"**Buyer Indemnitees**" has the meaning set forth in **Section 8.02.**

"**Buyer Minority Interest**" means the equity interest in Buyer to be issued to the Owners pursuant to the Amended and Restated Buyer LLC Agreement, which interest will represent twenty percent (20%) of the equity interests in Buyer.

"**Buyer's Accountants**" means Weaver and Tidwell L.L.P.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Closing**" has the meaning set forth in **Section 2.05.**

"**Closing Date**" has the meaning set forth in **Section 2.05.**

"**Closing Gross-Up Statement**" has the meaning set forth in **Section 2.04(b)(ii).**

"**Closing Note Amount**" means an amount equal to Forty Million Dollars and No Cents ($40,000,000) *plus* the amount of the Estimated Excess Working Capital, subject to adjustments and withholdings as provided for in this Agreement and in the Closing Note.

"**Closing Note**" means that certain Promissory Note in the amount of the Closing Note Amount executed and delivered by Buyer to QS HoldCo.

"**Closing Working Capital**" means an amount equal to (a) the aggregate Current Assets of each of the Targets, less (b) the aggregate Current Liabilities of each the Targets, determined as of the open of business on the Closing Date.

"**Closing Working Capital Statement**" has the meaning set forth in **Section 2.04(b)(i).**

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Conversion**" has the meaning set forth in the recitals.

"**Current Assets**" means cash and cash equivalents, accounts receivable aged no more than 60 days, inventory (including any work in progress with respect to rig houses) and prepaid expenses, but excluding (a) the portion of any prepaid expense of which Buyer will not receive the benefit following the Closing, (b) deferred Tax assets and (c) receivables from any of the Targets' Affiliates, directors, managers, employees, officers or equity holders and any of their respective Affiliates, determined in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments

3

and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end as if such accounts were being prepared and audited as of a fiscal year end.

"**Current Liabilities**" means accounts payable, accrued Taxes and accrued expenses, including, in each case, related to work in progress with respect to rig houses, but excluding payables to any of the Targets' Affiliates, directors, managers, employees, officers or equity holders and any of their respective Affiliates, deferred Tax liabilities and the current portion of long term debt, determined in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end as if such accounts were being prepared and audited as of a fiscal year end.

"**Direct Claim**" has the meaning set forth in **Section 8.05(c)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement.

"**Disputed Amounts**" has the meaning set forth in **Section 2.04(c)(iii)**.

"**DMobley**" has the meaning set forth in the preamble.

"**Dollars or $**" means the lawful currency of the United States.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Attributes**" means any emissions and renewable energy credits, energy conservation credits, benefits, offsets and allowances, emission reduction credits or words of similar import or regulatory effect (including emissions reduction credits or allowances under all applicable emission trading, compliance or budget programs, or any other federal, state or regional emission, renewable energy or energy conservation trading or budget program) that have been held, allocated to or acquired for the development, construction, ownership, lease, operation, use or maintenance of either Target as of: (i) the date of this Agreement; and (ii) future years for which allocations have been established and are in effect as of the date of this Agreement.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural

resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Indemnified Matters**" means those certain environmental issues with respect to the real property located at 480 County Road 355 El Campo, Texas and the operation of the business of the Targets set forth on the attached Schedule A.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to any Person, any other Person that, together with such first Person, would be treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**Estimated Closing Working Capital**" means an amount equal to Four Million One Hundred Thousand Dollars and No Cents ($4,100,000).

"**Estimated Excess Working Capital**" means an amount equal to One Million Two Hundred Thousand Dollars and No Cents ($1,200,000).

"**Financial Statements**" has the meaning set forth in **Section 3.06.**

"**GAAP**" means United States generally accepted accounting principles in effect from time to time consistently applied.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Gross-Up Amount**" means an amount equal to the lesser of: (a) Three Million Six Hundred Thousand Dollars and No Cents ($3,600,000.00) and (b) the sum of (i) the product of (A) twenty-five percent (25%) and (B) the excess of the aggregate purchase price allocated pursuant to **Section 6.05** to assets that are not capital assets for federal income tax purposes (excluding accounts receivable) over such assets' aggregate federal income tax bases and (ii) the product of (A) twenty-five percent (25%) and (B) the amount of depreciation recapture income on capital assets to be recognized by the Owners based upon the allocation made pursuant to **Section 6.05.**

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indebtedness**" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money (including all principal, interest, premiums, penalties, fees, expenses, indemnities, and breakage costs), (b) all indebtedness of such Person

evidenced by any note, bond, debenture, or other debt security or secured by any Encumbrance on property owned by such Person, (c) all obligations of such Person for the deferred purchase price of property or services (including any "earn-out" payments) other than those incurred in the ordinary course of business, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (e) all obligations of such Person as lessee under leases that are properly recordable as capital leases under GAAP, (f) any and all amounts drawn on letters of credit or similar facilities issued on behalf of such Person, and (g) all indebtedness of others referred to in clauses (a) through (f) above guaranteed by such Person.

"**Indemnified Party**" has the meaning set forth in **Section 8.05**.

"**Indemnifying Party**" has the meaning set forth in **Section 8.05**.

"**Independent Accountants**" has the meaning set forth in **Section 2.04(c)(iii)**.

"**Insurance Policies**" has the meaning set forth in **Section 3.16**.

"**Intellectual Property**" has the meaning set forth in **Section 3.12(a)**.

"**Intellectual Property Registrations**" has the meaning set forth in **Section 3.12(b)**.

"**Interim Balance Sheet**" has the meaning set forth in **Section 3.06**.

"**Interim Balance Sheet Date**" has the meaning set forth in **Section 3.06**.

"**Interim Financial Statements**" has the meaning set forth in **Section 3.06**.

"**Knowledge of a Seller or a Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of DMobley, YMobley, or of any director, manager or officer of QS HoldCo and/or a Target, after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" has the meaning set forth in **Section 3.07**.

"**Licensed Intellectual Property**" has the meaning set forth in **Section 3.12(a)**.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however,* that "**Losses**" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

7

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of either Target, or (b) the ability of a Seller to consummate the transactions contemplated hereby on a timely basis.

"**Material Contracts**" has the meaning set forth in **Section 3.09(a)**.

"**Material Customers**" has the meaning set forth in **Section 3.15(a)**.

"**Material Suppliers**" has the meaning set forth in **Section 3.15(b)**.

"**Mobley Affiliates**" has the meaning set forth in **Section 5.07(f)**.

"**Mobley Employment Agreement**" means that certain Employment Agreement dated as of the Closing Date between Buyer and DMobley.

"**Multi-Employer Plan**" has the meaning set forth in **Section 3.20(c)**.

"**Owners**" has the meaning set forth in the preamble.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in **Section 3.10(a)**.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Post-Closing Adjustment**" has the meaning set forth in **Section 2.04(b)(iii)**.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

"**Post-Closing Taxes**" means Taxes of the Targets for any Post-Closing Tax Period.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Pre-Closing Taxes**" means Taxes of the Targets for any Pre-Closing Tax Period.

"**Purchase Price**" has the meaning set forth in **Section 2.02**.

"**QLS**" has the meaning set forth in the preamble.

"**QLS LLC Interests**" has the meaning set forth in the recitals.

"**QLS Shares**" has the meaning set forth in the recitals.

"**QRS**" has the meaning set forth in the preamble.

"**QRS LLC Interests**" has the meaning set forth in the recitals.

"**QS HoldCo**" has the meaning set forth in the preamble.

"**QS HoldCo Contribution**" has the meaning set forth in the recitals.

"**Qualified Benefit Plan**" has the meaning set forth in **Section 3.20(c)**.

"**Real Property**" means the real property owned, leased or subleased by either Target, together with all buildings, structures and facilities located thereon.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Released Claims**" has the meaning set forth in **Section 5.13(b)**.

"**Releasee**" and "**Releasees**" have the meaning set forth in **Section 5.13(b)**.

"**Representation Released Claims**" has the meaning set forth in **Section 5.13(a)**.

"**Representative**" means, with respect to any Person, any and all directors, managers officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Resolution Period**" has the meaning set forth in **Section 2.04(c)(ii)**.

"**Restricted Business**" means the past business of the Targets and the actual and anticipated business of the Targets as of the Closing Date, including but not limited to the provision of wellsite support services, wellsite production services and wellsite construction services to the oilfield industry, including, rental equipment, rig housing and accommodations, water and sewer systems, power supply, frac tank services, vacuum truck services, waste management, water hauling, liquids and solids control, completion fluids, gravel trucks, roustabout crews, heavy hauling, transfer equipment, securing rights and permits, clearing and leveling of land, building of roads & pads, and pipeline construction.

"**Restricted Period**" has the meaning set forth in **Section 5.07(a)**.

"**Review Period**" has the meaning set forth in **Section 2.04(c)(I)**.

"**Seller**" has the meanings set forth in the preamble.

"**Seller Basket Exclusions**" has the meaning set forth in **Section 8.04(b)**

"**Seller Indemnitees**" has the meaning set forth in **Section 8.03**.

"**Seller Note**" means that certain Promissory Note in the amount of the Seller Note Amount, with interest being calculated back to the Closing Date, executed and delivered by Buyer to QS HoldCo.

"**Seller Note Amount**" means an amount equal to Twenty Million Dollars and No Cents ($20,000,000), subject to adjustment as provided for herein.

"**Sellers**" has the meaning set forth in the preamble.

"**Sellers' Agent**" has the meaning set forth in the preamble.

"**Shares**" has the meaning set forth in the recitals.

"**Statement of Objections**" has the meaning set forth in **Section 2.04(c)(ii)**.

"**Straddle Period**" has the meaning set forth in **Section 6.04**.

"**Target**" has the meanings set forth in the preamble.

"**Target Intellectual Property**" has the meaning set forth in **Section 3.12(a)**.

"**Target Working Capital**" means an amount equal to Two Million Nine Hundred Thousand and No Cents ($2,900,000).

"**Targets**" has the meaning set forth in the preamble.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Claim**" has the meaning set forth in **Section 6.06**.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Territory**" means North America.

"**Third Party Claim**" has the meaning set forth in **Section 8.05(a)**.

"**Transaction Documents**" means this Agreement, the Amended and Restated Buyer LLC Agreement, the Seller Note, the Mobley Employment Agreement, LLC Interest Assignment Documents, the Real Property Lease and Purchase Option Agreement, and any other document, instrument or agreement delivered in connection with this Agreement.

"**Union**" has the meaning set forth in **Section 3.21(b)**.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"**YMobley**" has the meaning set forth in the preamble.

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01** **Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, for the consideration specified in **Section 2.02**, QS HoldCo shall sell to Buyer, and Buyer shall purchase from QS HoldCo, the QLS LLC Interests and the QRS LLC Interests, free and clear of all Encumbrances.

**Section 2.02** **Purchase Price.** Subject to the terms and conditions set forth in this Agreement, in reliance upon the covenants, agreements, representations and warranties of the Sellers contained herein, and in consideration of the aforesaid sale, assignment, transfer, conveyance and delivery of the QLS LLC Interests and the QRS LLC Interests to Buyer, Buyer shall pay an aggregate amount equal to: (a) the Closing Note Amount (via delivery of the Closing Note), subject to adjustments pursuant to **Section 2.04(b)** hereof; *plus* (b) the Seller Note Amount (via delivery of the Seller Note) (collectively, the "**Purchase Price**"). Additionally, QS HoldCo shall receive the Buyer Minority Interest, which Buyer Minority Interest is to be issued in respect of a contribution of capital of certain assets as set forth in the Amended and Restated Buyer LLC Agreement. The parties agree to allocate the Purchase Price for tax purposes as provided in **Section 6.05**.

**Section 2.03** **Transactions to be Effected at the Closing.**

   (a)    At the Closing, Buyer shall deliver:

      (i)    the Closing Note for the Closing Note Amount, less any payments made directly to Sellers' broker set forth in **Section 3.24**, if applicable, and less any payments made directly to lenders to satisfy any Indebtedness set forth on **Section 3.03(d)** of the Disclosure Schedules and any Encumbrances set forth on **Section 3.10(a)** of the Disclosure Schedules;

      (ii)    the Seller Note for the Seller Note Amount;

      (iii)    the Buyer Minority Interest; and

      (iv)    the Transaction Documents and all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to **Section 7.03** of this Agreement.

   (b)    At the Closing, Sellers' Agent shall deliver to Buyer:

      (i)    All certificates evidencing the QLS Shares, the QLS LLC Interests and the QRS LLC Interests, free and clear of all Encumbrances, duly endorsed in blank or accompanied by stock or interest powers or other instruments of transfer duly executed in blank, with all required stock transfer tax stamps affixed thereto; and

      (ii)    the Transaction Documents and all other agreements, documents, instruments or certificates required to be delivered by Sellers at or prior to the Closing pursuant to **Section 7.02** of this Agreement.

   **Section 2.04    Purchase Price Adjustment.**

   (a)    **Estimated Closing Working Capital.** At Closing, the Sellers have provided to Buyer a statement attached hereto as Schedule B setting forth Sellers' good faith estimate of Closing Working Capital and the parties have agreed, based on such statement to the Estimated Closing Working Capital and the Estimated Excess Working Capital, which amount has been added to the Closing Note. Based on such statement, Sellers shall be entitled to distribute the excess cash to the extent such excess cash exceeds the Estimated Closing Working Capital and provided that,and only to the extent that, such distribution would not cause Current Assets to be less than Current Liabilities.

   (b)    **Post-Closing Adjustment.**

      (i)    Within 90 days after the Closing Date, Buyer shall prepare, in accordance with GAAP (including Current Assets as defined herein), and deliver to Sellers' Agent a statement setting forth its calculation of Closing Working Capital, which statement shall contain a balance sheet of each Target as of the Closing Date (without giving effect to the transactions contemplated herein but taking into account the amount of any cash distributed pursuant to Section 2.04(a)), all components (and the amounts thereof) necessary to compute Closing Working Capital, all other necessary supporting information, and a calculation of Closing Working Capital (the **"Closing Working Capital Statement"**).

(ii)    Within 90 days after the Closing Date, Buyer shall prepare and deliver to Sellers' Agent a statement setting forth its calculation of the Gross-Up Amount, consistent with the Allocation Statement, which statement shall contain supporting information and calculation of the Gross-Up Amount, if any (the "**Closing Gross-Up Statement**").

(iii)    The Post-Closing Adjustment shall be an amount equal to the Closing Working Capital (as adjusted for any cash distributed pursuant to **Section 2.04(a)**) *minus* the Estimated Closing Working Capital *plus* the Gross-Up Amount (the "**Post-Closing Adjustment**"). If the Post-Closing Adjustment is a positive number, Buyer shall pay to Sellers' Agent for the benefit of Sellers an amount equal to the Post-Closing Adjustment. If the Post-Closing Adjustment is a negative number, Sellers, jointly and severally, shall pay to Buyer an amount equal to the Post-Closing Adjustment (reflected as a positive number).

(c)    **Examination and Review.**

(i)    Examination. After receipt of the Closing Working Capital Statement and the Closing Gross-Up Statement, Sellers shall have 30 days (the "**Review Period**") to review each such statement. During the Review Period, Sellers and Sellers' Accountants shall have full access to the books and records of the Sellers, the personnel of, and work papers prepared by, Buyer and/or Buyer's Accountants to the extent that they relate to the Closing Working Capital Statement or the Closing Gross-Up Statement and to such historical financial information (to the extent in Buyer's possession) relating to such statements as a Seller may reasonably request for the purpose of reviewing such statements and to prepare a Statement of Objections (defined below), *provided, that* such access shall be in a manner that does not interfere with the normal business operations of Buyer or the Targets.

(ii)    Objection. On or prior to the last day of the Review Period, Sellers' Agent may object to the Closing Working Capital Statement and/or Closing Gross-Up Statement by delivering to Buyer a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "**Statement of Objections**"). Any objection to the Closing Gross-Up Statement must be entirely consistent with the Allocation Statement. If Sellers' Agent fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital Statement, the Closing Gross-Up Statement, and the Post-Closing Adjustment, as the case may be, shall be deemed to have been accepted by Sellers. If Sellers' Agent delivers the Statement of Objections before the expiration of the Review Period, Buyer and Sellers' Agent shall negotiate in good faith to resolve such objections within 15 days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Closing Working Capital Statement, the Closing Gross-Up Statement, and the Post-Closing Adjustment, as applicable, with such changes as may have been previously agreed in writing by Buyer and Sellers' Agent, shall be final and binding.

(iii)    Resolution of Disputes. If Sellers' Agent and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**") shall be submitted for resolution to the office of Hein & Associates LLP or, if Hein

& Associates LLP is unable to serve, Buyer and Sellers' Agent shall appoint by mutual agreement the office of an impartial nationally or regionally recognized firm of independent certified public accountants (the "**Independent Accountants**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Working Capital Statement and/or the Closing Gross-Up Amount Statement, as applicable. The parties hereto agree that all adjustments shall be made without regard to materiality. The Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Working Capital Statement and the Closing Gross-Up Amount Statement, as applicable and the Statement of Objections.

(iv)     Fees of the Independent Accountants. The Sellers, jointly and severally, on the one hand and the Buyer on the other shall each pay fifty percent (50%) of the fees of the Independent Accountants.

(v)     Determination by Independent Accountants. The Independent Accountants shall make a determination as soon as practicable within 30 days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Working Capital Statement, the Closing Gross-Up Statement, and/or the Post-Closing Adjustment, shall be conclusive and binding upon the parties hereto.

(vi)     Payments of Post-Closing Adjustment. Except as otherwise provided herein, any payment of the Post-Closing Adjustment, together with interest calculated as set forth below, shall (A) be due (x) if all or any portion of the Post-Closing Adjustment is undisputed, within five Business Days of acceptance of the applicable Closing Working Capital Statement and Closing Gross-Up Statement (or any portions thereof, as applicable) or (y) if there are Disputed Amounts, within five Business Days of the resolution described in clause (v) above; and (B) be paid by wire transfer of immediately available funds to such account or accounts (in percentages designated by the designator of the accounts) as is directed by Buyer or Sellers' Agent, as the case may be.

(d)     **Adjustments for Tax Purposes.** Any payments made pursuant to **Section 2.04(b)(iii)** shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

**Section 2.05**     **Closing.** Subject to the terms and conditions of this Agreement, the purchase, sale, and contribution contemplated hereby shall take place at a closing (the "**Closing**") to be held on the date that is thirty (30) days after the date of this Agreement (or, if such date is not a business day, on the next business day), or, if later, the date that is two Business Days after the last of the conditions to Closing set forth in **Article VII** have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), at the offices of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill, & Mullis, P.A., 101 E. Kennedy Blvd, Suite 2700, Tampa, FL 33602, or at such other time or on such other date or at such other place as Sellers and Buyer may mutually agree upon in writing (the day on

14

which the Closing takes place being the **"Closing Date"**); provided, however, Closing shall not take place after December 31, 2012, without the consent of DMobley.

**Section 2.06** **Withholding Tax.** Buyer and the Targets shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer and the Targets may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Sellers hereunder.

**Section 2.07** **The Sellers' Agent.**

(a)     **Appointment.** Each of the Sellers does hereby appoint the Sellers' Agent the attorney-in-fact and agent of such Seller for purposes of execution and delivery of such documents and the taking of such action on behalf of each such Seller as may be necessary to consummate the transactions contemplated by this Agreement. All actions taken by the Sellers' Agent shall be binding upon each of the Sellers and the Buyer may rely thereon. The appointment by the Sellers of the Sellers' Agent as attorney-in-fact and agent of the Sellers is coupled with an interest and is irrevocable and shall not terminate or otherwise be affected by the death, disability, incompetence, bankruptcy, dissolution or insolvency of any Seller.

(b)     **Powers.** The Sellers' Agent shall have full power and authority until all indemnification rights hereunder have been satisfied or otherwise expired to execute, deliver, and receive on the Sellers' behalf all notices, requests, and other communications hereunder; to fix and alter on their behalf the date, time and place of the Closing; to waive, amend or modify any provisions of this Agreement in accordance with **Section 10.09** of the Agreement; to agree to negotiate; enter into settlements and compromises of, and comply with orders of courts with respect to any indemnification claim pursuant to **Article VIII**; to litigate, defend, enforce or take any other actions and execute any other documents that the Sellers' Agent deems advisable in connection with enforcing any rights or obligations or defending any claim or action under this Agreement on behalf of the Sellers and to take such other action on their behalf in connection with this Agreement, the Closing, and the transactions contemplated hereby as such Sellers' Agent deems appropriate.

(c)     **Successor Sellers' Agent.** In the event of (i) the death or permanent disability of the Sellers' Agent, or (ii) his, her or its resignation as the Sellers' Agent, a successor Sellers' Agent shall be elected by those Sellers who held, as of the Closing Date, a majority of the equity in QS HoldCo. Each successor Sellers' Agent shall have all of the power, authority, rights and privileges conferred by this Agreement upon the original Sellers' Agent, and the term **"Sellers' Agent"** as used herein shall be deemed to include any successor Sellers' Agent.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Sellers, jointly and severally, represent and warrant to Buyer that the statements contained in this **Article III** are true and correct as of the date hereof.

**Section 3.01** **Organization and Authority of Sellers.** QS HoldCo is a corporation duly organized, validly existing and in good standing under the Laws of the state of Texas. QS HoldCo has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by QS HoldCo of this Agreement and any other Transaction Document to which QS HoldCo is a party, the performance by QS HoldCo of its obligations hereunder and thereunder and the consummation by QS HoldCo of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of QS HoldCo. This Agreement has been duly executed and delivered by QS HoldCo and the Owners, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of QS HoldCo and of the Owners enforceable against QS HoldCo and the Owners in accordance with its terms. When each other Transaction Document to which QS HoldCo and/or the Owners is or will be a party has been duly executed and delivered by QS HoldCo and the Owners, as applicable (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of QS HoldCo enforceable against it or him, as applicable, in accordance with its terms.

**Section 3.02** **Organization, Authority and Qualification of QLS and QRS.** Prior to the Conversion, QLS was a corporation duly organized, validly existing and in good standing under the Laws of the State of Texas and had full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted. As of the Closing, QLS is a limited liability company organized, validly existing and in good standing under the Laws of the State of Texas and has full entity power and authority to own, operate or lease the properties and assets now owned operated or leased by it and to carry on its business as it has been and is currently conducted; prior to it being converted into a limited liability company, at all times QLS was a corporation duly organized, validly existing and in good standing under the Laws of the State of Texas. QRS is a limited liability company organized, validly existing and in good standing under the Laws of the State of Texas and has full entity power and authority to own, operate or lease the properties and assets now owned operated or leased by it and to carry on its business as it has been and is currently conducted. **Section 3.02** of the Disclosure Schedules sets forth each jurisdiction in which each of QRS and QLS is licensed or qualified to do business, and each of QRS and QLS is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the

16

properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. All corporate and entity actions taken by each of QRS and QLS in connection with this Agreement and the other Transaction Documents will be duly authorized on or prior to the Closing.

### Section 3.03    Capitalization.

(a)    The authorized capital stock of QLS prior to the Conversion consisted of 10,000 shares of common stock, no par value, of which 2,000 shares were issued and outstanding and constitute the QLS Shares. All of the QLS Shares were duly authorized, were validly issued, fully paid and non-assessable, and were owned of record and beneficially by Seller, free and clear of all Encumbrances. Upon the QS HoldCo Contribution and the Conversion, all of the equity interests of QLS LLC will have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by QS HoldCo, free and clear of all Encumbrances. The authorized capital stock of QS HoldCo, as of the date of this Agreement, consists of 2,000 shares of common stock, no par value, of which 2,000 shares are issued and outstanding. All of the issued shares of QS HoldCo have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by the Owners, free and clear of all Encumbrances. All of the equity interests of QRS have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by the Owners, free and clear of all Encumbrances. Upon consummation of the transactions contemplated by this Agreement and the Transaction Documents, including the contribution of the QRS LLC Interests by the Owners to the Buyer, Buyer shall own all equity rights of any kind and nature in QLS LLC and QRS, in each case, free and clear of all Encumbrances.

(b)    All of the QLS Shares and other equity interests in QLS, QRS, and QS HoldCo, and upon the Conversion, the QLS LLC Interests, were issued in compliance with applicable Laws. None of the QLS Shares or other equity interests in QRS, QLS, or QS HoldCo were issued in violation of any agreement, arrangement or commitment to which any Seller Party is a party or is subject to or in violation of any preemptive or similar rights of any Person.

(c)    There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of QLS and/or QS HoldCo or the equity interests in QRS and/or, upon the Conversion, QLS LLC, or obligating any person to issue or sell any shares of capital stock of or any other equity interest in, QRS, QLS, or QS HoldCo. None of QRS, QLS, QS HoldCo, or, upon the Conversion, QLS LLC, has outstanding or authorized any equity appreciation, phantom equity, profit participation or similar rights. There are no voting trusts, stockholder or equityholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the QLS Shares or any other equity in QRS, QLS, QS HoldCo, or, upon the Conversion, QLS LLC.

(d)    **Section 3.03(d)** of the Disclosure Schedules sets forth all Indebtedness of each of the Targets as of the date of this Agreement and the Closing Date, including the name of each

lender, the aggregate amount owed to each such lender, the name of each Target to which such Indebtedness relates, and the title and brief description of any Contracts to which such Indebtedness relates.

Section 3.04    No Subsidiaries. None of QRS or QLS owns, or has any interest in any shares or has an ownership interest in any other Person.

Section 3.05    No Conflicts; Consents. The execution, delivery and performance by each Seller Party of this Agreement and the other Transaction Documents to which each is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws, certificate of formation, operating agreement, limited liability company agreement, or other organizational documents of any Seller Party; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to any Seller Party; (c) except as set forth in **Section 3.05** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which any Seller Party is a party or by which any Seller Party is bound or to which any of their respective properties and assets are subject (including any Material Contract) or any Permit affecting the properties, assets or business of either Target; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any properties or assets of either Target. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any Seller Party in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required under the HSR Act.

Section 3.06    Financial Statements. Complete copies of each Target's audited financial statements consisting of the balance sheet of the such Target as at December 31st in each of the years 2009, 2010 and 2011 and the related statements of income and retained earnings, equityholders' equity and cash flow for the years then ended (the "**Audited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of each of the Targets as at August 31, 2012 and the related statements of income and retained earnings, equityholders' equity and cash flow for the nine- month period then ended (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**") are included in the Disclosure Schedules. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements).

18

The Financial Statements are based on the books and records of each of the Targets, and fairly present the financial condition of each of the Targets as of the respective dates they were prepared and the results of the operations of each of the Targets for the periods indicated. The balance sheets of each of the Targets as of December 31, 2011 is referred to collectively herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of each of the Targets as of August 31, 2012 is referred to herein are referred to collectively as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**". Each of the Targets maintains a standard system of accounting established and administered in accordance with GAAP.

Section 3.07     **Undisclosed Liabilities.** Each of the Targets has no liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise ("**Liabilities**"), except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which do not exceed $10,000 individually or $50,000 in the aggregate.

Section 3.08     **Absence of Certain Changes, Events and Conditions.** Since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to either Target, any:

(a)     event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     with the exception of the QS HoldCo Contribution and the Conversion, amendment of the charter, by-laws, certificate of formation, operating agreement, limited liability company agreement or other organizational documents of either Target;

(c)     with the exception of the QS HoldCo Contribution and the Conversion, split, combination or reclassification of any shares of its capital stock or other equity interests;

(d)     issuance, sale or other disposition of any of its capital stock or other equity interests, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its capital stock or other equity interests;

(e)     declaration or payment of any dividends or distributions on or in respect of any of its capital stock or other equity interests or redemption, purchase or acquisition of its capital stock or other equity interests;

(f)     material change in any method of accounting or accounting practice of either Target, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(g)     material change in either Target's cash management practices and its policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control,

prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(h)     entry into any Contract that would constitute a Material Contract;

(i)     incurrence, assumption or guarantee of any indebtedness for borrowed money except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

(j)     transfer, assignment, sale or other disposition of any of the assets shown or reflected in the Balance Sheet or cancellation of any debts or entitlements;

(k)     transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Intellectual Property;

(l)     material damage, destruction or loss (whether or not covered by insurance) to either Target's property;

(m)     any capital investment in, or any loan to, any other Person;

(n)     acceleration, termination, material modification to or cancellation of any material Contract (including, but not limited to, any Material Contract) to which either Target is a party or by which it is bound;

(o)     any material capital expenditures;

(p)     imposition of any Encumbrance upon either Target's properties, capital stock, equity or assets, tangible or intangible;

(q)     (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of either Target's employees, officers, directors, managers independent contractors or consultants, other than as provided for in any written agreements or required by applicable Law, (ii) change in any other terms of employment for any employee, (iii) any termination of any employees for which the aggregate costs and expenses exceed $50,000, or (iv) action to accelerate the vesting or payment of any compensation or benefit for any employee, officer, director, manager, independent contractor or consultant;

(r)     adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, manager, independent contractor or consultant, (ii) Benefit Plan or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(s)     any loan to (or forgiveness of any loan to), or entry into any other transaction with, any of its stockholders, directors, managers, officers and employees;

(t)     entry into a new line of business or abandonment or discontinuance of existing lines of business;

(u)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state

bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(v)     purchase, lease or other acquisition of the right to own, use or lease any property or assets for an amount in excess of $10,000, individually (in the case of a lease, per annum) or $50,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of inventory or supplies in the ordinary course of business consistent with past practice;

(w)     acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or stock of, or by any other manner, any business or any Person or any division thereof;

(x)     action by either Target to make, change or rescind any Tax election, amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer in respect of any Post-Closing Tax Period; or

(y)     any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

### Section 3.09     Material Contracts.

(a)     **Section 3.09(a)** of the Disclosure Schedules lists each of the following Contracts of each Target (such Contracts, together with all Contracts concerning the occupancy, management or operation of any Real Property (including without limitation, brokerage contracts) listed or otherwise disclosed in **Section 3.10(b)** of the Disclosure Schedules and all Contracts relating to Intellectual Property set forth in **Section 3.12(d)** and **Section 3.12(f)** of the Disclosure Schedules, being **"Material Contracts"**):

(i)     each Contract of either Target involving aggregate consideration in excess of $50,000 and which, in each case, cannot be cancelled by the such Target without penalty or without more than 90 days' notice;

(ii)     all Contracts that require a Target to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

(iii)     all Contracts that provide for the indemnification by a Target of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(iv)     all Contracts that relate to the acquisition or disposition of any business, a material amount of equity or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(v)     all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which a Target is a party;

(vi) all employment agreements and Contracts with independent contractors or consultants (or similar arrangements) to which a Target is a party and which are not cancellable without material penalty or without more than 90 days' notice;

(vii) except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees) of a Target;

(viii) all Contracts with any Governmental Authority to which a Target is a party;

(ix) all Contracts that limit or purport to limit the ability of a Target to compete in any line of business or with any Person or in any geographic area or during any period of time;

(x) any Contracts to which a Target is a party that provide for any joint venture, partnership or similar arrangement by the such Target;

(xi) all Contracts between or among a Target on the one hand and a Sellers or any Affiliate of a Seller (other than a Target) on the other hand;

(xii) all collective bargaining agreements or Contracts with any Union to which a Target is a party; and

(xiii) any other Contract that is material to a Target and not previously disclosed pursuant to this **Section 3.09.**

(b) Each Material Contract is valid and binding on one or both Targets in accordance with its terms and is in full force and effect. None of the Targets or, to Sellers' Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer.

**Section 3.10    Title to Assets; Real Property.**

(a) The applicable Target has good and valid (and, in the case of owned Real Property, good and marketable fee simple) title to, or a valid leasehold interest in, all Real Property, the Contribution Assets, and personal property and other assets reflected in the Audited Financial Statements or acquired after the Balance Sheet Date, other than properties and assets sold or otherwise disposed of in the ordinary course of business consistent with past practice since the Balance Sheet Date. **Section 3.10(a)** of the Disclosure Schedules sets for a true, accurate and complete list of all vehicles, equipment, rig houses and other tangible assets owned by the Targets and/or used in the business of the Targets. All such properties and assets (including leasehold interests) are free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(i)     those items set forth in **Section 3.09(a)(i)** of the Disclosure Schedules;

(ii)     liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures and for which there are adequate accruals or reserves on the Balance Sheet;

(iii)     mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the business of either Target;

(iv)     easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the business of either Target; or

(v)     other than with respect to owned Real Property, liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business consistent with past practice which are not, individually or in the aggregate, material to the business of either Target.

(b)     **Section 3.10(b)** of the Disclosure Schedules lists (i) the street address of each parcel of Real Property; (ii) if such property is leased or subleased by a Target, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease for each leased or subleased property; and (iii) the current use of such property. With respect to owned Real Property, Sellers have delivered or made available to Buyer true, complete and correct copies of the deeds and other instruments (as recorded) by which the applicable Target acquired such Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Sellers or the Targets and relating to the Real Property. With respect to leased Real Property, Sellers have delivered or made available to Buyer true, complete and correct copies of any leases affecting the Real Property. Each Seller is not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any leased Real Property. The use and operation of the Real Property in the conduct of each Target's business do not violate in any material respect any Law, covenant, condition, restriction, easement, license, permit or agreement. No material improvements constituting a part of the Real Property encroach on real property owned or leased by a Person other than a Target. There are no Actions pending nor, to the Sellers' Knowledge, threatened against or affecting the Real Property or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain proceedings.

**Section 3.11     Condition And Sufficiency of Assets.** Except as set forth in Section 3.11 of the Disclosure Schedules, the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of each Target and the Contribution Assets are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property

is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by each Target, together with all other properties and assets of each Target and the Contribution Assets, are sufficient for the continued conduct of the Targets' business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of the Targets as currently conducted.

      **Section 3.12    Intellectual Property.**

     (a)    "**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world, including such property that is owned by either of the Targets ("**Target Intellectual Property**") and that in which either Target holds exclusive or non-exclusive rights or interests granted by license from other Persons, including the Sellers ("**Licensed Intellectual Property**"):

        (i)    trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered or unregistered, and all registrations and applications for registration of such trademarks, including intent-to-use applications, all issuances, extensions and renewals of such registrations and applications and the goodwill connected with the use of and symbolized by any of the foregoing;

        (ii)    internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority;

        (iii)    original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered or unregistered), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications;

        (iv)    confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; and

        (v)    patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications.

     (b)    **Section 3.12(b)** of the Disclosure Schedules lists all Target Intellectual Property that is either (i) subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction (collectively, "**Intellectual Property Registrations**"), including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing; or (ii) used in or necessary for either Target's current or planned business or operations. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and

paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing. Each Target has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all Intellectual Property Registrations.

(c)     Except as set forth in **Section 3.12(c)** of the Disclosure Schedules, the Targets own, exclusively or jointly with other Persons, all right, title and interest in and to the Target Intellectual Property, free and clear of Encumbrances. Without limiting the generality of the foregoing, the Targets have entered into binding, written agreements with every current and former employee of each Target, and with every current and former independent contractor, whereby such employees and independent contractors (i) assign to a Target any ownership interest and right they may have in the Target Intellectual Property; and (ii) acknowledge the Targets' exclusive ownership of all Target Intellectual Property. The Targets' have provided Buyer with true and complete copies of all such agreements. Each Target is in full compliance with all legal requirements applicable to the Target Intellectual Property and the Targets' ownership and use thereof.

(d)     **Section 3.12(d)** of the Disclosure Schedules lists all licenses, sublicenses and other agreements whereby a Target is granted rights, interests and authority, whether on an exclusive or non-exclusive basis, with respect to any Licensed Intellectual Property that is used in or necessary for the Targets' current or planned business or operations. The Targets have provided Buyer with true and complete copies of all such agreements. All such agreements are valid, binding and enforceable between the applicable Target and the other parties thereto, and the applicable Target and such other parties are in full compliance with the terms and conditions of such agreements.

(e)     The Target Intellectual Property and Licensed Intellectual Property as currently or formerly owned, licensed or used by a Target or proposed to be used, and the Target's conduct of its business as currently and formerly conducted and proposed to be conducted have not, do not and will not infringe, violate or misappropriate the Intellectual Property of any Person. No Seller Party has received any communication, and no Action has been instituted, settled or, to either Seller's Knowledge, threatened that alleges any such infringement, violation or misappropriation, and none of the Target Intellectual Property are subject to any outstanding Governmental Order.

(f)     **Section 3.12(f)** of the Disclosure Schedules lists all licenses, sublicenses and other agreements pursuant to which a Target grants rights or authority to any Person with respect to any Target Intellectual Property or Licensed Intellectual Property. Sellers have provided Buyer with true and complete copies of all such agreements. All such agreements are valid, binding and enforceable between the applicable Target and the other parties thereto, and the applicable Target and such other parties are in full compliance with the terms and conditions of such agreements. No Person has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Target Intellectual Property.

**Section 3.13** **Inventory.** All inventory of each Target, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of

business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. All such inventory is owned by the applicable Target free and clear of all Encumbrances, and no inventory is held on a consignment basis. The quantities of each item of inventory (whether raw materials, work-in-process or finished goods) are not excessive, but are reasonable in the present circumstances of each of the Targets.

Section 3.14 . **Accounts Receivable.** The accounts receivable reflected on the Interim Balance Sheet and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by the Targets involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of the Targets not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) subject to a reserve for bad debts shown on the Interim Balance Sheet or, with respect to accounts receivable arising after the Interim Balance Sheet Date, on the accounting records of each of the Targets, are collectible in full within 60 days after billing. The reserve for bad debts shown on the Interim Balance Sheet or, with respect to accounts receivable arising after the Interim Balance Sheet Date, on the accounting records of the each of the Targets have been determined in accordance with GAAP, consistently applied, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes.

Section 3.15 . **Customers and Suppliers.**

(a) **Section 3.15(a)** of the Disclosure Schedules sets forth (i) each customer who has paid aggregate consideration to any Target for goods or services rendered in an amount greater than or equal to $25,000 for each of the two most recent fiscal years (collectively, the "**Material Customers**"); and (ii) the amount of consideration paid by each Material Customer during such periods. Except as set forth in **Section 3.15(a)** of the Disclosure Schedules, no Seller Party has received any notice, or has any reason to believe, that any of either Target's Material Customers has ceased, or intends to cease after the Closing, to use its goods or services or to otherwise terminate or materially reduce its relationship with the Targets. To the Knowledge of DMobley or YMobley, no Affiliate of DMobley or YMobley and no blood relative or relative by marriage of DMobley or YMobley exercises any power or control over the decision-making of any Material Customer with respect to such Material Customer's past decisions to do business with any Target.

(b) **Section 3.15(b)** of the Disclosure Schedules sets forth (i) each supplier to whom any Target has paid consideration for goods or services rendered in an amount greater than or equal to $25,000 for each of the two most recent fiscal years (collectively, the "**Material Suppliers**"); and (ii) the amount of purchases from each Material Supplier during such periods. Except as set forth in **Section 3.15(b)** of the Disclosure Schedules, no Seller Party has received any notice, or has any reason to believe, that any of its Material Suppliers has ceased, or intends

to cease, to supply goods or services to the Targets or to otherwise terminate or materially reduce its relationship with the Targets. To the Knowledge of DMobley or YMobley, no Affiliate of DMobley or YMobley and no blood relative or relative by marriage of DMobley or YMobley exercises any power or control over the decision-making of any Material Supplier with respect to such Material Supplier's past decisions to do business with any Target.

**Section 3.16** **Insurance.** Section 3.16 of the Disclosure Schedules sets forth a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors', managers' and officers' liability, fiduciary liability and other casualty and property insurance maintained by Sellers or their Affiliates (including the Targets) and relating to the assets, business, operations, employees, officers, managers and directors of each Target (collectively, the **"Insurance Policies"**) and true and complete copies of such Insurance Policies have been made available to Buyer. Such Insurance Policies are in full force and effect and shall remain in full force and effect following the consummation of the transactions contemplated by this Agreement. Neither the Sellers nor any of their Affiliates (including the Targets) has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each Insurance Policy. The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based liability on the part of the either Target. All such Insurance Policies (a) are valid and binding in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. Except as set forth on **Section 3.16** of the Disclosure Schedules, there are no claims related to the business of either of the Targets pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. None of Sellers or any of their Affiliates (including the Targets) is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the businesses of the Target and are sufficient for compliance with all applicable Laws and Contracts to which a Target is a party or by which it is bound.

**Section 3.17** **Legal Proceedings; Governmental Orders.**

(a) Except as set forth in **Section 3.17(a)** of the Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened (a) against or by any Seller or either Target affecting any of the Sellers' or Targets' respective properties or assets (or by or against any Affiliate of either Target or any Seller relating to a Target); or (b) against or by a Target, Seller or any Affiliate of a Seller that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)      Except as set forth in **Section 3.17(b)** of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting either Target or any of the Targets' properties or assets. The Targets are in compliance with the terms of each Governmental Order set forth in **Section 3.17(b)** of the Disclosure Schedules. No event has occurred or circumstances exist that may constitute or result in (with or without notice or lapse of time) a violation of any such Governmental Order.

**Section 3.18      Compliance With Laws; Permits.**

(a)      Except as set forth in **Section 3.18(a)** of the Disclosure Schedules, each Seller and each Target has complied, and is now complying, with all Laws applicable to it or its business, properties or assets.

(b)  .   All Permits required for each Target to conduct its business have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 3.18(b)** of the Disclosure Schedules lists all current Permits issued to a Target, including the names of the Permits and their respective dates of issuance and expiration. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in **Section 3.18(b)** of the Disclosure Schedules.

**Section 3.19      Environmental Matters.**

(a)      Each Target is currently and has been in compliance with all Environmental Laws and has not, and each Seller has not, received from any Person any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)      Each Target has obtained and is in material compliance with all Environmental Permits (each of which is disclosed in **Section 3.19(b)** of the Disclosure Schedules) necessary for the ownership, lease, operation or use of the business or assets of such Target and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Sellers through the Closing Date in accordance with Environmental Law, and no Seller Party is aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the ownership, lease, operation or use of the business or assets of the Targets as currently carried out. With respect to any such Environmental Permits, Sellers have undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of the same, and no Seller Party is aware of any condition, event or circumstance that might prevent or impede the transferability of the same, nor have they received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same.

28

(c)     No real property currently or formerly owned, operated or leased by a Target is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)     There has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the business or assets of a Target or any real property currently or formerly owned, operated or leased by a Target, and no Seller Party has received an Environmental Notice that any real property currently or formerly owned, operated or leased in connection with the business of either Target (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, any Seller Party.

(e)     Section 3.19(e) of the Disclosure Schedules contains a complete and accurate list of all active or abandoned aboveground or underground storage tanks owned or operated by each Target.

(f)     Section 3.19(f) of the Disclosure Schedules contains a complete and accurate list of all off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by each Seller Party and any predecessors as to which any Seller Party may retain liability, and none of these facilities or locations has been placed or proposed for placement on the National Priorities List (or CERCLIS) under CERCLA, or any similar state list, and no Seller Party has received any Environmental Notice regarding potential liabilities with respect to such off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by any Seller Party.

(g)     No Seller Party has retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

(h)     The Sellers have provided or otherwise made available to Buyer and listed in Section 3.19(h) of the Disclosure Schedules: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models and other similar documents with respect to the business or assets of each Target or any currently or formerly owned, operated or leased real property which are in the possession or control of any of the Seller Parties related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current or future Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

(i)     No Seller Party is aware of or reasonably anticipates, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated

29

with the ownership, lease, operation, performance or use of the business or assets of each Target as currently carried out.

(j)     The Sellers own and control all Environmental Attributes (a complete and accurate list of which is set forth in **Section 3.19(j)** of the Disclosure Schedules) and have not entered into any contract or pledge to transfer, lease, license, guarantee, sell, mortgage, pledge or otherwise dispose of or encumber any Environmental Attributes as of the date hereof. No Seller Party is aware of any condition, event or circumstance that might prevent, impede or materially increase the costs associated with the transfer (if required) to Buyer of any Environmental Attributes after the Closing Date.

### Section 3.20     Employee Benefit Matters.

(a)     **Section 3.20(a)** of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, profit-sharing, deferred compensation, incentive, performance award, phantom equity, equity or equity-based, change in control, retention, severance, vacation, paid time off, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by either Target for the benefit of any current or former employee, officer, director, manager, retiree, independent contractor or consultant of either Target or any spouse or dependent of such individual, or under which either Target has or may have any Liability, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise (as listed on **Section 3.20(a)** of the Disclosure Schedules, each, a **"Benefit Plan"**).

(b)     With respect to each Benefit Plan, Sellers have made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, employee handbooks and any other written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the most recently filed Form 5500, with schedules attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the two most recently completed plan years; and (viii) copies of material notices, letters or other correspondence from

30

the Internal Revenue Service, Department of Labor or Pension Benefit Guaranty Corporation relating to the Benefit Plan.

(c)     Except as set forth in **Section 3.20(c)** of the Disclosure Schedules, each Benefit Plan (other than any multi-employer plan within the meaning of Section 3(37) of ERISA (each a **"Multi-employer Plan")**) has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a **"Qualified Benefit Plan"**) is so qualified and has received a favorable and current determination letter from the Internal Revenue Service, or with respect to a prototype plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and nothing has occurred that could reasonably be expected to cause the revocation of such determination letter from the Internal Revenue Service or the unavailability of reliance on such opinion letter from the Internal Revenue Service, as applicable, nor has such revocation or unavailability been threatened. Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject either Target or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code. Except as set forth in **Section 3.20(c)** of the Disclosure Schedules, all benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with, GAAP.

(d)     Neither the Targets nor any of their ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA or related provisions of the Code or foreign Law relating to employee benefit plans; (ii) failed to timely pay premiums to the Pension Benefit Guaranty Corporation; (iii) withdrawn from any Benefit Plan; or (iv) engaged in any transaction which would give rise to liability under Section 4069 or Section 4212(c) of ERISA.

(e)     With respect to each Benefit Plan (i) except as set forth in **Section 3.20(e)** of the Disclosure Schedules, no such plan is a Multi-employer Plan, and all contributions required to be paid by a Target or its respective ERISA Affiliates have been timely paid to the applicable Multi-employer Plan; (ii) no such plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (iii) no Action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan; (iv) except as set forth in **Section 3.20(e)** of the Disclosure Schedules, no such plan is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code, and no plan listed in **Section 3.20(e)** of the Disclosure Schedules has failed to satisfy the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; and (v) no "reportable event," as defined in Section 4043 of ERISA, has occurred with respect to any such plan.

(f)      Except as set forth in **Section 3.20(f)** of the Disclosure Schedules and required by applicable Law, no provision of any Benefit Plan or collective bargaining agreement could reasonably be expected to result in any limitation on Buyer or any of its Affiliates from amending or terminating any Benefit Plan. The Targets have no commitment or obligation and have not made any representations to any employee, officer, director, manager, independent contractor or consultant, whether or not legally binding, to adopt, amend or modify any Benefit Plan or any collective bargaining agreement, in connection with the consummation of the transactions contemplated by this Agreement or otherwise.

(g)      Except as set forth in **Section 3.20(g)** of the Disclosure Schedules and other than as required under Section 601 et. seq. of ERISA or other applicable Law, no Benefit Plan provides post-termination or retiree welfare benefits to any individual for any reason, and neither the Targets nor any of their ERISA Affiliates have any Liability to provide post-termination or retiree welfare benefits to any individual or ever represented, promised or contracted to any individual that such individual would be provided with post-termination or retiree welfare benefits.

(h)      Except as set forth in **Section 3.20(h)** of the Disclosure Schedules, there is no pending or, to the Knowledge of either Seller, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the three years prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(i)      There has been no amendment to, announcement by either Seller, either Target or any of their Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year with respect to any director, manager, officer, employee, independent contractor or consultant, as applicable. None of the Seller Parties nor any of their Affiliates has any commitment or obligation or has made any representations to any director, manager, officer, employee, independent contractor or consultant, whether or not legally binding, to adopt, amend or modify any Benefit Plan or any collective bargaining agreement.

(j)      Each Benefit Plan that is subject to Section 409A of the Code has been operated in compliance with such section and all applicable regulatory guidance (including notices, rulings and proposed and final regulations).

(k)      Each individual who is classified by either Target as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Benefit Plan.

(l)      Except as set forth in **Section 3.20(l)** of the Disclosure Schedules, neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, manager, officer, employee, independent contractor or consultant of

either Target to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation due to any such individual; (iii) limit or restrict the right of either Target to merge, amend or terminate any Benefit Plan; (iv) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; or (v) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

**Section 3.21    Employment Matters.**

(a)    **Section 3.21(a)** of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Targets (differentiated by Target) as of the date hereof, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. Except as set forth in **Section 3.21(a)** of the Disclosure Schedules, as of the date hereof, all compensation, including wages, commissions and bonuses, payable to employees, independent contractors or consultants of the Targets for services performed on or prior to the date hereof have been paid in full (or accrued in full on the audited balance sheet contained in the Closing Working Capital Statement) and there are no outstanding agreements, understandings or commitments of either Target with respect to any compensation, commissions or bonuses.

(b)    Except as set forth in **Section 3.21(b)** of the Disclosure Schedules, each Target is not, and has not been for the past five (5) years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not been for the past five (5) years, any Union representing or purporting to represent any employee of either Target, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. Except as set forth in **Section 3.21(b)** of the Disclosure Schedules, there has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting either Target or any of its employees. Neither Target has any duty to bargain with any Union.

(c)    Each Seller is and has been in compliance with the terms of the collective bargaining agreements and other Contracts listed on **Section 3.21(b)** of the Disclosure Schedules and all applicable Laws pertaining to employment and employment practices, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. All individuals characterized and treated by either Target as independent contractors or consultants are properly treated as independent contractors under all applicable Laws. All employees classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. Except as set forth in **Section 3.21(c)**, there are no Actions against a Target pending,

or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of a Target, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wage and hours or any other employment related matter arising under applicable Laws.

(d)     Each Target has complied with the WARN Act and it has no plans to undertake any action in the future that would trigger the WARN Act.

**Section 3.22**     **Taxes.** Except as set forth in **Section 3.22** of the Disclosure Schedules:

(a)     All Tax Returns required to be filed on or before the Closing Date by each Target have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by each of the Targets (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)     At all times in existence prior to the date of this Agreement and on the date of this Agreement, QLS has been and is taxed as an "S Corporation" under Code Section 1361 for U.S. federal income tax purposes, with QLS having a valid election in place to be taxed as such. As of the Closing, each Target is a disregarded entity for U.S. federal income tax purposes and for purposes of the income tax laws of each state and local tax jurisdiction in which each Target has done business subjecting it to state and/or local income taxation in the twelve months preceding this Agreement.

(c)     Each Target has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(d)     No claim has been made by any taxing authority in any jurisdiction where either Target does not file Tax Returns that the non-filing Target is, or may be, subject to Tax by that jurisdiction.

(e)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Targets.

(f)     The amount of the each Target's Liability for unpaid Taxes for all periods ending on or before September 30, 2012 does not, in the aggregate, exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) reflected on the Financial Statements for the applicable Target. The amount of the each Target's Liability for unpaid Taxes for all periods following the end of the recent period covered by the Financial Statements shall not, in the aggregate, exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) as adjusted for the passage of time in accordance with the past custom and practice of the Targets (and which accruals shall not exceed comparable amounts incurred in similar periods in prior years).

(g) **Section 3.22(g)** of the Disclosure Schedules sets forth:

(i) the taxable years of each Target as to which the applicable statutes of limitations on the assessment and collection of Taxes have not expired;

(ii) those years for which examinations by the taxing authorities have been completed; and

(iii) those taxable years for which examinations by taxing authorities are presently being conducted.

(h) All deficiencies asserted, or assessments made, against a Target as a result of any examinations by any taxing authority have been fully paid.

(i) Neither Target is a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

(j) Sellers have delivered to Buyer copies of all federal, state, local and foreign income, franchise and similar Tax Returns, examination reports, and statements of deficiencies assessed against, or agreed to by, each Target for all Tax periods ending after January 1, 2007.

(k) There are no Encumbrances for Taxes (other than for current Taxes not yet due and payable) upon the assets of either Target.

(l) Neither Target is a party to, or bound by, any Tax indemnity, Tax-sharing or Tax allocation agreement.

(m) Neither Target is a party to, or bound by, any closing agreement or offer in compromise with any taxing authority.

(n) No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any taxing authority with respect to a Target.

(o) Neither Target has been a member of an affiliated, combined, consolidated or unitary Tax group for Tax purposes. Neither Target has Liability for Taxes of any Person (other than itself) under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local or foreign Law), as transferee or successor, by contract or otherwise.

(p) Neither Target has agreed to make, nor is it required to make, any adjustment under Sections 481(a) or 263A of the Code or any comparable provision of state, local or foreign Tax Laws by reason of a change in accounting method or otherwise. Neither Target has taken any action that could defer a Liability for Taxes of a Target from any Pre-Closing Tax Period to any Post-Closing Tax Period.

(q) Neither Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2. Neither Target is, nor has either been, a United States real property holding corporation (as defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(a) of the Code.

35

(r)     Neither Target has been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code.

(s)     Neither Target has  been a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011 4(b).

(t)     **Section 3.22(t)** of the Disclosure Schedules sets forth all foreign jurisdictions in which each Target is subject to Tax, is engaged in business or has a permanent establishment. Neither Target has entered into a gain recognition agreement pursuant to Treasury Regulations Section 1.367(a)-8. Neither Target has transferred an intangible the transfer of which would be subject to the rules of Section 367(d) of the Code.

(u)     None of the assets of either Target is property that a target is required to treat as being owned by any other person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954, as amended.

**Section 3.23    Books and Records.** The minute books and stock record books of the Targets, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices. The minute books of the respective Targets contain accurate and complete records of all meetings, and actions taken by written consent of, the stockholders, the board of directors, any committees of the board of directors of the respective Targets, and managers, and no meeting, or action taken by written consent, of any such stockholders, board of directors, committee, or managers has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of the respective Targets.

**Section 3.24    Brokers.** Except for Associate Equity Group, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Sellers.

**Section 3.25    Full Disclosure.** No representation or warranty by Sellers in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to each Seller that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01     Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware. Buyer has full power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the other parties hereto) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 4.02     No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) except as set forth in **Section 4.02** of the Disclosure Schedules, require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required under the HSR Act.

**Section 4.03     Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

## ARTICLE V
### COVENANTS

**Section 5.01     Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall, and shall cause each Target to, (x) conduct the business of the Targets in the ordinary course of business consistent with past practice; and (y) use their best efforts to maintain and preserve intact the current organization (except for the Conversion), business and franchise of the Targets and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having business relationships with the Targets. Without limiting the foregoing, from the date hereof until the Closing Date, Sellers shall:

(a)     cause each Target to preserve and maintain all of its Permits;

(b)     cause each Target to pay its debts, Taxes and other obligations when due;

(c)     cause each Target to maintain the properties and assets owned, operated or used by each Target in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(d)     cause each Target to continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

(e)     cause each Target to defend and protect its properties and assets from infringement or usurpation;

(f)     cause each Target to perform all of its obligations under all Contracts relating to or affecting its properties, assets or business;

(g)     cause each Target to maintain its books and records in accordance with past practice;

(h)     cause each Target to comply in all material respects with all applicable Laws; and

(i)     cause each Target not to take or permit any action that would cause any of the changes, events or conditions described in **Section 3.08** to occur.

Notwithstanding the foregoing, the assets set forth on **Section 5.01(a)** of the Disclosure Schedule shall be distributed to the Seller equityholder of the applicable Target owning the assets prior to the Closing, and all liabilities associated with those assets will be assumed by the applicable Seller prior to the Closing. Notwithstanding anything herein to the contrary, the assets set forth on **Section 5.01(b)** of the Disclosure Schedules (the "**Contribution Assets**") shall be distributed to QS HoldCo prior to the Closing. QS HoldCo shall, and the Sellers shall cause QS HoldCo to, contribute the Contribution Assets, free and clear of all Encumbrances, as a contribution of capital to Buyer, in exchange for the interest in Buyer granted to QS HoldCo at Closing and a Capital Account in Buyer, upon or, if requested by Buyer, simultaneously with, the contribution of all capital contributions required of Rocaceia, LLC to Buyer. It is agreed that the fair market value of such Contribution Assets is $2,000,000 and shall be $2,000,000 for purposes of

contribution to Buyer and the limited liability company agreement of Buyer. Sellers shall execute and deliver such documents as the Buyer may request, including bills of sale providing for representations and warranties and agreements consistent with the terms and conditions of this Agreement.

Section 5.02     Access to Information. From the date hereof until the Closing, Sellers shall, and shall cause each Target to, (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, Contracts and other documents and data related to the Target; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Target as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers and the Target to cooperate with Buyer in its investigation of the Target. Without limiting the foregoing, Sellers shall permit Buyer and its Representatives to conduct environmental due diligence of the Targets and the Real Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Targets and the Real Property. Any investigation pursuant to this Section 5.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Sellers or the Targets. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement.

Section 5.03     No Solicitation of Other Bids.

(a)     Sellers shall not, and shall not authorize or permit any of their Affiliates (including the Targets) or any of its or their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Sellers shall immediately cease and cause to be terminated, and shall cause its Affiliates (including the Targets) and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "Acquisition Proposal" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning (i) a merger, consolidation, liquidation, recapitalization, share exchange or other business combination transaction involving either Target; (ii) the issuance or acquisition of equity securities of either Target; or (iii) the sale, lease, exchange or other disposition of any significant portion of the Targets' properties or assets.

(b)     In addition to the other obligations under this Section 5.03, Sellers shall promptly (and in any event within three Business Days after receipt thereof by a Seller or its Representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which

could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)     Sellers agree that the rights and remedies for noncompliance with this **Section 5.03** shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 5.04     Notice of Certain Events.**

(a)     From the date hereof until the Closing, Sellers shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by either Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 7.02** to be satisfied;

(ii) -     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)     any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)     any Actions commenced or, to either Seller's Knowledge, threatened against, relating to or involving or otherwise affecting a Seller or a Target that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 3.17** or that relates to the consummation of the transactions contemplated by this Agreement.

(b)     Buyer's receipt of information pursuant to this **Section 5.04** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement (including **Section 8.02** and **Section 9.01(b)**) and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 5.05     Resignations.** Sellers shall deliver to Buyer written resignations, effective as of the Closing Date, of the officers, managers and directors of each Target set forth on **Section 5.05** of the Disclosure Schedules/requested by Buyer at least five Business Days prior to the Closing.

**Section 5.06     Confidentiality.** From and after the Closing, Sellers shall, and shall cause their Affiliates to, hold, and shall use its reasonable best efforts to cause its or their

respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Targets, except to the extent that a Seller can show that such information (a) is generally available to and known by the public through no fault of either Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by a Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If either Seller or any of their Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which the Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* the Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.07    Non-competition; Non-solicitation**

(a)    For a period of five (5) years commencing on the Closing Date (the "**Restricted Period**"), Sellers shall not, and shall not permit any of their Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between each Target and customers or suppliers of the Target. Notwithstanding the foregoing, Sellers may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Sellers are not a controlling Person of, or a member of a group which controls, such Person and do not, directly or indirectly, own 1% or more of any class of securities of such Person.

(b)    During the Restricted Period, Sellers shall not, and shall not permit any of their Affiliates to, directly or indirectly, hire or solicit any employee of either Target or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this **Section 5.07(b)** shall prevent Sellers or any of their Affiliates from hiring (i) any employee whose employment has been terminated by a Target or Buyer or (ii) after 365 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)    During the Restricted Period, Sellers shall not, and shall not permit any of their Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients or customers of either Target or potential clients or customers of either Target for purposes of diverting their business or services from the Target.

(d)    Sellers acknowledge that a breach or threatened breach of this **Section 5.07** would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate

remedy, and hereby agrees that in the event of a breach or a threatened breach by Sellers of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(e)   Sellers acknowledge that the restrictions contained in this **Section 5.07** are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 5.07** should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in this **Section 5.07** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(f)   Notwithstanding any provisions in this **Section 5.07** to the contrary, the conduct of the business of QCE Supply, Inc., Texas Quality Gate Guards, LLC and Texas Quality Mats, LLC (collectively, the **"Mobley Affiliates"**) shall not be considered to be a violation of this Section to the extent the business of the Mobley Affiliates is conducted in the same manner and to the same extent as the business of the Mobley Affiliates was conducted as of the Closing Date. Further, Buyer acknowledges that DMobley's sons are not subject to any contractual restrictive covenant with any of the Buyer or the Targets.

### Section 5.08   Governmental Approvals and Consents

(a)   Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions (including those under the HSR Act) required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)   The Sellers and Buyer shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 3.05** and **Section 4.02** of the Disclosure Schedules.

(c)    Without limiting the generality of the parties' undertakings pursuant to subsections (a) and (b) above, each of the parties hereto shall use all reasonable best efforts to:

(i)    respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any Transaction Document;

(ii)    avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any Transaction Document; and

(iii)    in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any Transaction Document has been issued, to have such Governmental Order vacated or lifted.

(d)    If any consent, approval or authorization necessary to preserve any right or benefit under any Contract to which a Target is a party is not obtained prior to the Closing, Sellers shall, subsequent to the Closing, cooperate with Buyer and the applicable Target or Targets in attempting to obtain such consent, approval or authorization as promptly thereafter as practicable. If such consent, approval or authorization cannot be obtained, Sellers shall use its reasonable best efforts to provide the Targets with the rights and benefits of the affected Contract for the term thereof, and, if Sellers provide such rights and benefits, the applicable Target shall assume all obligations and burdens thereunder.

(e)    All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers or the Targets with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(f)    Notwithstanding the foregoing, nothing in this **Section 5.08** shall require, or be construed to require, Buyer or any of its Affiliates to agree to (i) sell, hold, divest, discontinue or limit, before or after the Closing Date, any assets, businesses or interests of Buyer, the Targets or any of their respective Affiliates; (ii) any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests which, in either case, could reasonably be expected to result in a Material Adverse Effect or materially and adversely impact the economic

43

or business benefits to Buyer of the transactions contemplated by this Agreement; or (iii) any material modification or waiver of the terms and conditions of this Agreement.

**Section 5.09      Books and Records.**

(a)      In order to facilitate the resolution of any claims made against or incurred by Sellers prior to the Closing, or for any other reasonable purpose, for a period of three (3) years after the Closing, Buyer shall:

(i)      retain the books and records (including personnel files) of the Targets relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Targets; and

(ii)      upon reasonable notice, afford the Representatives of Sellers reasonable access (including the right to make, at Sellers' expense, photocopies), during normal business hours, to such books and records;

*provided, however,* that any books and records related to Tax matters shall be retained pursuant to the periods set forth in **Article VI.**

(b)      In order to facilitate the resolution of any claims made by or against or incurred by Buyer or Targets after the Closing, or for any other reasonable purpose, for a period of three (3) years following the Closing, the Sellers shall:

(i)      retain the books and records (including personnel files) of the Sellers which relate to each Target and its operations for periods prior to the Closing; and

(ii)      upon reasonable notice, afford the Representatives of Buyer or the Targets reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records;

*provided, however,* that any books and records related to Tax matters shall be retained pursuant to the periods set forth in **Article VI.**

(c)      Neither Buyer nor Sellers shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 5.09** where such access would violate any Law.

**Section 5.10      Closing Conditions** From the date hereof until the Closing, each party hereto shall, and Sellers shall cause the Targets to, use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VII** hereof.

**Section 5.11      Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), Sellers shall not make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate

44

with any news media without the prior written consent of the Buyer.  Nothing in this Section shall restrict or prohibit Buyer from making public announcements in respect of this Agreement or the transactions contemplated hereby after the Closing Date.

Section 5.12    **Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

Section 5.13    **Release.**

(a)    Effective from and after the Closing, each Seller agrees that in no circumstances shall it bring any action against either of the Targets or any of their respective past, present or future officers, managers, directors or employees arising out of any breach of any pre-Closing covenant or agreement made by either Target contained in this Agreement or any other Transaction Document (the **"Representation Released Claims"**).Effective from and after the Closing, each Seller, on behalf of itself, himself, or herself and on behalf of its, his, or her successors, assigns, next-of-kin, representatives, administrators, executors, agents, partners, members, Affiliates and any other Person or entity claiming by, through, or under any of the foregoing, hereby unconditionally releases and forever discharges the Targets and each of their past, present, and future equityholders, directors, officers, affiliates, employees, counsel, agents and representatives, and each of their respective successors and assigns (individually, a **"Releasee"** and, collectively, the **"Releasees"**) from any liability arising out of any matter, circumstance or event occurring at or prior to Closing, including a claim that the consideration received by any Seller in exchange for its, his or her securities is inadequate or does not fully reflect the fair market value of the ownership interest of such Seller(s) in the Targets (together with the Representation Released Claims, the **"Released Claims"**).  Notwithstanding anything to the contrary herein, nothing contained in this **Section 5.13** shall constitute a release or waiver of any rights of any Seller explicitly provided for in this Agreement.Further, each Seller hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Released Claim, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee based upon any Released Claim.  Each Seller represents to the Releasees that he, she or it has not assigned or transferred or purported to assign or transfer to any Person all or any part of, or any interest in, any Released Claim.Each Seller understands and hereby agrees that the release under this Section 5.13 with respect to the Released Claims shall remain effective in all respects notwithstanding such additional or different facts and legal theories or the discovery of those additional or different facts or legal theories.

Section 5.14    **Environmental Issues.** As soon as practicable after Closing, Sellers, at their sole cost and expense, shall perform and complete all actions required to remediate and correct the Environmental Indemnified Matters, including but not limited to bringing the Environmental Indemnified Matters into full and complete compliance with all Laws, including all Environmental Laws.  For purposes of remedying the matter relating to the sandblasting of

equipment, Sellers agree to construct a structure or facility satisfactory to Buyer, in its sole discretion, to enable the sandblasting activities to be in compliance with all Laws. In performing and completing the foregoing actions, Sellers shall cooperate and consult in good faith with Buyer as to the means used to accomplish such actions and as to the costs and expenses required in performing such actions. Such actions shall be performed at all times to the satisfaction of Buyer. If Sellers fail to comply with the provisions of this Section, Buyer shall be entitled to off set any amounts Buyer determines, in its sole discretion, are required to satisfy Seller's obligations under this Section against any amounts Buyer owes to any Seller, up to $150,000.

Section 5.15

## ARTICLE VI
### TAX MATTERS

**Section 6.01**        **Tax Covenants.**

(a)        Without the prior written consent of Buyer, Sellers (and, prior to the Closing, the Targets, their Affiliates and their respective Representatives) shall not, to the extent it may affect, or relate to, a Target, make, change or rescind any Tax election (other than to make any election resulting in a Target coming to be taxed as a disregarded entity for income tax purposes), amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer or a Target in respect of any Post-Closing Tax Period. Sellers agree that Buyer is to have no liability for any Tax resulting from any action of Sellers, the Targets, any of their Affiliates or any of their respective Representatives, and agrees to indemnify and hold harmless Buyer (and, after the Closing Date, each Target) against any such Tax or reduction of any Tax asset.

(b)        All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Sellers when due. Sellers shall, at their own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

(c)        Buyer shall prepare, or cause to be prepared, all Tax Returns required to be filed by the Targets after the Closing Date with respect to a Pre-Closing Tax Period. Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or any accounting method and shall be submitted by Buyer to Sellers (together with schedules, statements and, to the extent requested by Sellers' Agent, supporting documentation) at least 45 days prior to the due date (including extensions) of such Tax Return. If Sellers' Agent objects to any item on any such Tax Return, it shall, within ten days after delivery of such Tax Return, notify Buyer in writing that it so objects, specifying with particularity any such item and stating the specific factual or legal basis for any such

46

objection. If a notice of objection shall be duly delivered, Buyer and Sellers' Agent shall negotiate in good faith and use their reasonable best efforts to resolve such items. If Buyer and Sellers' Agent are unable to reach such agreement within ten days after receipt by Buyer of such notice, the disputed items shall be resolved by the Independent Accountants and any determination by the Independent Accountants shall be final. The Independent Accountants shall resolve any disputed items within twenty days of having the item referred to it pursuant to such procedures as it may require. If the Independent Accountants is unable to resolve any disputed items before the due date for such Tax Return, the Tax Return shall be filed as prepared by Buyer and then amended to reflect the Independent Accountants' resolution. The costs, fees and expenses of the Independent Accountants shall be borne equally by Buyer on the one hand and Sellers on the other. The preparation and filing of any Tax Return of a Target that does not relate to a Pre-Closing Tax Period shall be exclusively within the control of Buyer.

**Section 6.02     Termination of Existing Tax Sharing Agreements.** Any and all existing Tax sharing agreements (whether written or not) binding upon the Targets shall be terminated as of the Closing Date. After such date neither the Targets, Sellers nor any of the Sellers' Affiliates and their respective Representatives shall have any further rights or liabilities thereunder.

**Section 6.03     Tax Indemnification.** Except to the extent treated as a liability in the calculation of Closing Working Capital, Sellers shall jointly and severally indemnify the Targets, Buyer, and each Buyer Indemnitee and hold them harmless from and against (a) any Loss attributable to any breach of or inaccuracy in any representation or warranty made in **Section 3.22**; (b) any Loss attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in **Article VI**; (c) all Taxes of the Targets or relating to the business of the Targets for all Pre-Closing Tax Periods; (d) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which a Target (or any predecessor of a Target) is or was a member on or prior to the Closing Date by reason of a liability under Treasury Regulation Section 1.1502-6 or any comparable provisions of foreign, state or local Law; and (e) any and all Taxes of any person imposed on a Target arising under the principles of transferee or successor liability or by contract, relating to an event or transaction occurring before the Closing Date. In each of the above cases, together with any out-of-pocket fees and expenses (including attorneys' and accountants' fees) incurred in connection therewith. Sellers shall reimburse Buyer for any Taxes of either Target that are the responsibility of Sellers pursuant to this **Section 6.03** within ten Business Days after payment of such Taxes by Buyer or the applicable Target.

**Section 6.04     Straddle Period.** In the case of Taxes that are payable with respect to a taxable period that begins before and ends after the Closing Date (each such period, a "**Straddle Period**"), the portion of any such Taxes that are treated as Pre-Closing Taxes for purposes of this Agreement shall be:

(a)     in the case of Taxes based upon, or related to, income or receipts, deemed equal to the amount which would be payable if the taxable year ended with the Closing Date; and

(b)     in the case of other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

**Section 6.05      Tax Allocation of Purchase Price.** The parties hereto understand that the sale of the QLS LLC Interests and the QRS LLC Interests hereunder shall, for income Tax purposes, constitute a sale of all of the assets of QLS and QRS by QS HoldCo. The parties hereto agree that Buyer shall reasonably value the individual assets of QRS and QLS and prepare a statement setting forth the allocations of purchase price (including liabilities assumed for income Tax purposes) among the assets of QRS and QLS consistent with the economic terms of this Agreement (the **"Allocation Statement"**) within forty five (45) days of the Closing Date, which shall be binding upon all parties hereto. The parties hereto and their respective Affiliates shall report the purchase and sale of assets deemed to occur for income tax purposes on all relevant Tax Returns, including IRS Form 8594 and any amendments thereto, consistent with the Allocation Statement. No party shall take any position that is inconsistent with such allocation unless required to do so by Law. Notwithstanding any provision in this Section to the contrary, the parties hereto agree that no more than $21,000,000 shall be allocated to the fixed assets of the Targets and no more than $100,000 shall be allocated to the obligations of Sellers under **Section 5.07.**

**Section 6.06      Contests.** Buyer agrees to give written notice to Sellers' Agent of the receipt of any written notice by a Target, Buyer or any of Buyer's Affiliates which involves the assertion of any claim, or the commencement of any Action, in respect of which an indemnity may be sought by Buyer pursuant to this **Article VI** (a **"Tax Claim"**); *provided, that* failure to comply with this provision shall not affect Buyer's right to indemnification hereunder. Buyer shall control the contest or resolution of any Tax Claim; *provided, however,* that Buyer shall obtain the prior written consent of affected Sellers (which consent shall not be unreasonably withheld or delayed) before entering into any settlement of a claim or ceasing to defend such claim; and, *provided further,* that affected Sellers shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by the affected Seller.

**Section 6.07      Cooperation and Exchange of Information.** Sellers and Buyer shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return pursuant to this **Article VI** or in connection with any audit or other proceeding in respect of Taxes of either Target. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by tax authorities. Each of Sellers and Buyer shall retain all Tax Returns,

48

schedules and work papers, records and other documents in its possession relating to Tax matters of the Targets for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods. Prior to transferring, destroying or discarding any Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of either Target for any taxable period beginning before the Closing Date, Sellers or Buyer (as the case may be) shall provide the other with reasonable written notice and offer the other party the opportunity to take custody of such materials.

   **Section 6.08  Tax Treatment of Indemnification Payments.** Any indemnification payments pursuant to this **Article VI** shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

   **Section 6.09  Survival.** Notwithstanding anything in this Agreement to the contrary, the provisions of **Section 3.22** and this **Article VI** shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days.

   **Section 6.10  Overlap.** To the extent that any obligation or responsibility pursuant to **Article VIII** may overlap with an obligation or responsibility pursuant to this **Article VI**, the provisions of this **Article VI** shall govern.

## ARTICLE VII
### CONDITIONS TO CLOSING

   **Section 7.01  Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

   (a)  The filings of Buyer and Sellers pursuant to the HSR Act, if any, shall have been made and the applicable waiting period and any extensions thereof shall have expired or been terminated.

   (b)  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

   (c)  Sellers shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in **Section 3.05** and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in

Section 4.02, in each case, in form and substance reasonably satisfactory to Buyer and Sellers, and no such consent, authorization, order and approval shall have been revoked.

Section 7.02       Conditions to Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)       Other than the representations and warranties of Sellers contained in **Section 3.01, Section 3.02, Section 3.03, Section 3.06** and **Section 3.24**, the representations and warranties of Sellers contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Sellers contained in **Section 3.01, Section 3.02, Section 3.03, Section 3.06** and **Section 3.24** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)       Sellers shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; *provided, that,* with respect to agreements, covenants and conditions that are qualified by materiality, Sellers shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)       No Action shall have been commenced against Buyer, Sellers or either Target, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)       All approvals, consents and waivers that are listed on **Section 3.05** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)       From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(f)     The Transaction Documents (other than this Agreement) shall have been executed and delivered by the parties thereto and true and complete copies thereof shall have been delivered to Buyer.

(g)     Buyer shall have received a certificate, dated the Closing Date and signed by duly authorized officers of each of the Sellers, that each of the conditions set forth in **Section 7.02(a)** and **Section 7.02(b)** have been satisfied.

(h)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of QS HoldCo and each Target certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers or managing members of the Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(i)     Buyer shall have received satisfactory evidence that one hundred percent (100%) of the equity of QLS has been contributed to QS HoldCo and that QLS has been converted into a Texas limited liability company.

(j)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of QS HoldCo and each Target certifying the names and signatures of the officers of the Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(k)     Buyer shall have received resignations of the directors, managers and officers of the Targets pursuant to **Section 5.05**.

(l)     QS HoldCo and each Target shall have delivered to Buyer a good standing certificate (or its equivalent) for QS HoldCo and each Target from the secretary of state or similar Governmental Authority of the jurisdiction under the Laws in which the Seller is organized.

(m)     Sellers shall have delivered to Buyer a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that Sellers are not a foreign person within the meaning of Section 1445 of the Code.

(n)     Sellers shall have delivered, or caused to be delivered, to Buyer any and all certificates evidencing the QLS Shares, QLS LLC Interests and QRS LLC Interests, free and clear of Encumbrances, duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank and with all required stock transfer tax stamps affixed.

(o)     Sellers shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(p)    Buyer shall have closed on financing with a lender, and on terms and conditions, satisfactory to Buyer in its sole discretion yielding gross proceeds to fund the transactions contemplated hereby of not less than Forty Million Dollars ($40,000,000).

**Section 7.03**    **Conditions to Obligations of Sellers.** The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Buyer contained in **Section 4.01,** the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in **Section 4.01** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; *provided, that,* with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)    All approvals, consents and waivers that are listed on **Section 4.02** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Sellers at or prior to the Closing.

(e)    The Transaction Documents (other than this Agreement) shall have been executed and delivered by the parties thereto and true and complete copies thereof shall have been delivered to Sellers.

(f)    Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 7.03(a)** and **Section 7.03(b)** have been satisfied.

(g)    Sellers shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the managers of Buyer authorizing the execution, delivery and

performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(h)     Sellers shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(i)     Buyer shall have delivered to Sellers cash in an amount equal to the Purchase Price by wire transfer in immediately available funds, to an account or accounts that has been designated at least two Business Days prior to the Closing Date by Sellers in a written notice to Buyer.

(j)     Buyer shall have delivered to Sellers such other documents or instruments as Sellers reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
### INDEMNIFICATION

**Section 8.01      Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein (other than any representations or warranties contained in **Section 3.22** which are subject to **Article VI**) shall survive the Closing and shall remain in full force and effect until the date that is three (3) years from the Closing Date; *provided, that* the representations and warranties in **Section 3.01, Section 3.03, Section 3.10(a), Section 3.19, Section 3.24,** and **Section 4.01** shall survive indefinitely and the representations and warranties in **Section 3.20** shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days. All covenants and agreements of the parties contained herein (other than any covenants or agreements contained in **Article VI** which are subject to **Article VI**) shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

**Section 8.02      Indemnification By Sellers.** Subject to the other terms and conditions of this **Article VIII**, Sellers shall jointly and severally indemnify and defend each of Buyer and its Affiliates (including the Targets) and their respective Representatives (collectively, the **"Buyer Indemnitees"**) against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Sellers contained in this Agreement or in any certificate or instrument delivered by or on behalf of a Seller pursuant to this Agreement (other than in respect of **Section 3.22**, it being understood that the sole remedy for any such inaccuracy in or breach thereof shall be pursuant to **Article VI**), as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by one or more Seller pursuant to this Agreement (other than any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in **Article VI**, it being understood that the sole remedy for any such breach, violation or failure shall be pursuant to **Article VI**); or

(c)     the Environmental Indemnified Matters or any matters relating to that certain Fee Agreement and Disbursement agreement dated December 21, 2012 between Associate Equity Group and DMobley and YMobley or any other arrangement or agreement providing for a commission, broker, or similar payment to any other party in connection with the consummation of the transaction contemplated by this Agreement.

**Section 8.03     Indemnification By Buyer.** Subject to the other terms and conditions of this **Article VIII**, Buyer shall indemnify and defend each Seller and its Affiliates and their respective Representatives (collectively, the **"Seller Indemnitees"**) against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date); or

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement (other than **Article VI**, it being understood that the sole remedy for any such breach thereof shall be pursuant to **Article VI**).

**Section 8.04     Certain Limitations.** The indemnification provided for in **Section 8.02** and **Section 8.03** shall be subject to the following limitations:

(a)     Sellers shall not be liable to the Buyer Indemnitees for indemnification under **Section 8.02(a)** (other than with respect to a claim for indemnification based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any representation or warranty

in **Section 3.01, Section 3.03, Section 3.10(a), Section 3.19, Section 3.20** and **Section 3.24** (the "**Buyer Basket Exclusions**"), until the aggregate amount of all Losses in respect of indemnification under **Section 8.02(a)** (other than those based upon, arising out of, with respect to or by reason of the Buyer Basket Exclusions) exceeds $50,000, in which event Sellers shall jointly and severally be required to pay or be liable for all such Losses from the first dollar.

(b)     Buyer shall not be liable to the Seller Indemnitees for indemnification under **Section 8.03(a)** (other than with respect to a claim for indemnification based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any representation or warranty in **Section 4.01**(the "**Seller Basket Exclusions**")) until the aggregate amount of all Losses in respect of indemnification under **Section 8.03(a)** (other than those based upon, arising out of, with respect to or by reason of the Seller Basket Exclusions) exceeds $50,000, in which event Buyer shall be required to pay or be liable for all such Losses from the first dollar.

(c)     For purposes of this **Article VIII**, any inaccuracy in or breach of any representation or warranty, as well as the amount of Losses incurred therefrom, shall be determined without regard to any materiality, Knowledge, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty.

**Section 8.05      Indemnification Procedures.** The party making a claim under this **Article VIII** is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this **Article VIII** is referred to as the "**Indemnifying Party**".

(a)     **Third Party Claims.** If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; *provided, that* if the Indemnifying Party is Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by or on behalf of a Person that is a supplier or customer of either Target, or (y) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 8.05(b)**, it shall have the right to take such

action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, *provided, that* if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 8.05(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Sellers and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of **Section 5.06**) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     **Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 8.05(b)**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 8.05(a)**, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)     **Direct Claims.** Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event

56

not later than 30 days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Targets' premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30 day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

(d)     **Tax Claims.** Notwithstanding any other provision of this Agreement, the control of any claim, assertion, event or proceeding in respect of Taxes of the a Target (including, but not limited to, any such claim in respect of a breach of the representations and warranties in **Section 3.22** hereof or any breach or violation of or failure to fully perform any covenant, agreement, undertaking or obligation in **Article VI**) shall be governed exclusively by **Article VI** hereof.

**Section 8.06     Payments.** Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article VIII**, the Indemnifying Party shall satisfy its obligations within 15 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such 15 Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to but excluding the date such payment has been made at a rate per annum equal to the prime rate as reported in the Wall Street Journal on the day the underlying payment is due (or the next most recent business day, if such day was not a business day) plus five percent (5%), or if less, the maximum interest rate legally chargeable by applicable Law. Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed. In addition, to the extent the Seller Note is outstanding, the Buyer may at its option elect to be deemed to have received indemnification payments from the Sellers by reducing the principal amount of the Seller Note by the amount of indemnification payments due to the Buyer, which reduction shall result in an equal amount of payment being deemed to have made by the Sellers to the Buyer under this Section. In the event of a foregoing described reduction, the principal amount of the Seller Note shall be further

reduced by an amount equal to the amount of interest that was previously paid pursuant to the Note and/or previously accrued but is unpaid that is equal to the amount of interest that was previously paid and/or unpaid and accrued that would not have been paid and/or accrued had the principal amount of the Note at all times been reduced by the amount of the foregoing reduction. The Sellers agree to cause the Seller Note to be amended and to consent to such amendment to reflect such reductions in the principal amount of the Seller Note.

**Section 8.07     Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 8.08     Effect of Investigation.** The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in **Section 7.02** or **Section 7.03**, as the case may be.

## ARTICLE IX
### TERMINATION

**Section 9.01     Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Sellers and Buyer;

(b)     by Buyer by written notice to the Sellers' Agent if:

(i)     Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Sellers within five days of Seller's receipt of written notice of such breach from Buyer;

(ii)     any of the conditions set forth in **Section 7.01** or **Section 7.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 31, 2012, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)     Buyer determines to terminate this Agreement prior to the Closing, in its sole discretion (subject to **Section 10.01**).

(c)    by Sellers by written notice to Buyer if:

(i)    Sellers are not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller; or

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.03** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by December 31, 2012, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Sellers in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02**    **Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    as set forth in this **Article IX** and **Section 5.06** and **Article X** hereof; and

(b)    that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

### ARTICLE X
#### MISCELLANEOUS

**Section 10.01**    **Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 10.02**    **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal

business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 10.02**):

If to any or all of Sellers:        [SELLER'S AGENT ADDRESS]
                                     Facsimile:    [FAX NUMBER]
                                     E-mail: [E-MAIL ADDRESS]
                                     Attention:    David Michael Mobley

with a copy to:                      Holden & Associates
                                     P.O. Box 1594
                                     Norman, OK 73070
                                     Facsimile:    405.364.2414
                                     E-mail: vholden@holdenassociatesok.com
                                     Attention:    Virgil Holden

If to Buyer:                         Quality Lease and Rental Holdings, LLC
                                     501 East Kennedy Boulevard, Suite 801
                                     Tampa, Florida 33602
                                     Facsimile:    [FAX NUMBER]
                                     E-mail: allan.martin@amci360.com
                                     Attention:    Allan Martin, CEO

with a copy to:                      Trenam Kemker
                                     101 East Kennedy Boulevard, Suite 2700
                                     Tampa FL 33602
                                     Facsimile:    813.229.6553
                                     E-mail: ncastellano@trenam.com
                                     Attention:    Nelson Castellano, Esq.

with a copy to:                      Main Street Capital Corporation
                                     1300 Post Oak Boulevard, Suite 800
                                     Houston, Texas 77056
                                     Facsimile:    713.350.6042
                                     Email: dhyzak@mainstcapital.com
                                     Attention:    Dwayne Hyzak

     **Section 10.03      Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise

requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04     Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05     Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in **Section 5.07(e)**, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06     Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07     Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.08     No Third-party Beneficiaries.** Except as provided in **Section 6.03** and **Article VIII**, this Agreement is for the sole benefit of the parties hereto and their respective

successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Notwithstanding the foregoing, Buyer, Sellers and the Sellers' Agent acknowledge that Main Street Capital Corporation and Main Street Capital II, LP (together, "**Main Street**") is each a third-party beneficiary to this Agreement and that Main Street shall be entitled to enforce the covenants and obligations of Sellers and Sellers' Agent, including but not limited to the Sellers' covenants and obligations set forth in **Section 5.06**, **Section 5.07** and **Section 5.12** and **Article VI** and **Article VIII**. Main Street's rights as a third-party beneficiary of this Agreement may be exercised by either or all of Main Street Capital Corporation, Main Street Capital II, LP, or any of their respective Affiliates, independently or in conjunction with Buyer, and such rights shall not be prejudiced by any prior assertion or waiver of any right, claim or cause of action for damages or equitable relief or any other claim, assertion or waiver made by Buyer under this Agreement. As third-party beneficiary to this Agreement, Main Street shall be entitled to all of the remedies available to Buyer under this Agreement, in addition to such other remedies as may be permitted at law or in equity.

Section 10.09     **Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.10     **Dispute Resolution.** Notwithstanding any provision of this Agreement to the contrary, all disputes, controversies or claims (with the exception of Third Party Claims and any claim for equitable relief, including but not limited to injunctive relief or specific performance) arising out of or relating to this Agreement and the transactions contemplated hereby shall be resolved by agreement among the parties, or, if not so resolved within thirty (30) days then the dispute shall be resolved by final and binding arbitration in Tampa, Florida pursuant to the then existing Commercial Arbitration Rules of the American Arbitration Association. The arbitrator will apply the law of the State of Florida, United States of America, as to both substantive and procedural questions. Such arbitration will take place before a single arbitrator. The single arbitrator shall be agreed upon by the parties to the arbitration. In the event the parties cannot agree upon an arbitrator within twenty (20) calendar days after the effective date of receipt of either party's notice to arbitrate, the arbitrator will be appointed pursuant to the Commercial Arbitration Rules of the American Arbitration Association. All costs associated with the arbitration will be borne by the non-prevailing party to the arbitration, and the non-prevailing party to the arbitration will be responsible for the

reasonable attorneys' fees and costs of the prevailing party incurred in connection with the arbitration, in addition to its own fees. The determinations of such arbitrator will be final and binding upon the parties to the arbitration, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The arbitrator shall set forth the grounds for the decision in the award construed in accordance therewith.

**Section 10.11    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Florida.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS (EXCEPT AS PROVIDED FOR OTHERWISE THEREIN) OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, TO THE EXTENT NOT ARBITRABLE IN ACCORDANCE WITH **SECTION 10.10,** MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF FLORIDA IN EACH CASE LOCATED IN THE CITY OF TAMPA AND COUNTY OF HILLSBOROUGH, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER

PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

**Section 10.12     Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.13     Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**QUALITY LEASE SERVICE, LLC**

By:_____
      David Michael Mobley, Manager

**QLS HOLDCO, INC.**

By:_____
      David Michael Mobley, President

_____
**DAVID MICHAEL MOBLEY**, individually

**QUALITY LEASE AND RENTAL HOLDINGS, LLC**

By:_____
      Allan Martin, Manager

**QUALITY LEASE RENTAL SERVICE, LLC**

By:_____
      David Michael Mobley, Manager

_____
**DAVID MICHAEL MOBLEY**, as Sellers' Agent

_____
**DAVID MICHAEL MOBLEY**, as trustee and authorized agent of Greta Yvette Mobley

_____
**GRETA YVETTE MOBLEY**

[Signature Page to Purchase and Contribution Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**QUALITY LEASE SERVICE, LLC**          **QUALITY LEASE RENTAL SERVICE, LLC**

By:_____          By:_____
    David Michael Mobley, Manager              David Michael Mobley, Manager

**QLS HOLDCO, INC.**

By:_____
    David Michael Mobley, President          _____
                            **DAVID MICHAEL MOBLEY**, as Sellers' Agent

_____          _____
**DAVID MICHAEL MOBLEY**, individually          **DAVID MICHAEL MOBLEY**, as trustee and
                                    authorized agent of Greta Yvette Mobley

**QUALITY LEASE AND RENTAL**
**HOLDINGS, LLC**          _____
                            **GRETA YVETTE MOBLEY**

By:_____
    Allan Martin, Manager

[Signature Page to Purchase and Contribution Agreement]

## Schedule A

### Environmental Indemnified Matters

1.      Three ASTs stored on the northwest corner of the Site are not located within secondary containment.   In the event of a spill or leak, diesel fuel and/or used oil would potentially contaminate onsite soils and/or groundwater.

2.      Sandblasting occurs on the east side of the property in open air on a non-paved portion of the Site.   Compressed air and sand are used to blast paint from equipment bought by QLS with the intention of repairing and re-selling.   Paint and sand from the blasting is not captured.

**Schedule B**

**Estimated Closing Working Capital**

(see attached)

**Quality Lease Service and Quality Lease Rental Service**
**Working Capital**
**December 26, 2012**

| | Per Books as of 12/27/12 | | | Nov 30, 2012 Gates Financials | | | Rentz's 12/27 Amounts, As Adjusted 12/30/12 | | | Per M&A's 12/29 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | CLS | Rentals | Total | CLS | Rentals | Total | CLS | Rentals | Total | | Bill Short Review Comments 12/20/13 |
| **Current assets:** | | | | | | | | | | | |
| **Cash:** | | | | | | | | | | | |
| FSB1 - operating (12/26/12) | 974,015 | 1,857,542 | 2,831,597 | 1,790,525 | | | 974,015 | 1,857,542 | 2,831,597 | | Unrecorded |
| FSB1 - payroll (12/27/12) | (245,912) | | (245,912) | | | | (245,912) | | (245,912) | | Unrecorded |
| Unrestricted funds 12/26/12 | 2,176,539 | | 2,176,539 | | | | 2,176,539 | | 2,176,539 | | Unrecorded |
| **Total Cash** | 1,904,642 | 1,857,582 | 4,462,224 | 1,790,525 | 2,164,566 | 3,955,091 | 1,904,642 | 1,857,542 | 4,462,224 | 3,400,000 | |
| **Unbilled receivable:** | | | | | | | | | | | |
| Accounts receivable (12/26/12) | 4,554,145 | 2,129,405 | 6,683,550 | 413,586 | 209,370 | 622,856 | 413,586 | 209,370 | 622,856 | 6,200,000 | Based on Nov 30 |
| Employee receivable (Nov 2012) | 40,722 | | 40,722 | 4179566 | 1,392,396 | 5,571,942 | 4,554,145 | 2,129,405 | | | |
| Allowance for doubtful accounts (Nov 2012) | (167,066) | (200,564) | (367,630) | 49,433 | (200,564) | 49,433 | | | | | Not included in definition of Net Working Capital |
| Inventory - Construction in Progress | | | | (167,066) | | (167,066) | | | | 500,000 | Removed because the reserve is replaced with the reductn |
| Prepaid insurance (support tab) | 33,950 | | 33,950 | 33,464 | | 33,464 | 33,650 | | 33,650 | | |
| **Total current assets** | 7,375,283 | 3,866,423 | 11,557,714 | 6,397,728 | 3,666,664 | 9,863,986 | 7,995,223 | 3,996,075 | 11,991,448 | 16,100,000 | |
| **Current liabilities:** | | | | | | | | | | | |
| Accounts payable | 382,582 | 126,454 | 509,036 | 788,654 | 304,450 | 1,093,106 | 382,582 | 126,454 | 509,036 | 1,200,000 | Cut and Nov that were $1,131M and $1,188M, respectively |
| Unrecorded payables - Trade | | | | | | | 130,000 | 330,000 | 500,000 | | Adjusted AP to equal Avg of Oct and Nov AP |
| Payroll liabilities (support tab) | 27,947 | | 27,947 | 15,541 | | 15,541 | 77,947 | | 77,947 | | |
| TX sales tax | 77,421 | | 77,421 | 67,645 | | 67,645 | 77,421 | | 77,421 | | |
| Accrued wages (Nov 2012) | 68,636 | | 68,636 | 65,673 | | 65,673 | 68,636 | | 68,636 | | The Nov 2012 accrual was 86,673  The amount of €86,636 w |
| Accrued commission (support tab) | 360,822 | | 360,822 | 186,782 | | 186,782 | 360,822 | | 360,822 | | |
| Accrued expenses (Holder) (estimated) | | | | | | | | | | | Dual retainers should not be included? |
| Accrued expenses (M&Y) (estimated) | 70,000 | | 70,000 | | | | | | | | Dual retainers should not be included? |
| TX margin tax accrual (estimated) | 67,000 | 33,000 | 110,000 | 33,000 | 1,000 | 34,000 | 87,000 | 23,000 | 110,000 | | |
| **Total current liabilities** | 1,054,728 | 169,454 | 1,224,182 | 1,179,917 | 305,450 | 1,484,967 | 1,184,728 | 479,454 | 1,664,182 | 1,200,000 | |
| **Working capital** | 6,294,565 | 3,736,969 | 10,033,534 | 4,918,431 | 3,360,214 | 8,379,058 | 6,870,495 | 1,889,221 | 10,347,366 | 8,300,000 | |
| Less: Cash distributed to Holders | | | | | | | | | | (4,462,224) | (3,400,000) |
| Less: Tentative Target Working Capital | | | | | | | | | | | 5,300,000 |
| Less: Bad debts to be written off (per Kevin) | | | | | | | (200,101) | (314,931) | | | (2,500,000) |
| Less: AR on payment plans | | | | | | | (107,347) | (86,494) | | | (314,432) |
| Less: Holdout entry AR | | | | | | | (387,261) | | | | (193,961) |
| Less: All A60 day and not included in rows 39, 40 or 41 | | | | | | | | | | | (407,261) |
| | | | | | | | | | | | (429,200) Based on Nov 30 AR, marked up by term |
| **Equals: Excess Working Capital** | | | | | | | | | | 1,601,429 | 4,815,616 |
| Add'l Est Dec EBITDA based on Trailing 11 mos average EBITDA | | | | | | | | | | 1,300,000 | |
| Estimated Excess Working Capital at Closing 12/31/12 | | | Round To | | | | | | | 1,230,000 | |

rn below for All 340 days

to the accrual for Aug, Sep and Oct. $37K is approx 1 week of payroll based on YTD payroll expense

## Disclosure Schedule 3.02

### Jurisdictions

QLS –          Texas, Florida, Louisiana & New Mexico

QLRS -        Texas, Florida, Louisiana & New Mexico

## Revised Disclosure Schedule 3.03(d)

### Debts
### (Note: "LDD" means Legal Due Diligence Uploads)

(1)    **Quality Lease Service, Inc.**

| Lender | As of 12/21/12 Amount Owed | Purpose | Debt Contracts |
|---|---|---|---|
| First State Bank | $    -0- | Loan for Draws | 4/5/12 Loan #80247323 See LDD B-5 - #7112891 |
| People's United | $ 87,948.00 | Trucks #33 & 34 | No Document Opened Acct#61740 See LDD B-5 - #7112898 |
| Ford | $ 17,700.31 | 2011 Ford F-350 | 11/16/10 Contract #3604 See LDD B-5 - #7112906 |
| Ford | $ 15,983.49 | 2011 Ford F-350 | 11/16/10 Contract #3589 See LDD B-5 - #7112908 |
| Ford | $  6,922.21 | 2010 Ford F-350 | 5/21/10 Contract #1751 See LDD B-5 - #7112909 |
| Ford | $ 22,791.19 | 2011 Ford F-150 | 2011 Contract #2874 See LDD B-5 - #7112916 |
| Ford | $ 10,204.83 | 2010 Ford F-350 | 2011 Contract #9988 See LDD B-5 - #7112918 |
| Ford | $  1,242.82 | 2010 Ford F-350 | 1/4/10 Contract #2322 See LDD B-5 - #7112919 |
| Ford | $ 44,977.44 | 2012 Ford F-350 | 5/31/12 Contract #8423 See LDD B-5 - #7112928 |
| Ford | $ 36,849.75 | 2012 Ford F-350 | 2/27/12 Contract#6236 See LDD B-5 - #7112930 |
| Ford | $ 35,801.82 | 2012 Ford F-350 | 2011 Contract #5581 See LDD B-5 - #7112932 |
| Ford | $ 43,460.45 | 2012 Ford F-350 | 6/15/12 Contract #8260 See LDD B-5 - #7112933 |

(Quality Lease Service, Inc. – Continued)

| Lender | Amount Owed | Purpose | Debt Contracts |
|---|---|---|---|
| Ford | $ 8,643.41 | 2011 Ford F-350 | 5/21/10 Contract #1676<br>See LDD B-5 - #7112957 |
| Ford | $ 26,154.02 | 2011 Ford F-350 | 2011 Contract #8979<br>See LDD B-5 - #7112958 |
| Ford | $ 30,899.72 | 2011 Ford F-350 | 2011 Contract #3667<br>See LDD B-5 - #7112959 |
| Ford | $ 33,859.87 | 2012 Ford F-350 | 2011 Contract #9358<br>See LDD B-5 - #7112961 |
| Ford | $ 41,703.37 | 2012 Ford F-350 | 2012 Contract #7904<br>See LDD B-5 - #7112962 |
| Ford | $ 43,360.51 | 2012 Ford F-350 | 2012 Contract #7700<br>See LDD B-5 - #7112963 |
| Ford | $ 53,501.56 | 2012 Ford F-350 | 9/27/12 Contract #7173<br>See LDD B-5 - #7112964 |
| GE Capital | $160,773.33 | 2 2012 Internationals<br>QCE transfer to QLS<br>(#147 & 148) | 2012 Contract<br>See LDD B-5 - #7112974 |
| GE Capital | $ 59,381.08 | 2 2010 Internationals<br>(#28 & #29) | 2010 Contract<br>See LDD B-5 - #7112973 |
| GE Capital | $104,166.75 | 3 2010 Internationals<br>(#30, 31, and 32) | 2010 Contract<br>See LDD B-5 - #7112837 |
| Mack Financial | $234,673.28 | 2 2012 Macks (#13 and #14) | 2/21/12 Loan Contract<br>See LDD B-5 - #7112983 |
| Cat Financial | $177,136.48 | Caterpillar Backhoe Loader | Contract<br>See LDD B-5 - #7113002 |
| John Deere | $370,714.81 | JD #2 Dozer & 2 Trackhoes<br>(#7 and #8) | Contract<br>See LDD B-5 - #7113004 |

**(Quality Lease Service, Inc. – Continued)**

| Lender | Amount Owed | Purpose | Debt Contracts |
|--------|-------------|---------|----------------|
| Cat Financial | $ 72,996.80 | Caterpillar Hydraulic Excavator | Contract<br>See LDD B-5 - #7113012 |
| Navistar | $ 26,624.40 | 2008 International & Dragon Trailer.<br>(Truck #9 and trailer #16) | 4/28/08 Loan Agreement<br>See LDD B-5 - #7113013 |
| Navistar | $ 11,151.58 | 2 2011 Internationals<br>(truck #141 and #142) | 3/8/10 Loan Agreement<br>See LDD B-5 - #7113016 |
| Navistar | $ 8,185.00 | 2010 International<br>(truck #26) | 2/11/10 Loan Agreement<br>See LDD B-5 - #7113014 |
| Navistar | $ 12,281.54 | 2010 International<br>(truck #27) | 2/19/10 Loan Agreement<br>See LDD B-5 - #7113015 |
| GE Capital | $ 56,778.60 | Trailers #74 through #78 | Contract |
| Ford | $ 31,126.03 | 2011 Ford F-350<br>DR Mobley transfer to QLS | Contract #9993<br>See LDD B-5 - #7112917 |
| Cat Financial | $124,931.45 | Backhoes #5 & #6 | Contract<br>See LDD B-5 - #7112986 |
| Ford | $ 37,607.20 | 2012 Ford F-350<br>DR Mobley transfer to QLS | Contract #1884<br>See LDD B-5 - #7112825 |
| Ford | $ 19,767.90 | 2011 Ford F-150 | Contract #7857 |
| Ford | $ 3,459.99 | 2009 Ford F-350 | Contract #6845 |
| Ford | $ 4,075.38 | 2010 Ford F-350 | Contract # 6756 |

**(2)   Quality Lease Rental Service, LLC**

| Lender | Amount Owed | Purpose | Debt Contracts |
|---|---|---|---|
| De Lage Landen | $180,928.47 | Lease 2 800S Boom Lifts | 10/14/11 Lease Agreement<br>See LDD B-5 - #7112829 |
| First State Bank | $ -0- | Loan for Draws | 4/5/12 Loan #80294689<br>See LDD B-5 - #7112832 |
| Cat Financial | $ 37,368.08 | Caterpillar Hydraulic Excavator | Contract<br>See LDD B-5 - #7112843 |
| First State Bank | Balance Transferred To Seller | Purchase 2011 Revolution MH | 10/27/11 Loan #80914807<br>See LDD B-5 - #7112854 |
| People's United | $159,648.00 | 4 Trailers/2 Pumps/1 Mud Tank | 1/13/11 Contract #62676<br>See LDD B-5 - #7112873 |
| People's United | $ 64,510.70 | 4 Pumps | 7/19/10 Contract #61741<br>See LDD B-5 - #7112881 |
| First State Bank | $ -0- | ? | 6/28/12 Loan<br>See LDD B-5 - #7112885 |
| Ford | $ 13,905.41 | 2010 Ford F-150 | Contract #5895<br>See LDD B-5 - #7112886 |

## Disclosure Schedule 3.05

**Exceptions to Consents, Notices or Actions Required**

QLS – None


QLRS – None

### Disclosure Schedule 3.09(a)

### Material Contracts – Occupancy, Management, Operation

QLS –

(i)    11 MSA's – Quality Lease Rental (See Attached Disclosure Schedule 3.09(a)(i)
26 MSA's – Quality Lease Service (See Attached Disclosure Schedule 3.09(a)(i))

(ii)    None

(iii)    None

(iv)    See Attached Disclosure Schedule 3.09(a)(iv)

(v)    *Engagement & Fee Agreement* dated 11/28/12 between David Michael Mobley & Greta Yvette Mobley and Associate Equity Group   (See Attached Disclosure Schedule 3.09(a)(v)).

(vi)    None

(vii)    See Disclosure Schedule 3.03(d)

(viii)    None

(ix)    None

(x)    None

(xi)    None

(xii)    None

(xiii)    None

QLRS –    Same as above

<u>Disclosure Schedule 3.09(a)(i)</u>
**Material Contracts**

# Quality Lease Rental MSA Information

C & E Operating, Inc.                                    1/15/2009
     Phone (281)265-6500
     Laura Burke
    Quality Lease Rental Updated MSA 3/1/2011

Chaparral Energy, L.L.C.                                 12/31/2009
     Phone (405)478-8770
     Phyllis Bray

Chesapeake Operating, Inc.                              12/6/2009
     Phone (405)848-8000      Fax (405)935-9576
     Stacy Roberts

Delta Petroleum Corporation                             3/24/2009
     Phone (303)293-9133      Fax (303)298-8251
     Lila Harvey, Esq.

Devon Energy Production Company, L.P.      7/26/2010
     Phone (405)235-3611      Fax (405)228-8369
     Marilyn Taber

Dow Chemical Company                                    2/9/2010
     Phone (979)238-9696
     Marc Davis

EOG Resources, Inc.                                     10/4/2010
     Phone (713)651-6414      Fax (713)651-6415
     Gina Hauck

Hilcorp Energy Company                                  11/4/2010
     Phone (713)209-2400      Fax (713)209-2478
     Lee E. Beckerman

Marathon Oil Corporation                                9/19/2011
     Phone (713)296-2778      Fax (713)513-6026
     Jay Gavr

NFR Energy LLC                                          4/19/2010
     Phone (832)242-9600      Fax (832)242-9560
     Ginny Ablassi

Pioneer Natural Resources USA Inc.         8/19/2008
     Phone (972)444-9001      Fax (972)969-3587
     Kimberly B Burke

# Quality Lease Service MSA Information

Anadarko Petroleum Corporation       6/24/2004
      Phone (832)636-2669       Fax (832)636-5658
      Linda Yerby

AKG Operating Company       6/14/2007
      Phone (512)494-1001       Fax (512)494-1040
      Greigh P. Kugler

C & E Operating, Inc.       1/15/2009
      Phone (281)265-6500
      Laura Burke

Carrizo Oil & Gas, Inc.       5/12/2003
      Phone (281)496-1352       Fax (281)496-1251
      Brad Fisher

Chesapeake Operating, Inc.       8/23/2010
      Phone (405)848-8000       Fax (405)935-9576
      Stacy Roberts

Coronado Minerals, LLC.       8/31/2012
      Phone (940)397-2759
      Bart Boley

Cox & Perkins Exploration, Inc.       6/17/2012
      Phone (713)783-7880       Fax (713)783-7605
      Pamella B. Blythe

Crosstex Energy Services, L.P.       3/4/2005
      Phone (214)953-9500       Fax (214)953-9501
      Kellye Fitzgerald

Dow Chemical Company       2/9/2010
      Phone (979)238-9696
      Marc Davis

Eagle Construction & Environmental Services, L.L.C.       6/24/2009
      Phone (254)629-1718       Fax (254)629-8625
      Matt LeFever

Endeavor Energy Resources, L.P.       5/19/2011
      Phone (432)687-1575       Fax (432)682-3088
      Autey C. Stephens

Energy XXI Services, LLC                                    2/13/2008
      Phone (713)351-3000        Fax (713)351-3300
          Ben Marchive

EOG Resources, Inc.                                        10/4/2010
      Phone (713)651-6414        Fax (713)651-6415
          Gina Hauck

Famcor Oil, Inc.                                           4/6/2005
      Phone (No # on MSA)

Future Petroleum Company, LLC                              2/12/2010
      Phone (713)993-0774        Fax (713)993-0906
          Carl Price

Hilcorp Energy Company                                     11/4/2010
      Phone (713)209-2400        Fax (713)209-2478
          Lee E. Beckerman

Kinder Morgan Treating, LP                                 11/12/2009
      Phone (713)369-9716        Fax (832)397-4603
          Zuela Carter

Llewellin Operating Co., LLC                               7/24/2012
      Phone (713)580-7200        Fax (713)580-7210
          Elizabeth Dziak

Marathon Oil Corporation                                   12/14/2011
      Phone (713)296-2778        Fax (713)513-6026
          PE Bodman for MP Bodkin

NFR Energy LLC                                             4/19/2010
      Phone (832)242-9600        Fax (832)242-9560
          Ginny Ablassi

Noble Energy, Inc.                                         12/22/2009
      Phone (281)872-3100        Fax (281)876-6106
          Cathe Kandis

Pioneer Natural Resources USA Inc.                         8/19/2008
      Amendment Adding to MSA for QLS on 2/27/2009
      Phone (972)444-9001        Fax (972)969-3587
          Kimberly B Burke

Rosetta Resources Operating LP                             4/21/2010
      Phone (713)335-4058        Fax (713)481-2511
          Amber Stovall

Southern Bay Operating LLC
Phone (281)537-9920
Francis M

11/12/2007
Fax (281)-537-8324

Vision Operating Company, LLC
Phone (713)861-7187
Amanda McCaleb

11/4/2008
Fax (713)861-7201

Zinke & Trumbo, Inc. (Zenergy)
Phone (918)743-5096
Rebecca A Farley

1/8/2004
Fax (918)743-5159

Schedule 3.09(a)(iv): Assets purchased In the preceding five years

| QLS | | RENTAL | |
|---|---|---|---|
| **DESCRIPTION** | **DATE ACQUIRED** | **DESCRIPTION** | **DATE ACQUIRED** |
| MidAmerEngine (4) Generators | 1/23/2008 | 24 Rig Houses < QLS | 1/1/2008 |
| 2008 Ford 350 | 1/31/2008 | New 2007 TH842 Terexs | 1/1/2008 |
| Cat Soil Compactor | 2/28/2008 | 2 XQ125 Power Modules | 1/15/2008 |
| (2) Cat Generators | 2/28/2008 | Cat Telehandler MDL TL943 | 2/15/2008 |
| 2008 Intl1Truck | 5/31/2008 | 2008 Ford 350 | 2/16/2008 |
| 2008 Dragon Trailer | 5/31/2008 | 23 Mud Tanks | 3/1/2008 |
| Vermeer Trencher | 6/30/2008 | Generators & Trailer | 3/6/2008 |
| Cat Backhoe | 6/30/2008 | 2006 Ford F350 | 5/9/2008 |
| Office Furnitgure | 7/2/2008 | Cat Power Module | 6/6/2008 |
| Office Furniture | 9/24/2008 | Computers | 7/1/2008 |
| New Office Bldg | 9/30/2008 | Computers | 8/1/2008 |
| Office Comuters | 9/30/2008 | Frac Tank | 8/1/2008 |
| Dragoon 5-Axel Lowboy | 10/3/2008 | Office Furniture | 8/14/2008 |
| CPS Belly Dump Tr aller | 10/3/2008 | 15 New Righouses | 8/15/2008 |
| CPS Belly Dump Tr aller | 10/3/2008 | 2008 Ford F350 | 8/15/2008 |
| 2007 International# 9400 | 1/1/2009 | File Cabinets | 10/1/2008 |
| 2007 International# 9400 | 1/1/2009 | (2) Forklifts Telehandlers | 10/16/2008 |
| 2007 International# 9400 | 1/1/2009 | Computers | 11/1/2008 |
| 2007 International# 9400 | 1/1/2009 | 2008 Ford F350 | 11/10/2008 |
| 2007 Internaitonal# 9400 | 1/1/2009 | Truck <Richie Auction | 2/28/2009 |
| 2007 International# 9400 | 1/1/2009 | Ford F-350 | 2/28/2009 |
| 2007 International# 9400 | 1/1/2009 | 11 Rig Houses | 6/30/2009 |
| 2007 Mac | 1/1/2009 | 8 Bath Houses | 6/30/2009 |
| 2006 InternationalTruck | 1/1/2009 | Dragon 5 axle Trailer | 7/31/2009 |
| 2006 InternationalTruck | 1/1/2009 | 2010 Ford 350 | 11/19/2009 |
| 2006 InternationalTruck | 1/1/2009 | Shop Improvements | 3/1/2010 |
| 2006 InternationalTruck | 1/1/2009 | (2) Trailers | 3/2/2010 |
| 2008 Ford F-350 | 1/1/2009 | New Shop Overhead Doors | 3/24/2010 |
| 130 BBL Vaccum Tanker | 1/1/2009 | (2) T.W. Tanks | 4/1/2010 |
| 130 BBL Vaccum Tanker | 1/1/2009 | 2 - Frac Tanks | 4/1/2010 |
| 130 BBL Vaccum Tanker | 1/1/2009 | Pressure Washer | 4/7/2010 |
| 130 BBL Tanker | 1/1/2009 | Porter Truck & 98 Trailer | 6/30/2010 |
| 130 BBL Vaccum Tanker | 1/1/2009 | Ford F 350 | 6/30/2010 |
| 2007 130 BBL Tanker | 1/1/2009 | F 350 Truck | 6/30/2010 |
| 2007 130 BBL Tanker | 1/1/2009 | 10 - Bath House Skids | 6/30/2010 |
| 2008 Ford F-350 | 1/1/2009 | 5 - New Rig Houses | 6/30/2010 |
| 2008 F-250 | 1/1/2009 | HMR Trailer 21' | 7/12/2010 |
| 2007 Dodge Ram | 1/1/2009 | Dragon Pump Tr Mdle 250 | 7/31/2010 |
| 2006 International Truck | 1/1/2009 | Dragon Pump Trk Mdle 250 | 7/31/2010 |
| 2008 Ford F-350 | 1/1/2009 | Dragon Pump Trk Mdle 250 | 7/31/2010 |
| 2005 Dragon Trailer | 1/1/2009 | Dragon Pump Trk Mdle 250 | 7/31/2010 |
| Mac Truck | 1/1/2009 | R & K Fab Flowback Tank | 9/8/2010 |
| 2001 HouMac | 1/1/2009 | R & K Floback Tank | 9/28/2010 |
| 2007 Ford F-350 | 1/1/2009 | 2- Rig Houses Atco | 10/14/2010 |
| 130 BBL Republic Tr aller | 1/1/2009 | R & K Fab Rack Tank # 13 | 10/22/2010 |
| Mac Truck | 1/1/2009 | 3- Rig Houses - Atco | 10/25/2010 |
| Mac Truck | 1/1/2009 | Mustang Excavator 312DL | 10/28/2010 |
| Mac Truck | 1/1/2009 | Misc Eqpt | 10/31/2010 |
| | | 2- Rig Houses - Atco | 11/4/2010 |

| | | | |
|---|---|---|---|
| 330 BBL SWS Tanker | 1/1/2009 | Trackhoe # 5 | 11/30/2010 |
| 330 BBL SWS Tanker | 1/1/2009 | 8 - H2o, Sewer Skids | 12/1/2010 |
| 330 BBL SWS Tanker | 1/1/2009 | 5 - New Rig Houses | 12/1/2010 |
| 330 BBL SWS Tanker | 1/1/2009 | Ford truck #125 | 12/17/2010 |
| 130 BBL Dragon Tanker | 1/1/2009 | 08 Cheve Ssurban | 12/31/2010 |
| 130 BBL Dragon Tanker | 1/1/2009 | F 350 Truck #120 | 12/31/2010 |
| Dragon Trailer | 1/1/2009 | F 350 Truck # 103 | 12/31/2010 |
| Dragon Trailer | 1/1/2009 | Trailer - People | 12/31/2010 |
| Dragon Trailer | 1/1/2009 | Trailer -Peoples | 12/31/2010 |
| 2006  Dragon Tanker | 1/1/2009 | Trailer - Peoples | 12/31/2010 |
| 2007 Lufkin Belly Dump | 1/1/2009 | Trailer - Peoples | 12/31/2010 |
| 2007 Lufkin Belly Dump | 1/1/2009 | Pump - People | 12/31/2010 |
| 2007 Lufkin Belly Dump | 1/1/2009 | PLump - Peoples | 12/31/2010 |
| 2007 Lufkin Belly Dump | 1/1/2009 | QLS-RH#72 | 1/1/2011 |
| 2000  Aztec Lowboy | 1/1/2009 | QLS-RH#75 | 1/1/2011 |
| Dragon Tanker ck # 2122 | 1/1/2009 | QLS-RH#86 | 1/1/2011 |
| Clement Dump Trailer - Gresh | 1/1/2009 | F-150 P/U , 2011 | 1/1/2011 |
| FordF-350 | 5/31/2009 | Trade In for Asset #9 | 1/11/2011 |
| 2010  Ford F-350 | 9/30/2009 | 3 - New Frac Tanks | 1/31/2011 |
| POlIel'sTrailer | 2/11/2010 | QLS-RH#66 | 2/1/2011 |
| John Deer Loader-CutterTractor N-46 | 4/30/2010 | QLS-RH#67 | 2/1/2011 |
| 767 Inti Truck SleeperNIP 443 | 4/30/2010 | QLS-RH#68 | 2/1/2011 |
| 7711nt'l Truck N;IP 444 | 4/30/2010 | ATCO-355106888T | 2/1/2011 |
| 783 Navistar NIP 445 | 4/30/2010 | ATCO-355106887T | 2/1/2011 |
| 2010 Mack Tr 1/ 34 | 7/31/2010 | ATCO-355106886T | 3/1/2011 |
| 20 I0 Mack Truck #33 | 7/31/2010 | ATCO-358117018T | 3/1/2011 |
| Inter'ITruck NIP4810 #-28 | 7/31/2010 | QLS-RH#90 | 3/2/2011 |
| Intern'lTruck # 219 N/P-481 0 | 7/31/2010 | ATCO-355107142 | 4/1/2011 |
| 2010 Dragon Trailer 130BBL # 74 | 8/31/2010 | ATCO-355117097T | 4/1/2011 |
| 2010 Dragon 130 BBL Tr ailer | 8/31/2010 | QLS-RH#76 | 6/1/2011 |
| 2010 Dragon 130 BBL 1/ 76 | 8/31/2010 | QLS-RH#77 | 6/1/2011 |
| 2010 Dragon 130BBL#77 | 8/31/2010 | QLS-RH#78 | 6/1/2011 |
| 2010DragonI30BBL#78 | 8/31/2010 | ATCO-355117098T | 6/1/2011 |
| 2010 Int'lTrk # 30 | 9/30/2010 | ATCO-355117110T | 6/4/2011 |
| 2010 Inl'lTruck # 31 | 9/30/2010 | ATCO-355117109T | 6/4/2011 |
| 2010 Int'l Truck # 32 | 9/30/2010 | ATCO-355117107 | 6/4/2011 |
| 99 Peterbuilt 1/ 350 | 10/31/2010 | ATCO-355117108 | 6/4/2011 |
| 98 Peterbuilt 1/ 25 | 10/31/2010 | ATCO-355117092T | 6/9/2011 |
| 2001 Peterbuilt# 19 | 10/31/2010 | ATCO-355117093T | 6/9/2011 |
| 1998 Peterbuilt # 18 | 10/31/2010 | Hart Distr: trailer | 7/20/2011 |
| Cat Excavator#6 | 4/30/2011 | QLS-RH#87 | 8/1/2011 |
| 2011 Ford F250 | 4/30/2011 | QLS-RH#88 | 9/1/2011 |
| 2011 Ford F250 | 5/31/2011 | Coastal: 4 - Flatbed utility Trailers | 9/1/2011 |
| F350 Supertor#6 | 6/27/2011 | 52 H2O Sewer Skids | 9/30/2011 |
| 2011 Ford F250 | 6/30/2011 | QLS-RH#89 | 10/1/2011 |
| F350 Ford Crew 2011 | 9/28/2011 | Coasta: 5 - Utility Trailers | 10/13/2011 |
| Mustang Capital Repairs | 11/5/2011 | Telescoping Booms | 10/15/2011 |
| 2012 Super F350 | 11/5/2011 | Telexcoping Boom s | 10/15/2011 |
| 2012 Super F350 | 11/14/2011 | 15 Bath Houses Skids | 10/31/2011 |
| EC Cycle Generators | 11/23/2011 | 14 Generator Skids | 10/31/2011 |
| Truck # 147 - 2012 International 7300 4x2 | 1/12/2012 | Dragon Trailer | 12/31/2011 |
| Truck #148 - 2012 International 7300 4x2 | 1/12/2012 | QLS-RH#91 | 1/1/2012 |
| 2012 Polaris Ranger | 1/20/2012 | QLS-RH#92 | 2/1/2012 |
| Truck #13 - 2012 Mack | 2/21/2012 | 5 new trailers | 2/6/2012 |

| | |
|---|---|
| Truck #14 - 2012 Mack | 2/21/2012 |
| Dozer #2 - 700J LGP | 2/22/2012 |
| Trackhoe #7 - 200DLFF Excavator | 2/22/2012 |
| Trackhoe #8 - 200DLFF Excavator | 2/22/2012 |
| Tax on Asset purchased | 2/23/2012 |
| QCE '99 Travil Trlr | 2/28/2012 |
| F350 S 936 #124 | 2/29/2012 |
| LansdwnMoody/generator | 3/7/2012 |
| Truck Beds | 3/15/2012 |
| 595 - HiTech Rlg/Trk #126 bed | 3/15/2012 |
| Dozer #1 - Cat Fin | 3/20/2012 |
| Backhoes #5 | 3/22/2012 |
| Backhoes #6 | 3/22/2012 |
| Truck #36 - 2013 Mack | 4/9/2012 |
| Truck #37 - 2013 Mack | 4/9/2012 |
| Truck # 149 - 2012 Ford F350Super Duty | 5/14/2012 |
| Truck Beds | 5/24/2012 |
| Truck #137 - 2012 Ford F350Super Duty | 5/24/2012 |
| Truck # 127 - 2012 Ford F350Super Duty | 5/31/2012 |
| Truck Beds | 6/7/2012 |
| New Engine for Truck #19 | 7/16/2012 |
| Truck # 150 - 2012 F350 super Dulty | 7/20/2012 |
| Truc k #151 - 2012 F350 Super Duty | 8/27/2012 |

| | |
|---|---|
| 2012 Ford / F350 Super Duty | 2/27/2012 |
| QLS-RH#93 | 4/1/2012 |
| QLS-RH#95 | 5/1/2012 |
| QLS-RH#96 | 6/1/2012 |
| 2012 Ford / F350 Super Duty | 6/15/2012 |
| QLS-RH#94 | 8/1/2012 |

*K-19*

**Disclosure Schedule 3.09(a)(v)**
**Material Contracts**

 **ASSOCIATE EQUITY GROUP**

# Engagement and Fee Agreement

**David Michael Mobley and Greta Yvette Mobley** ("Sellers") hereby engages Associate Equity Group ("Advisor") as the sole and exclusive agent for the purposes specified in this Agreement and grant to Advisor the exclusive right to Sell (as defined Paragraph 4.2 below) all or any portion of **Quality Lease Service, Inc. and/or Quality Lease Rental Service, LLC and/or other entities owned by Sellers** (the "Business"). Advisor's engagement as Sellers' sole and exclusive agent and primary intermediary for this transaction shall be upon the following terms and conditions:

1.      **Term.** This agreement shall have an initial term of Six (6) months, commencing on the date signed below. The term of this Agreement shall be automatically extended for an additional six-month period upon the expiration of the initial term unless Sellers notified Advisor, in writing by certified mail, no less than 15 days prior to the end of the initial term that this Agreement will not be extended.

2.      **Professional Services.** Advisor shall make customary and reasonable efforts to obtain a satisfactory purchaser for the Business; however, Advisor does not represent that Advisor has a present purchaser for the Business or that Advisor will be successful in obtaining a purchaser. Advisor's engagement is as an independent contractor, solely for the purpose of obtaining a purchaser for the Business, and Advisor shall not provide securities, accounting, appraisal, or legal services to us. Neither Sellers nor the Advisor shall have any authority to contract for or otherwise obligate the other.

3.      **All Inquiries Referred to Advisor.** During the term of this Agreement, Sellers will refer to Advisor, all inquiries and offerings received by Sellers with respect to possible Sale of the Business regardless of the source, and all negotiations shall be conducted by Advisor, subject to Sellers direction, review and final approval.

4.      **Fees.** Advisor shall be paid the following fees for Advisor's services under this Agreement:

      4.1      ~~Non-Refundable Retainer Fee. At the time of execution of this Agreement, Sellers will pay Advisor a non-refundable retainer fee in the amount of $15,000 (the "Retainer Fee"), which shall be considered earned at that time. The Retainer Fee shall be credited against any Advisor's Fee earned by Advisor.~~

      4.2      **Advisor's Fee.** Sellers will pay Advisor an Advisor's Fee computed in accordance with **Schedule A,** attached to this Agreement, upon occurrence of the following: (A) During the term of this Agreement, the sale of all or any material portion of the assets or shares of stock of the Business including, without limitation any merger or consolidation ("Sale") to any purchaser identified by Advisor, or obtained by Sellers, or any other person, or (B) For a period of 24 months after the expiration or termination of this Agreement, a Sale to any purchaser identified by Advisor or Sellers during the term of this Agreement. Advisor's Fees shall be considered earned at the closing of the Sale. The Advisor's Fee shall be paid in full at the closing of the Sale in immediately available funds by wire-transfer, or by another method acceptable to Advisor.

      4.3      **Expenses.** Sellers will pay for or reimburse Advisor promptly upon presentation to Sellers of a statement for all expenses that Advisor incurs in performing services under this Agreement, **provided that such expenses have been pre-approved by Sellers in writing.**

5.      **Closing Procedures.** Sellers shall list Advisor in all closing documents, furnish Advisor with a copy of the Sale Agreement, and notify Advisor in writing of the time and place of the closing. Advisor shall be a signatory to any closing or to any directions to an escrow agent and no closing or payment shall take place without the signature of Advisor. All remaining fees, expenses and other amounts due to Advisor under this Agreement shall be first deducted and paid to Advisor from the first disbursement of any funds. Sellers hereby grants to Advisor a security interest in all assets of the Business and the proceeds thereof which is the subject of this Agreement, including but not limited to, all accounts, inventory, equipment and general intangibles of the Business.

6.      **Accuracy of Information/Indemnification.** Sellers recognize and confirm that Advisor will rely upon information and data furnished by Sellers and that Advisor does not assume responsibility for accuracy and completeness of the information. Sellers affirm that Advisor will not undertake to independently verify information and data furnished by Sellers and that Advisor will not make an appraisal of any assets of the Business. Sellers represents and warrants to Advisor that all information to be furnished to Advisor and potential purchasers in connection with the Sale will be true and complete and contain no material omissions. Sellers shall defend and hold harmless Advisor against all losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorney's fees and court costs, which Advisor may incur as a result of a breach of the foregoing representation and warranty.

Associate Equity Group is a dba of Fort Worth-Tarrant Sunbelt, Inc.

7.      Advisor not Securities Broker or Dealer.  Sellers acknowledges that Advisor is not licensed as a securities broker or dealer, and Sellers will not seek to have Advisor participate in the sale or offering for sale of our shares of stock in the Business.  If Advisor obtains a purchaser and the Sellers and the prospective purchaser agree to complete a stock sale transaction, Sellers will not seek to avoid payment of the Advisor's Fee by claiming that the Advisor functioned as a securities broker or dealer.

8.      Escrow Monies.  Advisor is authorized to accept and escrow monies received from potential purchaser and Sellers agrees to execute such reasonable escrow agreements and instructions as Advisor may request.

9.      Limitation of Liability.  Advisor shall not be liable or responsible to Sellers for any special, direct, incidental, exemplary, punitive or consequential damages including but not limited to loss of revenue and/or the use thereof, loss of profit or loss of business reputation.  In addition, in no event will Advisor be liable for any damages that exceed one half of the fee minimum defined on Schedule A, attached.

10.     Advisor Publicity.  Upon completion of the Sale, Advisor may publicize Advisor's role in arranging the Sale, subject to Sellers's reasonable editorial approval.

11.     Parties in Interest.  The terms Sellers, "we", "our" and "us" shall include Sellers affiliates, subsidiaries, parent company, nominees, successors, assigns and any general partner of the undersigned.  The Agreement will be binding upon, inure to the benefit of; and be enforceable by the respective successors and assigns of the parties hereto.

12.     Assignment.  This Agreement may not be assigned by any party without the prior written consent of the other party, except that Advisor may assign the Agreement to a company owned by Advisor.  Any prohibited assignment shall be void.

13.     Headings.  The headings contained in this Agreement are for reference only and shall not affect the meaning or interpretation of this Agreement.

14.     Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission or sent by certified or express mail, postage prepaid.  Any such notice shall be deemed given when so delivered personally or sent by facsimile transmission, or, if mailed, three business days after the date of deposit in the United States Mails, addressed to parties as set forth on the signature page below.  Any party may by notice given in accordance with this paragraph to other parties designate another or additional address(es) or person(s) for receipt of notices.

15.     Governing Law/Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of Texas, venue of Dallas.

16.     Mandatory Mediation; Binding Arbitration; Venue; Attorneys' Fees.  Except for Advisor's rights to enforce its interests in paragraph 4, any dispute between Sellers and Advisor shall be subject to mediation and if not resolved, then to binding arbitration in accordance with the applicable rules and provisions of the American Arbitration Associations, "AAA".  The parties agree to conduct the mediation and if required, binding arbitration in Dallas, Texas, or another mutually agreed upon location.  The prevailing party in any arbitration or litigation shall be entitled to recover from the other party reasonable attorney and expert witness fees, court costs, and the administrative costs, fees, and expenses of the AAA, as the case may be, incurred in the same, in addition to any other relief that may be awarded.

17.     Interpretation.  Each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but, if any such provision is held to be prohibited or invalid, such provision will be ineffective only to the extent of such prohibition invalidity, without invalidating the remainder of the Agreement.

18.     Entire Agreement.  This Agreement and the attachment referred to herein contain the entire understanding of the parties with respect to its subject matter.  There are no restrictions, promises or warranties other than as set forth herein.

Associate Equity Group is a dba of Fort Worth-Tarrant Sunbelt, Inc.

Page 2 of 3 Including Schedule "A"

## SCHEDULE "A"

### FEE RATE AND CONDITIONS
### FOR EXCLUSIVE MARKETING AGENCY AGREEMENT BETWEEN
### FORT WORTH-TARRANT SUNBELT, INC.
### d/b/a ASSOCIATE EQUITY GROUP ("AGENT")
### Quality Lease Service, Inc. and/or Quality Lease Rental Service, LLC and/or other owned entities,
### ("BUSINESS") AND  David Michael Mobley and Greta Yvette Mobley ("THE OWNERS")

**Rate and Computation of Fee**

AGENT'S Fee shall be based on the Purchase Price or Total Consideration received for the Sale of all or part of the Business.  The Agent's Fee will be the percentage of Total Consideration shown below, provided, that the Fee shall be a minimum of $150,000.

**Commission Fee will be based on the following schedule of the Total Consideration**

> 10% on the first Million Dollars of Total Consideration -- ($1.00 to $1,000,000)
> Plus 9% on the 2nd Million Dollars of Total Consideration -- ($1,000,001 to $2million)
> Plus 8% on the 3rd Million Dollars of Total Consideration -- ($2,000,001 to $3million)
> Plus 7% on the 4th Million Dollars of Total Consideration -- ($3,000,001 to $4million)
> Plus 6% on the 5th and subsequent Million Dollars of Total Consideration -- ($4,000,001 +)

**Definition of Total Consideration**

The terms "Price", "Purchase Price" or "Total Consideration" shall be defined as the full value received by the Sellers directly, indirectly, proposed or projected from the Sale/Purchase Transaction, including, but not limited to: cash, assets, securities, credit or loan arrangements, promissory notes, earn-outs, contingency or deferred payment agreements, consulting or employment agreements, covenants not to compete, release or reduction of any debt burdens or tax obligations, lease payments, shareholder liabilities assumed by purchaser, and any other arrangements intended to convey value in connection with the Sale/Purchase. If the Sale is structured as a sale of stock, Total Consideration shall be an amount equal to consideration for the sale of the stock plus the amount of all liabilities assumed by the Buyer, directly or indirectly.

Accepted: _____     Date: 11 28 12
David Michael Mobley -- Authorized Representative and Personally

Accepted: _____     Date: 11-28-12
Greta Yvette Mobley -- Authorized Representative and Personally

Associate Equity Group is a dba of Fort Worth-Tarrant Sunbelt, Inc.

Page 3 of 3 including Schedule "A"

**Schedule 3.10(a)**

**Tangible Assets**

(see attached)

Schedule 3.10(a): all vehicles, equipment, rig houses and other tangible assets owned and/or used

| QTY. | Asset Type | Asset Type | Year | Make | Model | Asset Description | VIN No. |
|---|---|---|---|---|---|---|---|
| 1 | Truck | Tractor | 2008 | Mack | GU713 | W/60000# Winch | 1M1AX04Y08M003257 |
| 1 | Truck | Tractor | 2008 | Mack | GU713 | | 1M1AX04Y28M003258 |
| 1 | Truck | Tractor | 2007 | International | 9200 | | 2HSCEAPR87C516836 |
| 1 | Truck | Tractor | 2007 | International | 9200 | | 2HSCEAPR57C516843 |
| 1 | Truck | Tractor | 2007 | International | 9400 | | 2HSCNAPR87C521115 |
| 1 | Truck | Tractor | 2007 | Mack | CTP713B | Bobtail 70 bbl | 1M2AT13C07M001512 |
| 1 | Truck | Tractor | 2007 | International | 9200i | | 2HSCEAPRX7C516840 |
| 1 | Truck | Tractor | 2007 | International | 9200i | | 2HSCEAPR17C516841 |
| 1 | Truck | Tractor | 2006 | Mack | CXN613 | | 1M1AK06Y96N009643 |
| 1 | Truck | Tractor | 2006 | Mack | CXN613 | | 1M1AK06Y06N009644 |
| 1 | Truck | Tractor | 2006 | International | 9200i | | 2HSCEAPR06C307525 |
| 1 | Truck | Tractor | 2006 | International | 9200i | | 2HSCEAPR66C307528 |
| 1 | Truck | Tractor | 2006 | International | 9200i | 1-stack | 2HSCEAPR86C307529 |
| 1 | Truck | Tractor | 2001 | Peterbilt | 379 | 1-stack | 1XP5DR9X51D559096 |
| 1 | Truck | Tractor | 1999 | Peterbilt | 379 | | 1XP5DR9XXXD481360 |
| 1 | Truck | Tractor | 1998 | Peterbilt | 379 | | 1XP5DR9XXWD456778 |
| 1 | Truck | Tractor | 2010 | International | 9900 | | 3HSCHAPRXAN184976 |
| 1 | Truck | Tractor | 2010 | International | 9900i | 9900i SFA 6X4 | 3HSCHAPR8AN184975 |
| 1 | Truck | Tractor | 2010 | International | 5900 | | 1HSXYAPR9BJ269748 |
| 1 | Truck | Tractor | 2010 | International | 5900 | | 1HSXYAPR7BJ269750 |
| 1 | Truck | Tractor | 2010 | International | 5900 | Paystar | 1HSXYAPR7BJ269747 |
| 1 | Truck | Tractor | 2010 | International | 5900 | | 1HSXYAPR0BJ269749 |
| 1 | Truck | Tractor | 2010 | International | 5900 | Paystar | 1HSXYAPR5BJ269746 |
| 1 | Truck | Tractor | 2007 | International | 7000 | | 1HTWNACZ57J562983 |
| 1 | Truck | Tractor | 2008 | Mack | CHU | | 1M1AN07YX8N001947 |
| 1 | Truck | Tractor | 2008 | Peterbilt | 367 | | 1XPTD9EX08D756327 |
| 1 | Truck | Tractor | 2008 | International | 590 | | 1HSXRAPT18J632237 |
| 1 | Truck | Tractor | 2007 | Mack | CT7 | | 1M2AL01C57M007254 |
| 1 | Truck | Tractor | 2007 | International | 9600 | | 1HSXRAPT57J5458081 |
| 1 | Truck | Tractor | 2001 | Mack | | | 1M2P26AY41M032144 |
| 1 | Truck | Tractor | 2012 | Mack | CXU613 | | 1M1AV09Y6CM024442 |
| 1 | Truck | Tractor | 2012 | Mack | CXU613 | | 1M1AV09Y4CM024441 |
| 1 | Truck | Tractor | 2012 | International | 7300 | | 1HTZZAAL8CJ094401 |
| 1 | Truck | Tractor | 2012 | International | 7300 | | 1HTZZAAL8CJ094402 |
| 1 | Truck | Pickup | 2006 | Ford | F550 | | 3FRNW65X36V356037 |
| 1 | Truck | Pickup | 2005 | Ford | F650 | Crew | 3FRNW65R55V179740 |
| 1 | Truck | Pickup | 2008 | Ford | F350 | | 1FTWW30R98EA29830 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | Lariat, Crew, 4X4 | 1FT8W3BT4BEC80621 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | F350 | 1FT8W3BT5CEB73188 |

| | Type | Subtype | Year | Make | Model | Description | VIN |
|---|---|---|---|---|---|---|---|
| 1 | Truck | Pickup | 2012 | Ford | F350 | Crew, utility bed, diesel | 1FT8W3AT2CEB77863 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | | 1FT8W3AT6CEB15172 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1FT8W3BT5BEC24445 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1FT8W3AT9CEA32187 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | | 1FT8W3AT9BEC92295 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | | 1FT8W3ATA4CEB77864 |
| 1 | Truck | Tractor | 2011 | International | 7300 | | 1FT8W3AT8CEC41761 |
| 1 | Truck | Tractor | 2011 | International | 7300 | Service truck | 1HTZZAAL2BJ326622 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1HTZZAAL4BJ326623 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1FT8W3BT8BEA01719 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1FTWW3DR2AFA14408 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1FT8W3AT8BEB24115 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | Crew | 1FT8W3AT9BEB24088 |
| 1 | Truck | Pickup | 2010 | Ford | F350 | Crew, 4X4 | 1FTWW3BR7AEB12045 |
| 1 | Truck | Pickup | 2010 | Ford | F350 | | 1FTWW3AR3AEA68840 |
| 1 | Truck | Pickup | 2010 | Ford | F350 | Crew, 4X4 | 1FTWW3BR7AEA45642 |
| 1 | Truck | Pickup | 2006 | Ford | F250 | | 1FDWX37P26EC53726 |
| 1 | Truck | Pickup | 2006 | Dodge | 3500 | | 3D7MX46C26G204105 |
| 1 | Truck | Pickup | 2003 | Ford | F450 | Utility bed, Crew | 1FDXW46P23ED43694 |
| 1 | Truck | Pickup | 2003 | Ford | F350 | Weld truck | 1FTWX33P63ED36114 |
| 1 | Truck | Pickup | 2001 | Ford | F550 | Crew | 1FDAW56F61ED23271 |
| 1 | Truck | Pickup | 2010 | Ford | F350 | Crew, Lariat, 4X4 | 1FTFW1EV2AKA25605 |
| 1 | Truck | Pickup | 2010 | Ford | F150 | | 1FTFW1EV1AFD87501 |
| 1 | Truck | Pickup | 2008 | Ford | F350 | | 1FTSW21R68EB04711 |
| 1 | Truck | Pickup | 2007 | Ford | F350 | | 1FTWW30P87EA66297 |
| 1 | Truck | Pickup | 2006 | Dodge | 2500 | SLT Ram 2500, Crew, 4X4 | 3D7KS29C36G120615 |
| 1 | Truck | Pickup | 2006 | Ford | F350 | Crew, diesel | 1FTWW30P66EA93285 |
| 1 | Truck | Pickup | 2011 | Ford | F150 | | 1FTFW1EFBBKD40631 |
| 1 | Truck | Pickup | 2008 | Ford | F350 | | 1FTWW31RX8EC02866 |
| 1 | Truck | Pickup | 2008 | Ford | F350 | 4X4,Diesel, Crew | 1FTWW31R98ED66335 |
| 1 | Truck | Pickup | 2008 | Ford | F350 | | 1FTWW31R08EC64311 |
| 1 | Truck | Pickup | 2006 | Ford | F250 | | 1FDSX34P56EB81710 |
| 1 | Truck | Pickup | 2005 | Ford | F650 | Crew, utility bed | 3FRXW65Z16V104568 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | Crew, 4X4 | 1FT8W3BT2C5A32188 |
| 1 | Trailer | Utility | 2005 | American | | | 17YBP16BX56027943 |
| 1 | Trailer | Utility | 2003 | RD | | | 1R8BU18223M477337 |
| 1 | Trailer | Utility | 1998 | Big | | | 4K6PX1827W1E29223 |
| 1 | Trailer | Lowboy | 2011 | Dragon | | 50 Ton | 1UNSF4536A063129 |
| 1 | Trailer | Belly Dump | 2007 | Lufkin | | | 1L01C40237I163056 |
| 1 | Trailer | Belly Dump | 2007 | Lufkin | | | 1L01C40257I163057 |
| 1 | Trailer | Belly Dump | 2007 | Lufkin | | | 1L01C40277I163058 |
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST4228TL052860 |
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST4422X7L052961 |
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST4221TL052962 |
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST42287L052974 |

| Qty | Type | Category | Year | Make | Spec | Description | VIN/Serial |
|---|---|---|---|---|---|---|---|
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST422X7L052992 |
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST4217L052993 |
| 1 | Trailer | Vacuum | 2007 | Dragon | | | 1UNST4224Y7L052972 |
| 1 | Trailer | Vacuum | 2006 | Dragon | | | 1UNST42226L042004 |
| 1 | Trailer | Vacuum | 2006 | Dragon | | | 1UNST42226L042469 |
| 1 | Trailer | Vacuum | 2006 | Dragon | | | 1UNST42256L037573 |
| 1 | Trailer | Belly Dump | 2005 | Lufkin | | | 1UNST42235L033245 |
| 1 | Trailer | Flatbed | 2004 | Aztec | | | 1L01C402571163723 |
| 1 | Trailer | End Dump | 2000 | tRAVIS | | | 1A9BP1837YM362093 |
| 1 | Trailer | End Dump | 1999 | Clements | | | 1T91F3725X1247735 |
| 1 | Trailer | Heavy Load | 1997 | Top Hat | | | 1C9BB26B1VM110329 |
| 1 | Trailer | Lowboy | 2011 | Dragon | | 35' Lowboy | 4R7BU2628T1105678 |
| 1 | Trailer | Lowboy | 2010 | Dragon | Dovetail | 35' Lowboy | 1UNSF4622AL077572 |
| 1 | Trailer | Lowboy | 2010 | Dove Tail | | 35' Lowboy, 2-axle | 1D9SF4626AC661648 |
| 1 | Trailer | Generator | 2010 | STRE | | | 1UNSF4628AL077575 |
| 1 | Trailer | Generator | 2008 | ROAD | FB | | 5GVFU20258W000046 |
| 1 | Trailer | Generator | 2008 | ROAD | FB | with Broadcrown 60kw generator | 46UFU202081116601 |
| 1 | Trailer | Generator | 2008 | ROAD | FB | | 46UFU202881116599 |
| 1 | Trailer | Trailer | 2008 | Dragon | | | 46UFU202881116600 |
| 1 | Trailer | Trailer | 2008 | Dragon | | | 1UNSF48S88A063056 |
| 1 | Trailer | Mud Tank | 2008 | | | 5 axle | 1UNSF48557A063029 |
| 1 | Trailer | Mud Tank | 2007 | | | | 48755 |
| 1 | Trailer | Trailer | 2007 | | | | 48756 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 1UNSF48557A063001 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 35484 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 46275 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 44149 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 47963 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 47964 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 47962 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 47943 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 47970 |
| 1 | Trailer | Tank | 2007 | Dragon | | | 47969 |
| 1 | Trailer | Utility | 2007 | Top Hat | | Tandem | 4R7BU18277T078862 |
| 1 | Trailer | Utility | 2007 | Roadclipper | | | 46UFU202671114477 |
| 1 | Trailer | Utility | 2007 | Roadclipper | | | 46UFU08187I112889 |
| 1 | Trailer | Belly Dump | 2007 | CPS | LWBD-240 | | 5MC1116227P007064 |
| 1 | Trailer | Belly Dump | 2007 | CPS | | | 5MC1116277P006993 |
| 1 | Trailer | Lowboy | 2006 | Loadking | | | 5LKL543506I026034 |
| 1 | Trailer | Utility | 2006 | Top Hat | | | 4R7BU18276T073658 |
| 1 | Trailer | Utility | 2005 | TRAI | | | 5BEBU1829SC138448 |
| 1 | Trailer | Utility | 2001 | Top Hat | | | 4R7BU202817033437 |
| 1 | Trailer | Tank | 2000 | Park | | 14,700 gal tank | 132MP2027Y1005243 |
| 1 | Trailer | Tank | 1999 | Shopmade | | | 2 |
| 1 | Trailer | Tank | 1998 | Shopmade | | | TR185150 |

| Qty | Category | Type | Make | Year | Model | Description | Serial/ID |
|---|---|---|---|---|---|---|---|
| 1 | Trailer | Pipe | Shopmade | 1998 | | | 13T |
| 1 | Trailer | Trailer | Dragon | 2007 | | | 1UNSF48537A063000 |
| 1 | Trailer | Pipe | Shopmade | 1995 | | | 1 |
| 1 | Trailer | Lowboy | Loadking | 1994 | | | 4GFW04823R1011666 |
| 1 | Trailer | Lowboy | Loadking | 1994 | | | 1B4L58362R1118956 |
| 1 | Trailer | Flatbed | Trailboss | 1994 | TDW-3D-SRG-T1 | | 1W9FS2527RB059007 |
| 1 | Trailer | Utility | Modern | 1983 | | | 1UN10BC27P1008564 |
| 1 | Trailer | Floater | Lufkin | 1988 | | | 1L01B4226J1069895 |
| 1 | Trailer | Lowboy | Shopmade | 1981 | | | TR148668 |
| 1 | Trailer | Lowboy | Aztec | 1981 | | 2-axle | 800334 |
| 1 | Trailer | Lowboy | Aztec | 1980 | | 3-axle | 800236 |
| 1 | Trailer | Lowboy | Hyster | 1979 | | | 22291 |
| 1 | Trailer | Belly Dump | Ranch | 2007 | | T/A Bottom Dump | 1R9BSE0017L008430 |
| 1 | Trailer | Dump | Travis | 1996 | | | 1T91F3520T1247011 |
| 1 | Trailer | Step Deck | Dynaweld | 2001 | | SD576-48 Spread Axle Step Deck | 4U181DHR611040507 |
| 1 | Trailer | Flatbed | Lufkin | 1984 | | 2-axle | 1L01B4827E1064275 |
| 1 | Trailer | Flatbed | Trailmobile | 1998 | | | 1PTF7ATW0W9011110 |
| 1 | Trailer | Flatbed | Freuhal | 1985 | | | 1H5P04526FN027614 |
| 1 | Trailer | Utility | Tophat | 2011 | | 7x20 Heavy Hauler w/Whitco 5030 GPO S | 4R7BU2024BT106384 |
| 1 | Trailer | Utility | Top Hat | 2011 | | W/Pressure Washer | 4R7BU2029BT105036 |
| 1 | Trailer | Vacuum | Big Tex | 2010 | | | 16VNX1228A2E53382 |
| 1 | Trailer | Vacuum | Dragon | 2010 | | 130 BBL Vac | 1UNST4227AL078344 |
| 1 | Trailer | Vacuum | Dragon | 2010 | | 130 BBL Vac | 1UNST4229AL078345 |
| 1 | Trailer | Vacuum | Dragon | 2010 | | 130 BBL Vac | 1UNST4220AL078346 |
| 1 | Trailer | Vacuum | Dragon | 2010 | | 130 BBL Vac | 1UNST4222AL078347 |
| 1 | Trailer | Vacuum | Dragon | 2010 | | 130 BBL Vac | 1UNST4224AL078348 |
| 1 | Trailer | Heavy Load | Dragon | 2009 | | 5-axle,70 T | 1UNST48529L063061 |
| 1 | Trailer | Heavy Load | Mud Tank | 2009 | | | 13003072798 |
| 1 | Trailer | Pipe | Shopmade | 2000 | | | 3 |
| 1 | Trailer | Heavy Load | Dragon | 2008 | | HH LB, 5-axle | 1UNSF48505A063070 |
| 1 | Trailer | Tank | Dragon | 2008 | | | 1UNST422X7L083703 |
| 1 | Trailer | Flatbed | TL 2000 | 1999 | | 48' T/A Flatbed | 1TTF48206X1060528 |
| 1 | Trailer | Flatbed | Transcraft | 1999 | | 48' T/A Flatbed | 1TTF48201X1061165 |
| 1 | Construct Eq | Backhoe | Caterpillar | | 430D | | BNKO861 |
| 1 | Construct Eq | Backhoe | Caterpillar | | 420D | | FDP19441 |
| 1 | Construct Eq | Dozer | Caterpillar | | D5G | | FDW00578 |
| 1 | Construct Eq | Dozer | Caterpillar | | D6RIIXW | | AEP00535 |
| 1 | Construct Eq | Compactor | Caterpillar | | CS563CAW | | 4KN0339 |
| 1 | Construct Eq | Forklift | Caterpillar | | TH560B | | SLG00446 |
| 1 | Construct Eq | Maintainer | Caterpillar | | 140H | model 3176 CAT0140HCAPM02476 | APM02476 |
| 1 | Construct Eq | Maintainer | Caterpillar | | 140G | | 72VI3411 |
| 1 | Construct Eq | Trackhoe | Caterpillar | | 320CL | | PAB02202 |
| 1 | Construct Eq | Trackhoe | Caterpillar | | 315bL | | 3AW02423 |
| 1 | Construct Eq | Trackhoe | Caterpillar | | 315CL | CAT0315CPCJC00957 | CJC00957 |
| 1 | Construct Eq | Dozer | Caterpillar | 2006 | | assumes D6RIII | MRT00283 |

| Qty | Category | Type | Year | Manufacturer | Model | Description | ID |
|---|---|---|---|---|---|---|---|
| 1 | Construct Eq | Trackhoe | 2006 | Caterpillar | 320CL | 2006 Cat 320CL Excavator Trackhoe | PAB06193 |
| 1 | Construct Eq | Backhoe | | Caterpillar | 420D | | FDP04481 |
| 1 | Skid | Pump Skid | 2007 | Dragon | | Dragon 250 8X6X14 Pump w/16OHP Deut | 09-12-100532 |
| 1 | Construct Eq | Brush Cutter | 2007 | Gyro-Trac | GT-25 | | BCT251163C |
| 1 | Construct Eq | Dozer | | Caterpillar | D5G | CAT D5G LGP Dozer | RKG03596 |
| 1 | Trailer | Utility | 2007 | Road Clipper | | Tandem Trailer | 46UF2026711144T7 |
| 1 | Construct Eq | Telehandler | 2007 | Terex | TH842 | | 842-10331 |
| 1 | Construct Eq | Wheel Loader | 2007 | Caterpillar | 930G | | TWR03340 |
| 1 | Construct Eq | Compactor | | Caterpillar | 500D/400E | Soil Drum Compactor CATCP563PCNT01: | CNT01384 |
| 1 | Construct Eq | Telehandler | | Caterpillar | TL943 | | TBL00964 |
| 1 | Construct Eq | Backhoe | 2008 | Caterpillar | 420E | CAT042EPHLS06360 | HLS06360 |
| 1 | Construct Eq | Trencher | | Vermeer | RTX1250 | | 1VR6110R08100029 1 |
| 1 | Construct Eq | Telehandler | 2008 | Caterpillar | TL943 | | TBL01407 |
| 1 | Construct Eq | Telehandler | 2008 | Caterpillar | TL943 | | TBL01405 |
| 1 | Tank | Tank | | | | SWS 330 BBL Tank | 0010 |
| 1 | Tank | Tank | | | | SWS 330 BBL Tank | 0011 |
| 1 | Tank | Tank | | | | SWS 330 BBL Tank | 0012 |
| 1 | Tank | Tank | | | | SWS 330 BBL Tank | 0013 |
| 1 | Tank | Tank | | | | SWS 330 BBL Tank | 0014 |
| 1 | Skid | Pump Skid | | | Pending | 250 X 8 X 6 X 14 Pump w/174 HP Deutz M 0911210P1328 | Pump / 0911003p1328 Motor |
| 1 | Skid | Pump Skid | | | Pending | 250 X 8 X 6 X 14 Pump w/174 HP Deutz M 0911210P1423 | Pump / 0911003p1423 Motor |
| 1 | Skid | Pump Skid | | | | 250 X 8 X 6 X 14 Pump w/174 HP Deutz M 0911210P1424 | Pump / 0911003p1424 Motor |
| 1 | Skid | Pump Skid | | | | 250 X 8 X 6 X 14 Pump w/174 HP Deutz M 0911210P1459 | Pump / 0911003P1459 Motor |
| 1 | Skid | Pump Skid | | | | Pump 174 HP Deutz Motor & Skid Packag 0911210P1781 | Pump / 0911003P1781 Motor |
| 1 | Skid | Pump Skid | 2008 | | | Pump 174 HP Deutz Motor & Skid Packag 0911210P1782 | Pump / 0911003P1782 Motor |
| 1 | Construct Eq | Excavator | 2008 | Caterpillar | 312DL | Hydraulic Excavator, CAT0312DJXGK0008: | XGK00192 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS116 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS117 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS118 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS119 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS120 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS121 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS122 |
| 1 | Tank | Mud Tank | 2007 | RK | | 2007 Frac Tank Trl | QRS123 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF03302007QRS110 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF04162007QRS111 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF04162007QRS112 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF04252007QRS113 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF07032007QRS124 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF07162007QRS125 |
| 1 | Tank | Mud Tank | 2007 | DRAGON | | 2007 Frac Tank Trl | RBF07192007QRS126 |
| 1 | Tank | Tank | | DRAGON | | 300 BBL Rect Oilfield Skid Tank 102 x 7 | 13003072798 |
| 1 | Tank | Mud Tank | 2011 | RK | | RKRBFT Round Bottom Frac Tank | RKRBFT212011QLS26 |
| 1 | Tank | Mud Tank | 2011 | RK | | RKRBFT Round Bottom Frac Tank | RKRBFT212011QLS27 |
| 1 | Tank | Mud Tank | 2011 | RK | | RKRBFT Round Bottom Frac Tank | RKRBFT212011QLS28 |

| | Category | Type | Year | Manufacturer | Model | Description | Serial |
|---|---|---|---|---|---|---|---|
| 1 | Construct Eq | Trackhoe | | Caterpillar | 3200L | CAT0320DPSPN00609 | SPN00609 |
| 1 | Construct Eq | Boom Lift | 2011 | JLG | 800S | | 300150324 |
| 1 | Construct Eq | Boom Lift | 2011 | JLG | 800S | | 300150567 |
| 1 | Construct Eq | Dozer | | Caterpillar | D6KLGPCA | | DHA01759 |
| 1 | Construct Eq | Backhoe | | Caterpillar | 420E | | DJU03149 |
| 1 | Construct Eq | Backhoe | | Caterpillar | 420E | | DJU03155 |
| 1 | Construct Eq | Trackhoe | | John Deere | 200DLFF | 200D LC, w/second bucket | 1FF200DXJBD513520 |
| 1 | Construct Eq | Trackhoe | | John Deere | 200DLFF | Excavator 200D LC | 1FF200DXCBD513446 |
| 1 | Construct Eq | Dozer | | John Deere | 700J | 700J LPG | 1T0700JXVBD213328 |
| 1 | Construct Eq | Winch | | Caterpillar | TTT | TTT Winch | 145404634 |
| 1 | Tank | Frac Tank | 2000 | DRAGON | | | 35484 |
| 1 | Tank | Frac Tank | 2001 | DRAGON | | | 46275 |
| 1 | Tank | Frac Tank | 2002 | DRAGON | | | 44149 |
| 1 | Tank | Frac Tank | 2003 | DRAGON | | | 47963 |
| 1 | Tank | Frac Tank | 2004 | DRAGON | | | 47964 |
| 1 | Tank | Frac Tank | 2005 | DRAGON | | | 47962 |
| 1 | Tank | Frac Tank | 2006 | DRAGON | | | 47943 |
| 1 | Tank | Frac Tank | 2007 | DRAGON | | | 47970 |
| 1 | Tank | Frac Tank | 2008 | DRAGON | | | 47969 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | RH1 |
| 1 | Rig House | Rig House | 2008 | QLS | | | RH2 |
| 1 | Rig House | Rig House | 2010 | QLS | | | RH3 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH4 |
| 1 | Rig House | Rig House | 2008 | QLS | | | RH5 |
| 1 | Rig House | Rig House | 2007 | QLS | | | RH6 |
| 1 | Rig House | Rig House | 2009 | QLS | | | RH7 |
| 1 | Rig House | Rig House | 2009 | QLS | | | RH8 |
| 1 | Rig House | Rig House | 2009 | QLS | | | RH9 |
| 1 | Rig House | Rig House | 2010 | QLS | | | RH10 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH11 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH12 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH13 |
| 1 | Rig House | Rig House | 2010 | QLS | | | RH14 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH15 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH16 |
| 1 | Rig House | Rig House | 2010 | QLS | | | RH17 |
| 1 | Rig House | Rig House | 2007 | QLS | | | RH18 |
| 1 | Rig House | Rig House | 2010 | ATCO | | | RH19 |
| 1 | Rig House | Rig House | 2008 | QLS | | | RH20 |
| 1 | Rig House | Rig House | 2006 | QLS | | | RH21 |
| 1 | Rig House | Rig House | 2010 | QLS | | | RH22 |
| 1 | Rig House | Rig House | 2007 | QLS | | | RH23 |
| 1 | Rig House | Rig House | 2007 | QLS | | | RH24 |
| 1 | Rig House | Rig House | 2007 | QLS | | | RH25 |
| 1 | Rig House | Rig House | 2007 | QLS | | | RH26 |

| ID | Source | Year | Type | Source | Source | |
|---|---|---|---|---|---|---|
| RH27 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH28 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH29 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH30 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH31 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH32 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH33 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH34 | Rig House | 2007 | QLS | Rig House | Rig House | 1 |
| RH35 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH36 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH37 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH38 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH39 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH40 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH41 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH42 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH43 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH44 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH45 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH46 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH47 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH48 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH49 | Rig House | 2008 | QLS | Rig House | Rig House | 1 |
| RH50 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH51 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH52 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH53 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH54 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH55 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH56 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH57 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH58 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| RH59 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| RH60 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| RH61 | Rig House | 2010 | QLS | Rig House | Rig House | 1 |
| RH62 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| RH63 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| 354074628 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| 355106889 | Rig House | 2010 | ATCO | Rig House | Rig House | 1 |
| RH66 | Rig House | 2011 | QLS | Rig House | Rig House | 1 |
| RH67 | Rig House | 2011 | QLS | Rig House | Rig House | 1 |
| RH68 | Rig House | 2011 | QLS | Rig House | Rig House | 1 |
| 3551068888T | Rig House | 2011 | ATCO | Rig House | Rig House | 1 |
| 3551068887T | Rig House | 2011 | ATCO | Rig House | Rig House | 1 |
| 3551068896T | Rig House | 2011 | ATCO | Rig House | Rig House | 1 |

| Qty | Type | Description | Year | Make | Model | Notes | Serial/VIN |
|---|---|---|---|---|---|---|---|
| 1 | Rig House | Rig House | 2011 | QLS | | | RH 72 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 358117018 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355107142 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH75 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH76 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH77 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH78 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117097T |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117098T |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117110T |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117109T |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117107 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117108 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117092 |
| 1 | Rig House | Rig House | 2011 | ATCO | | | 355117093 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH87 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH88 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH89 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH90 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH91 |
| 1 | Rig House | Rig House | 2011 | QLS | | | RH92 |
| 1 | Rig House | Rig House | 2012 | QLS | | | RH93 |
| 1 | Rig House | Rig House | 2012 | QLS | | | RH94 |
| 1 | Rig House | Rig House | 2012 | QLS | | | RH95 |
| 18 | Change House | Change House | 2010 | | | Shower Houses | |
| 5 | Rig House | Rig House | 2012 | | | Under construction | |
| 5 | Rig House | Rig House | 2010 | | | | |
| 1 | Construct Eq | Soil Stabilizer | | Caterpillar | SS-250B | Soil Stabilizer- mdl. SS-250B | 5GR00222 |
| 44 | Skid | Sewer Skid | | | | Sewer Skids | |
| 5 | Skid | Generator Skid | | | | Generator Skids | |
| 1 | Trailer | Pipe | 1998 | Ford | F650 | | 3FRXW65Z15V10A568 |
| 1 | Truck | Pickup | 2005 | Ford | F350 | | 1FT8W3BT2CEA32188 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | | 1FT8W3BT5CEB66242 |
| 1 | Truck | Pickup | 2012 | Ford | F350 | | 1FT8W3BT7CEB15969 |
| 1 | Truck | Pickup | 2012 | Ford | F150 | | 1FTFW1EF1BFA60011 |
| 1 | Truck | Pickup | 2011 | Ford | F350 | | 1FTVW3BR1AEB05527 |
| 1 | Truck | Pickup | 2010 | Ford | F350 | | 1FTVW31R89EA17605 |
| 1 Lot | SHOP | Shop Inventory | | | | | |
| 1 Lot | TOOL | Tools and Shop | | | | | |
| 1 | Truck | Pickup | 2009 | Ford | F160 | | 1FTWW3DR2AEA14408 |
| 1 | Truck | Pickup | 2007 | DODG | F350 | | 3D7MX49A27G842446 |
| 1 | Truck | Junk | 1978 | MACK | | | R686ST22200 |
| 1 | Truck | Junk | 1961 | HOBB | | | 958005 |

| | | | | Pots Porches | |
|---|---|---|---|---|---|
| BW2942 | BILLS | 1976 | Junk | | 1 |
| 40FW04823R1011666 | TALB | 1994 | Junk | | 1 |
| 1A9BP1B37YM362093 | AZTE | 2000 | Junk | | 1 |
| 4R7BU402XCT113661 | TOPH | 2012 | Trailer | | 1 |
| 1L01B4824S1119308 | LUFK | 1995 | Junk | | 1 |
| 4R7BU2026BT106578 | Tophat | 2011 | Trailer | | 154 |
| | | | | | 16 |

 Houses

| | | | | |
|---|---|---|---|---|
| 1 | PIONEER | 137 | ATCO | 11/13/2012 |
| 2 | MARATHON | 480 | | |
| 3 | PIONEER | 231 | MUD | |
| 4 | MARATHON | 481 | MUD W/PORCH | |
| 5 | MARATHON | 481 | MUD W/PORCH | |
| 6 | PIONEER | 138 | CO MAN | |
| 7 | MARATHON | OFFICE | 12 MAN | 12/13/2012 |
| 8 | yard | YARD | 12 MAN | 12/17/2012 |
| 9 | PIONEER | 246 | 12 MAN | |
| 10 | PIONEER | 468 | 12 MAN | 12/18/2012 |
| 11 | PIONEER | 137 | CO MAN | 11/13/2012 |
| 12 | PIONEER | 226 | CO MAN | 11/13/2012 |
| 13 | PIONEER | 231 | CO MAN | |
| 14 | PIONEER | 132 | CO MAN | |
| 15 | MARATHON | 458 | CO MAN | 12/14/2012 |
| 15 | CHESAPEAKE | | | |
| 16 | DRIVERS | YARD | 4 ROOM | 12/17/2012 |
| 17 | READY | YARD | 12 MAN | 12/17/2012 |
| 18 | CHESAPEAKE | 18 | | |
| 18 | MARATHON | 458 | CO MAN | 11/13/2012 |
| 19 | PIONEER | 137 | ATCO | 11/13/2012 |
| 20 | | | | |
| 21 | PIONEER | 132 | CO MAN | |
| 22 | NEED CLEANING | YARD | 12 MAN | 12/17/2012 |
| 23 | PIONEER | 132 | CO MAN | |
| 24 | CHESAPEAKE | 24 | CO MAN | 11/13/2012 |
| 24 | | | | |
| 25 | PIONEER | 226 | CO MAN | 11/13/2012 |
| 26 | PIONEER | 247 | CO MAN | 11/12/2012 |
| 27 | PIONEER | 226 | CO MAN | 11/13/2012 |
| 28 | | | CO MAN | 12/15/2012 |
| 29 | CARRIZO OIL & GAS | 29 | CO MAN | 11/13/2012 |
| 30 | CHESAPEAKE | 30 | 3 ROOM | 11/13/2012 |
| 31 | CHESAPEAKE | 31 | 3 ROOM | 11/13/2012 |
| 32 | PIONEER | 247 | 3 ROOM | 11/12/2012 |
| 33 | MARATHON | 458 | CO MAN | 11/13/2012 |
| 34 | CARRIZO OIL & GAS | 34 | CO MAN | 11/13/2012 |
| 35 | PIONEER | 246 | | |
| 36 | CHESAPEAKE | 36 | 3 ROOM | 11/13/2012 |
| 37 | CHESAPEAKE | 37 | 3 ROOM | 11/13/2012 |
| 38 | PIONEER | 247 | | 11/12/2012 |
| 39 | CHESAPEAKE | 39 | 3 ROOM | 11/13/2012 |
| 40 | | | CO MAN | 12/15/2012 |
| 41 | CARRIZO OIL & GAS | 41 | CO MAN | 11/13/2012 |
| 42 | CARRIZO OIL & GAS | 42 | CO MAN | 11/13/2012 |
| 43 | PIONEER | 139 | CO MAN | 11/13/2012 |
| 44 | PIONEER | 247 | CO MAN | 11/12/2012 |

| 45 | MARATHON | OFFICE | 6 MAN | 12/13/2012 |
|---|---|---|---|---|
| 46 | PIONEER | 139 | CO MAN | 11/13/2012 |
| 47 | AURORA | 47 | CO MAN | 11/13/2012 |
| 48 | MARATHON | 481 | CO MAN | |
| 49 | PIONEER | 246 | CO MAN | |
| 50 | MARATHON | OFFICE | CO MAN | 12/13/2012 |
| 51 | CRESCENT DIR | PEARSALL | CO MAN | 11/13/2012 |
| 52 | PIONEER | 139 | 12 MAN | 11/13/2012 |
| 53 | MARATHON | 480 | | |
| 54 | HILLCORP | EORGE WES | CO MAN | 12/7/2012 |
| 55 | CHESAPEAKE | 55 | CO MAN | 11/13/2012 |
| 56 | | YARD | 12 MAN | |
| 57 | | | | |
| 58 | READY | YARD | ATCO 2 Q W/O SINK | 12/17/2012 |
| 59 | READY | YARD | ATCO 2Q 2T | 12/17/2012 |
| 60 | PIONEER | 137 | 12 MAN | 11/13/2012 |
| 61 | | RANCH | ATCO | |
| 62 | PIONEER | 246 | ATCO | 12/13/2012 |
| 63 | READY | YARD | ATCO2Q 2T | 12/17/2012 |
| 64 | | | | |
| 65 | NEED CLEANING | YARD | ATCO | 12/18/2012 |
| 65 | READY | YARD | ATCO 2Q | 12/17/2012 |
| 66 | MARATHON | 480 | CO MAN | |
| 67 | MARATHON | 481 | 12 MAN | |
| 68 | PIONEER | 138 | 12 MAN | |
| 69 | GEO | BIG E #2 | ATCO | 11/13/2012 |
| 70 | PIONEER | 226 | ATCO | 11/13/2012 |
| 71 | PIONEER | 230 | ATCO | |
| 72 | PIONEER | 138 | 12 MAN | |
| 73 | PIONEER | 138 | ATCO | |
| 74 | MARATHON | 480 | ATCO | |
| 75 | MARATHON | 458 | | |
| 75 | | | | |
| 76 | PIONEER | 230 | | |
| 76 | yard | YARD | ATCO | 12/17/2012 |
| 77 | PIONEER | 139 | 12 MAN | 11/13/2012 |
| 78 | PIONEER | 231 | CO MAN | |
| 79 | | | | |
| 80 | GEO | BIG E #2 | ATCO | 11/13/2012 |
| 81 | READY | YARD | ATCO 1Q 5T | 12/17/2012 |
| 82 | GEO | BIG E #2 | ATCO | 11/13/2012 |
| 83 | TXQGG | CARRIZO | ATCO | 12/14/2012 |
| 84 | PIONEER | 132 | ATCO | |
| 85 | PIONEER | 230 | ATCO | 12/13/2012 |
| 86 | PIONEER | 230 | ATCO | |
| 86 | PIONEER | 231 | 12 MAN | |

| 87  | MARATHON   | OFFICE   | CO MAN  | 12/13/2012 |
|-----|------------|----------|---------|------------|
| 88  |            |          |         |            |
| 89  | MARATHON   | 458      | CO MAN  | 11/13/2012 |
| 90  | MARATHON   | OFFICE   | CO MAN  |            |
| 91  | PIONEER    | 468      | CO MAN  | 12/18/2012 |
| 92  | MARATHON   | 480      | 10 MAN  |            |
| 93  |            |          |         |            |
| 94  | GEO        | BIG E #2 | CO MAN  | 11/13/2012 |
| 95  |            |          |         |            |
| 96  | MARATHON   | 481      | 12 man  | 12/6/2012  |
| 96  | CARPENTORS | YARD     | 12 MAN  | 12/17/2012 |
| 97  | MARATHON   | OFFICE   | 12 MAN  | 12/13/2012 |
| 97  | shell      | YARD     | 12 man  | 12/17/2012 |
| 98  | CARPENTORS | YARD     | 3 ROOM  | 12/28/2012 |
| 99  | SHELL      | YARD     | co man  | 12/6/2012  |
| 100 | welders    | YARD     | co man  | 12/6/2012  |
| 101 |            |          |         |            |

SHOWER HOUSES

| CO. | RIG. | NO S.H. | |
|-----|------|---------|---|
| YARD | | 3 | |
| PIONEER | 132 | 1 | |
| PIONEER | 137 | 1 | |
| PIONEER | 138 | 1 | |
| PIONEER | 139 | 1 | |
| PIONEER | 226 | 1 | |
| PIONEER | 230 | 1 | |
| PIONEER | 231 | 1 | |
| PIONEER | 246 | 1 | |
| PIONEER | 247 | 1 | |
| PIONEER | 468 | 1 | |
| MARATHON | 458 | 1 | |
| MARATHON | 480 | 1 | |
| MARATHON | 481 | 1 | |
| MARATHON | 481 | 1 | MUD LAB |
| GEO | BIG E #2 | 1 | |

POTS

| CO. | RIG. | NO. |
|-----|------|-----|
| PIONEER | 132 | 11 |
| PIONEER | 137 | 12 |
| PIONEER | 138 | 12 |
| PIONEER | 139 | 10 |
| PIONEER | 226 | 9 |
| PIONEER | 230 | 9 |
| PIONEER | 231 | 9 |
| PIONEER | 246 | 9 |
| PIONEER | 247 | 8 |
| PIONEER | 468 | 9 |
| PIONEER | 458 | 10 |
| PIONEER | 480 | 11 |
| PIONEER | 481 | 9 |
| GEO | BIG E #2 | 8 |
| MARATHON | OFFICE | 6 |
| MARATHON | PIPELINE | 1 |
| CHESAPEAKE | 24 | 1 |
| CHESAPEAKE | 30 | 1 |
| CHESAPEAKE | 31 | 1 |
| CHESAPEAKE | 36 | 1 |
| CHESAPEAKE | 37 | 1 |
| CHESAPEAKE | 39 | 1 |
| CARRIZO OIL & GAS | 29 | 1 |
| CARRIZO OIL & GAS | 34 | 1 |
| CARRIZO OIL & GAS | 41 | 1 |
| CARRIZO OIL & GAS | 42 | 1 |
| AURORA | 47 | 1 |

| PORCHES | | |
|---------|---------|----|
| YARD | | 1 |
| PIONEER | 132 | 1 |
| PIONEER | 137 | 1 |
| PIONEER | 138 | 1 |
| PIONEER | 139 | 1 |
| PIONEER | 226 | 1 |
| PIONEER | 230 | 1 |
| PIONEER | 231 | 1 |
| PIONEER | 246 | 1 |
| PIONEER | 247 | 1 |
| PIONEER | 468 | 1 |
| MARATHON | 458 | 2 |
| MARATHON | 480 | 1 |
| MARATHON | 481 | 1 |
| GEO | BIGE #2 | 1 |
| GENERATORS | | |
| PIONEER | 137 | |
| PIONEER | 230 | |
| CHESAPEAKE | | |
| MARATHON | 480 | |
| MARATHON | 481 | |
| SEPTIC SKIDS | | |
| YARD | | 10 |
| PIONEER | 132 | 2 |
| PIONEER | 137 | 2 |
| PIONEER | 138 | 2 |
| PIONEER | 139 | 2 |
| PIONEER | 226 | 2 |
| PIONEER | 230 | 2 |
| PIONEER | 231 | 2 |
| PIONEER | 246 | 2 |
| PIONEER | 247 | 2 |
| PIONEER | 468 | 2 |
| MARATHON | 458 | 2 |
| MARATHON | 480 | 2 |
| MARATHON | 481 | 2 |
| GEO | BIG E #2 | 3 |
| MARATHON | OFFICE | 4 |
| MARATHON | PIPELINE | 1 |

## Disclosure Schedule 3.10(a)(i)

### Permitted Encumbrances

QLS        None

QLRS       None

## Disclosure Schedule 3.10(b)

### Real Property

**Note:  All real property is owned by DMobley and YMobley.  No written leases are in place and no rent has been charged or accrued in the current use of the property.  Legals on the property used by both QLS and QLRS are as follows:**

(1)     Street Address:  480 CR 335, El Campo, Texas

A 6.48 acre tract of land situated in the B.D. King (I.R.R. Co.) Survey No. 16, Abstract No. 601, and in the Isabella Woods Survey, Abstract No. 694, Wharton County, Texas, being a portion of Lot Two (2) of the Schoeneberg Subdivision as per plat thereof recorded in Slides 2119 & 2120 of the Plat Cabinet II Records of Wharton County, Texas, said 6.48 acre tract being more particularly described by metes and bounds in that certain General Warranty Deed recorded in Volume 654, Page 48, Wharton County, Texas.

and

Lot 1 of the Schoeneberg Subdivision, Whatron County, Texas, said plat being filed on July 11, 2005 in the Plat Records as File Number 225943 of the Plat Records II, Slide No. 2119-2120 of Whatron County, Texas.

(2)     Street Address:  1007 N. Hwy 77A, Yoakum, Texas

Being 2.44 acres of land, more or less, same being out of and a part of that certain 13.589 acre tract of land out of the Patrick Ryan League in Lavaca County, Texas, which 13.589 acre tract was conveyed by John Huth and wife, Ima Huth, to R.M. "Doc" Hagan by deed dated the 27th day of June, 1966, of record in Volume 237, Page 409, Deed Records of Lavaca County, Texas.

## Disclosure Schedule 3.11

### Exceptions to Condition/Sufficiency of Assets

QLS -        None

QLRS -       None

## Disclosure Schedule 3.12(b)

### Intellectual Property Licenses

QLS -        MS Office; QuickBooks; Adobe Acrobat

QLRS -       Same as above.

## Disclosure Schedule 3.12(c)

### Exceptions to Jointly-Owned Intellectual Property

QLS -        No jointly-owned IP.

QLRS -       No jointly-owned IP.

### Disclosure Schedule 3.12(d)

### Intellectual Property Licenses to QLS, etc.

QLS -        None

QLRS -       None

## Disclosure Schedule 3.12(f)

### Intellectual Property Licenses granted by QLS, etc.

QLS -          None

QLRS -         None

## Disclosure Schedule 3.15(a)

### Material Customers – $25,000 or more

| | Customer   -   2011 | Customer   -   2012 |
|---|---|---|
| QLS & QLRS | See 2011 Customers List Attached | See 2012 Customers List Attached |

## 2011 Customers – $25,000 or More

**12.31.11**

Total Revenue by Customer - Combined (Rental & QLS)

| Sum of Jan - Dec 11 | |
|---|---|
| Customer | Total |
| PIONEER NATURAL RESOURCES | 7,726,013 |
| GEO SOUTHERN ENERGY CORP | 5,785,122 |
| C & E OPERATING, INC. | 3,229,301 |
| N F R ENERGY | 2,165,806 |
| CHESAPEAKE OPERATING INC | 1,353,431 |
| HILCORP ENERGY COMPANY | 976,052 |
| CAZA OPERATING, LLC | 858,147 |
| A K G | 852,990 |
| FURIE OPERATING LLC | 771,517 |
| CASKIDS OPERATING | 658,362 |
| TEXAS - ENERGY | 467,975 |
| KINDER MORGAN | 263,032 |
| FORBES ENERGY SERVICES | 244,330 |
| AURORA RESOURCES CORPORATION | 134,170 |
| BAKER HUGHES | 115,255 |
| NOBLE ENERGY, INC. | 110,269 |
| COX & PERKINS EXPLORATION | 99,872 |
| WOLVERINE CONSTRUCTION | 83,692 |
| MARATHON OIL COMPANY | 53,365 |
| BECKVILLE DISPOSAL & OPERATIONS | 39,406 |
| | |

## 2012 Customers - $25,000 or More

Total Revenue by Customer - Combined (Rental & QLS)

| Jan - Nov 12 | |
|---|---|
| **Customer** | **Total** |
| PIONEER NATURAL RESOURCES | $ 7,301,085.00 |
| GEO SOUTHERN ENERGY CORP | 6,860,731.91 |
| C & E OPERATING, INC. | 2,290,535.18 |
| CHESAPEAKE OPERATING INC. | 2,059,200.00 |
| MARATHON OIL COMPANY | 1,635,303.53 |
| TEXAS ENERGY | 1,299,389.25 |
| WILLBROS DOWNSTREAM, LLC | 963,097.92 |
| TEXAS QUALITY MATS | 806,555.69 |
| A K G | 588,638.13 |
| N F R ENERGY | 333,471.48 |
| CARRIZO OIL & GAS | 324,285.00 |
| BAKER HUGHES | 246,915.00 |
| RESACA RESOURCES, LLC | 217,220.00 |
| COX & PERKINS EXPLORATION | 188,775.59 |
| CAZA OPERATING, LLC | 179,505.00 |
| SELECT ENERGY | 173,126.50 |
| GREEN HUNTER WATER | 142,388.00 |
| LLEWELLIN OPERATING COMPANY LLC | 135,795.00 |
| WHITE TOP | 91,895.00 |
| NOBLE ENERGY, INC. | 80,674.00 |
| CORONADO MINERALS LLC | 76,472.72 |
| HARVEST PIPELINE COMPANY | 70,680.00 |
| PREMIER NATIONAL RESOURCES LLC | 65,295.25 |
| J C INSTRIDE, INC. | 54,905.00 |
| LAVACA RIVER OPERATION | 46,805.00 |
| CRESCENT DIRECTIONAL DRILLING LP | 45,237.34 |
| AURORA RESOURCES CORPORATION | 43,220.00 |
| DAYTON LEASE SERVICE | 40,935.00 |
| LEGEND NATURAL GAS | 36,780.00 |
| ZENERGY, INC. | 36,595.00 |
| LINC ENERGY | 35,100.00 |
| FURIE OPERATING LLC | 29,150.00 |
| EAGLE FORD HUNTER | 28,610.00 |
| JET OIL PRODUCER INC | 28,560.00 |
| LIME ROCK RESOURCES | 28,455.00 |

**Disclosure Schedule 3.15(b)**

**Material Suppliers - $25,000 or more**

| Supplier - 2011 | Supplier - 2012 |
|---|---|
| QLS & QLRS | See 2011 Vendors List Attached | See 2012 Vendors List Attached |

2011 Vendors - $25,000 or More

| Name | Amount |
|---|---|
| Various credit cards | 1,421,384.00 |
| ATCO STRUCTURES & LOGISTICS | 1,114,078.00 |
| SUTHERLANDS LUMBER COMPANY | 632,312.00 |
| SUN COAST RESOURCES, INC. | 602,685.68 |
| FUEL STREAMERS, INC. | 449,499.84 |
| UNITED HEALTHCARE | 301,709.33 |
| FIRST INSURANCE FUNDING CORP. | 298,626.98 |
| ADVANCED CONTAINER CO., INC. | 287,600.00 |
| VELVDI OIL CO., INC. | 282,818.66 |
| ARGU.MDEGUI OIL CO. II, LTD | 249,997.69 |
| STATE COMPTROLLER | 229,181.00 |
| MUSTANG TRACTOR | 208,296.46 |
| CEMEX | 207,654.13 |
| MID-AMERICA ENGINE, INC | 193,427.44 |
| INLAND ENVIRONMENTAL & REMEDIATION | 185,961.75 |
| FLEETONE, LLC | 187,417.01 |
| VICTORIA MACK SALES | 163,059.78 |
| REGIONAL STEEL PRODUCTS, INC. | 160,913.97 |
| E.LAND PRODUCTS, INC. | 146,461.90 |
| TEXAS QUALITY GATE GUARD,LLC | 136,900.00 |
| SWANTNER & GORDON INSURANCE AGENCY | 129,678.00 |
| PRINODA GRAVEL COMPANY | 129,392.50 |
| BRIGGS & VESELKA CO. | 119,760.00 |
| M & M GRAVEL SALES, INC. | 116,354.30 |
| CROSS ROADS OIL FIELD SUPPLY | 113,732.74 |
| R & K FABRICATING | 102,000.00 |
| VONDERAU FORD | 98,911.87 |
| EFFICIENCY AIR INC. | 96,192.58 |
| MARTIN PHASE CONVERTERS, INC. | 94,580.00 |
| PATRICK KUBALA TAX ASSESSOR | 94,032.21 |
| GENE'S WRECKER | 92,001.13 |
| NEW GATE SUTTOS | 90,482.29 |
| REEDY TRUCKING, INC. | 90,447.26 |
| AT&T | 89,317.00 |
| WHARTON COUNTY ELECTRIC COOP | 87,055.45 |
| WALMART | 83,284.67 |
| APPLIED STANDARDS INSPECTION, INC. | 77,167.80 |
| EL CAMPO PARTS, INC. | 76,781.44 |
| SELECT IMPORTS FURNITURE & DECOR | 71,656.01 |
| IMMEK MATERIALS CO. | 71,638.68 |
| MARTIN AUTOPARK | 66,458.89 |
| SHERWIN WILLIAMS CO. | 65,660.40 |
| NAVISTAR FINANCIAL CORPORATION 236745 | 84,679.84 |
| JACKIE DRIVE IN | 64,299.28 |
| TEXAS DEPT. OF TRANSPORTATION | 61,650.00 |
| STAG OILFIELD SERVICES | 61,403.76 |
| TF TANK SERVICES, LLC | 59,626.58 |
| SOUTH TEXAS CORRUGATED PIPE | 59,339.80 |
| TERRY BRANDL WELDING, INC. | 57,416.41 |
| TREVINO CONSTRUCTION COMPANY, LLC | 55,385.00 |
| GRAINGER | 55,158.42 |
| HODGES WELDING SUPPLY | 54,062.25 |
| H BUILDERS, LLC | 53,700.00 |
| WOLVERINE CONSTRUCTION, INC. | 53,080.49 |
| ACCOYS | 52,755.00 |
| SIMPLOT GROWER SOLUTIONS | 51,420.70 |
| ISAACES DIRECTIONAL DRILLING | 49,980.00 |
| GCR LOUISE/ELCAMPO | 49,855.10 |
| E. A. COLLINS & SONS | 49,872.36 |
| DIESEL TRUCK SERVICE | 48,007.50 |
| FARMERS COOP OF EL CAMPO | 45,626.88 |
| COASTAL TRAILER SALES | 43,776.00 |
| LECO LIFT | 43,552.50 |
| SEAMANS PLUMBING | 43,102.24 |
| DIRECTV | 42,835.00 |
| HART TV & ELECTRONICS | 42,802.34 |
| HOELSCHER CAR CARE CENTER | 41,580.85 |
| WYLIE MANUFACTURING CO. | 41,659.86 |
| TRACTOR SUPPLY CREDIT PLAN | 40,722.41 |
| LEGOLFT INC. | 40,052.50 |
| JWCO DIRECTIONAL DRILLING, INC | 39,210.00 |
| BK CUSTOMZ & COLLISION | 38,371.56 |
| OUTLAW SAFETY & COMPLIANCE LLC | 36,386.64 |
| SPECIAL INSURANCE SERVICES | 35,963.69 |
| DU-TEX, INC. | 34,667.17 |
| JAMES W. KEATING, CPA | 32,896.00 |
| MARCO MACHINE COMPANY, INC. | 32,095.42 |
| LONE STAR GLASS | 31,934.57 |
| VERMEER EQUIPMENT OF TEXAS | 31,640.35 |
| SOUTHERN ALARM, INC. | 31,064.00 |
| COBURES | 30,474.64 |
| RSC EQUIPMENT RENTAL | 30,062.07 |
| CLEANSTREAM WASTEWATER | 29,385.56 |
| GULF INTERNATIONAL TRUCKS | 29,268.31 |
| TROYS FENCE | 28,900.00 |
| HANDSOME HOMES LLC | 28,332.00 |
| DE LAGE LANDEI 481247 | 26,681.59 |
| UN-FIRST HOLDINGS, INC. | 26,531.20 |
| MEDINA PAINT & BODY | 25,390.00 |
| STENHOLM WELDING SERVICE | 25,320.00 |

2012 Vendors - $25,000 or More

| Name | Amount |
|---|---|
| Various credit cards | 993,237.00 |
| THOMAS PETROLEUM, LLC | 459,227.54 |
| CEMEX | 384,621.67 |
| SUTHERLANDS LUMBER COMPANY | 343,465.00 |
| FLEETONE, LLC | 300,197.69 |
| M & B EXPLORATION | 298,910.00 |
| UNITED HEALTHCARE | 281,604.04 |
| M & M GRAVEL SALES, INC. | 241,948.54 |
| FUEL STREAMERS, INC. | 229,712.71 |
| STATE COMPTROLLER | 170,348.29 |
| ARGUINDEGUI OIL CO, II, LTD. | 150,833.56 |
| MID-AMERICA ENGINE, INC. | 150,319.00 |
| SUN COAST RESOURCES, INC. | 147,564.59 |
| VICTORIA MACK SALES | 128,954.59 |
| REGIONAL STEEL PRODUCTS, INC. | 128,280.11 |
| ADVANCED CONTAINER CO., INC. | 119,800.00 |
| AMBERSCAPES, INC. | 103,501.25 |
| LECO LIFT | 101,806.43 |
| TEXAS QUALITY GATE GUARD,LLC | 100,462.50 |
| I-IMPACT SOLUTIONS, LLC | 98,100.00 |
| TEXAS DEPT. OF TRANSPORTATION | 90,000.00 |
| BOUDREAULT ELECTRONICS, LLC | 75,431.30 |
| GCR LOUISE/ELCAMPO | 73,184.36 |
| MAREK MATERIALS CO. | 72,123.66 |
| GENE'S WRECKER | 67,985.66 |
| APPLIED STANDARDS INSPECTION, INC. | 66,353.50 |
| E&R ENERGY, LP | 65,000.00 |
| VONDERAU FORD | 64,974.49 |
| SHERWIN WILLIAMS CO. | 61,937.82 |
| EL CAMPO PARTS, INC. | 57,818.62 |
| INLAND ENVIRONMENTAL & REMEDIATION | 57,298.90 |
| COA TEXAS MATAGORDA BAY CHAPTER | 54,476.00 |
| VELVIN OIL CO., INC. | 53,355.39 |
| EFFICIENCY AIR INC. | 53,279.01 |
| TERRY BRANDL WELDING, INC. | 52,551.15 |
| CROSS ROADS OIL FIELD SUPPLY | 51,693.13 |
| CORNER STOP | 50,345.76 |
| EXPRESS ENERGY SERVICES OPERATING L | 48,031.26 |
| AT&T | 47,178.00 |
| CHESTER KOEHN LASER LANDLEVELING | 46,082.50 |
| MCCOYS | 46,574.00 |
| JACK'S DRIVE IN | 42,776.16 |
| WHARTON COUNTY ELECTRIC COOP | 42,650.19 |
| TROY W. GLOVER | 41,806.90 |
| J & S OILFIELD CONSTRUCTION SERVICES | 40,150.00 |
| GULF INTERNATIONAL TRUCKS | 39,623.19 |
| NICHOLS' VINYL FENCE & RAILING | 38,606.07 |
| CUSTOM MARINE FABRICATORS | 38,187.00 |
| ERIKSEN MARINE | 37,721.76 |
| RUSHING TRANSPORT SERVICES, INC. | 37,106.91 |
| DERRICK L. ROLLINS | 37,095.46 |
| HOUSTON FREIGHTLINER,WESTERN STAR | 36,295.18 |
| VULCAN CONSTRUCTION MATERIALS, LP | 36,195.07 |
| UNITED AG | 35,652.50 |
| UNIFIRST HOLDINGS, INC. | 34,640.18 |
| RINKER MATERIALS | 34,363.56 |
| DELFINO V CHAVELAS | 34,293.29 |
| JAMES W. KEATING, CPA | 34,215.00 |
| HODGES WELDING SUPPLY | 34,006.16 |
| DIRECTV | 33,570.00 |
| DXP ENTERPRISES, INC. | 33,557.97 |
| PATRICK KUBALA TAX ASSESSOR | 33,198.52 |
| SWANTNER & GORDON INSURANCE AGENCY | 32,743.00 |
| REEDY TRUCKING, INC. | 32,680.00 |
| MARK'S MACHINE COMPANY, INC. | 32,390.14 |
| TRAVEL PLANNER | 31,422.44 |
| MARTIN PHASE CONVERTERS, INC. | 31,040.00 |
| BRIGGS & VESELKA CO. | 30,026.00 |
| CENTURY ASPHALT | 29,127.78 |
| SELECT IMPORTS FURNITURE & DECOR | 28,293.24 |
| ETOS INC. | 27,839.84 |
| HOELSCHER CAR CARE CENTER | 26,542.55 |
| WALMART | 25,616.06 |

## Disclosure Schedule 3.16

### Insurance Policies & Claims

QLS & QLRS - Insurance maintained by Sellers or their Affiliates:

Acadia Ins.  #WCA 30000222-10
Fireman's #CAA 3000219-10

Berkley National Insurance Co. EGL000197210 – Commercial General Liability
Berkley National Insurance Co. EUL000197310 - Umbrella Liability
Berkley Regional Insurance Co. ECA310199612 – Automobile Liability
Berkley Regional Insurance Co. EWC310201512 - Workers Compensation & Employers' Liability
Navigators Insurance Co. HO10ILM01682202 – Leased/Rented Equipment Floater

QLS & QLRS – Pending claims in which coverage has been questioned, denied or disputed, etc.:  None.

## Disclosure Schedule 3.17(a)

### Legal Actions

QLS -        None

QLRS -        None

<u>Disclosure Schedule 3.17(b)</u>

**Outstanding Government Orders/Unsatisfied Judgments, etc.**

QLS -         None

QLRS -       None

## Disclosure Schedule 3.18(a)

### Exceptions to Compliance with Laws

QLS -         None

QLRS -        None

## Disclosure Schedule 3.18(b)

### Permits

QLS -      Application for Oil & Gas Waste Hauler's Permit (See Attached)
US DOT Permit #MC-738168-P (See Attached)
NM Taxation & Revenue Department Registration Certificate (See Attached)
FL Department of State certificate of good standing (See Attached)
Texas Sales & Use Tax Permit #1-76-0386612-4

QLRS -    Texas Sales & Use Tax Permit #3-20346-8572-0

## Disclosure Schedule 3.19(b)

### Environmental Permits

QLS -          None

QLRS -         None

**Disclosure Schedule 3.19(e)**

**Storage Tanks**

QLS maintains three aboveground storage tanks located on the northwest corner of the Real Property located at 480 CR 335, El Campo, Texas.

## Disclosure Schedule 3.19(f)

### Off-Site Hazardous Materials Facilities/Locations

QLS -          None

QLRS -         None

**Disclosure Schedule 3.19(h)**

**Environmental Reports, etc.**

QLS -        None

QLRS -       None

## Disclosure Schedule 3.19(j)

### Environmental Attributes

QLS -        None

QLRS -       None

### Disclosure Schedule 3.20(a)

**Employee Benefit Plans**

QLS –        United Health Care – Medical
             United Health Care – Prescription Drugs
             Colonial Life – Accident, Criticall Illness, Term Life, Disability
             SIS Line – Supplemental (Medical Gap Insurance)


QLRS –       None

## Disclosure Schedule 3.20(c)

### Exceptions to Benefit Plan Compliance

QLS -       None

QLRS -      None

## Disclosure Schedule 3.20(e)

### Multi-Employer Plan, etc.

QLS -      None

QLRS -     None

### Disclosure Schedule 3.20(f)

**Benefit Plan Litigation**

QLS -        None

QLRS -       None

## Disclosure Schedule 3.20(g)

### Post-Termination/Retiree Welfare Benefits

QLS -        None

QLRS -        None

**Disclosure Schedule 3.20(h)**

**Threatened Actions/Audits etc. – Benefit Plans**

QLS -          None

QLRS -        None

## Disclosure Schedule 3.20(l)

### Entitlement/Acceleration, etc. – Benefit Plan

QLS -        None

QLRS -        None

### Disclosure Schedule 3.21(a)

### Employees, Independent Contractors, Consultants

QLS -    See attached for Employees, Hire Date, Title & Compensation plus Bonuses paid for 2009, 2010 & 2011.
No Independent Contractors
No Consultants
75% of Employees Health Insurance is paid by QLS
100% Health Insurance paid by QLS for the following employees
Lisa L. Alliston, Doyle R. Gassett, April Guardado, Tammie W. Mazander, Jason McGraw, Jessie B. Mobley, Sr., Cody B. Mobley, David M. Mobley, David R. Mobley, Yvette Mobley, Mary M. Murphy, Rigoberto Rubio Vega, Troy G. Eason, Tiffany A. Hawes, Stacy Metting, Steven L. Quinn and Amy L. Eubanks.
100% of Employees SIS Link supplemental insurance is paid by QLS (To Cover the deductible from UHC)
Company cell phones are provided & used for business & personal use
Fuel-One tank of fuel is provided for Office personnel weekly.


QLRS -    No Employees, Independent Contractors or Consultants

QLS-Sino Payroll

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | REG. PAY RATE | OVT. RATE |
|---|---|---|---|---|---|---|---|---|
| 1 | ALEJANDRO ALCANTAR | 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 | 03/17/08 | 01/11/69 | SPANISH | CARPENTER | $ 21.25 | $ 10.62 |
| 2 | ALEXANDER S. PENA | 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 | 10/12/09 | 12/25/83 | ENGLISH | MECHANIC | $ 15.00 | $ 7.50 |
| 3 | AMANDA N. MOBLEY | 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 | 10/18/10 | 07/10/84 | ENGLISH | SECRETARY | $ 1,000.00 | $ - |
| 4 | AMY L. EUBANKS | 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 | 09/01/10 | 07/06/75 | ENGLISH | SALES | $ 1,500.00 | $ - |
| 5 | APRIL NICOLE ESCAMILLA GUARDADO | 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 | 12/30/08 | 07/13/93 | ENGLISH | SECRETARY | $ 300.00 | |
| 6 | ATANACIO DEL AGUA GUERRERO | 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 | 09/28/11 | 08/14/86 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 7 | CARLOS RUIZ | 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 | 03/17/08 | 04/11/70 | SPANISH | CARPENTER | $ 14.00 | $ 7.00 |
| 8 | CARMEN Z. CHOLOPISA | 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 | 05/31/12 | 12/03/82 | ENGLISH | MAINTENANCE | $ 1,462.00 | |
| 9 | CHASE D. FARMER | 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 | 12/05/11 | 03/27/85 | ENGLISH | OPERATOR | $ 11.60 | $ 5.80 |
| 10 | CODY B. MOBLEY | 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 | 06/01/06 | 02/06/89 | ENGLISH | SALES | $ 1,000.00 | |
| 11 | COURTNEY MOBLEY | 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 | 08/14/09 | 02/28/91 | ENGLISH | OFFICE HELP | $ 300.00 | |
| 12 | DAVID J. RIVERA | 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 | REHIRE - 07/01/11 | 07/01/71 | SPANISH | DRIVER | $ 11.60 | $ 5.80 |
| 13 | DAVID M. MOBLEY | 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 | 05/01/89 | 08/24/62 | ENGLISH | PRESIDENT | $ 3,000.00 | |
| 14 | DAVID R. MOBLEY | 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 | 02/21/05 | 10/29/83 | ENGLISH | SALES | $ 2,000.00 | |
| 15 | DELFINO V. CHAVELAS | 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 | 03/17/08 | 01/09/71 | SPANISH | CARPENTER | $ 12.90 | $6.45 |
| 16 | DERRICK L. ROLLINS | 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 | REHIRE - 10/30/11 | 11/15/69 | ENGLISH | DRIVER | $ 11.60 | $5.80 |
| 17 | ERNESTO BRIONES | 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 | 06/26/06 | 11/07/58 | SPANISH | WELDER | $ 11.75 | $ 5.87 |
| 18 | ESMERALDA CAROLINA HERNANDEZ GODINEZ | 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 | 10/03/12 | 06/19/77 | SPANISH | MAINTENANCE | $ 10.00 | $ 5.00 |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | REG. PAY RATE | OVT. RATE |
|---|---|---|---|---|---|---|---|---|
| 19 | ESPERANZA REYNA | 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 | 11/03/08 | 02/13/49 | SPANISH | MAINTENANCE | $ 10.00 | $ 5.00 |
| 20 | ESTEBAN MOSQUEDA PARTIDA | 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 | 01/21/12 | 09/02/83 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 21 | EVODIO MORALES | 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 | 09/18/06 | 07/12/77 | SPANISH | ROUSTABOUT | $ 8.00 | $ 4.00 |
| 22 | FERMAN VEGA | 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 | 05/14/00 | 08/04/75 | SPANISH | PUSHER | $ 11.75 | $ 5.87 |
| 23 | FERNANDO RAMIREZ | 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 | 08/13/07 | 07/27/80 | SPANISH | WELDER | $ 8.00 | $ 4.00 |
| 24 | FIDEL GARCIA RAMON | 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 | 10/18/12 | 07/23/67 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 25 | FRANCISCO J. JARAMILLO-RIVAS | 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 | 09/22/11 | 03/11/88 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 26 | GABRIEL MENDOZA-CHAVEZ | 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 | 08/26/10 | 03/05/78 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 27 | GELACIO ALMAZAN | 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 | 09/08/00 | 11/21/65 | SPANISH | PUSHER | $ 10.90 | $ 5.45 |
| 28 | GERARDO ZAMUDIO | 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 | 02/17/12 | 11/21/80 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 29 | GILBERT LEDEAY | 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 | 05/24/06 | 08/27/89 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 30 | J JESUS MESA LUJAN | 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 | 07/07/11 | 01/23/83 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 31 | JACOB E. BRIDGES | 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 | 02/07/12 | 11/22/80 | ENGLISH | MAINTENANCE | $ 1,500.00 | |
| 32 | JASON MCGRAW | 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 | 07/13/09 | 06/14/79 | ENGLISH | MAINTENANCE | $ 1,500.00 | |
| 33 | JEREMY C. LESLEY | 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 | 04/05/12 | 02/14/84 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 34 | JESSIE BAILEY MOBLEY SR | 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 | 01/16/12 | 06/19/67 | ENGLISH | MAINTENANCE | $ 1,500.00 | |
| 35 | JIMMY COLE CORMIER | 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 | 10/06/10 | 08/26/85 | ENGLISH | MECHANIC | $ 14.00 | $ 7.00 |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | REG. PAY RATE | | OVT. RATE | |
|---|---|---|---|---|---|---|---|---|---|---|
| 36 | JONATHAN LUIS SANTIAGO | 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 | | | | DRIVER | $ | 11.60 | $ | 5.80 |
| 37 | JONATHAN WAYNE STOUT | 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 | 04/05/12 | 08/11/83 | ENGLISH | DRIVER | $ | 11.60 | $ | 5.80 |
| 38 | JOSE C. GONZALEZ CELIO | 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 | 10/22/11 | 02/03/73 | SPANISH | ROUSTABOUT | $ | 7.25 | $ | 3.62 |
| 39 | JOSE L ESPINO PANIAGUA | 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 | 11/11/11 | 07/21/91 | ENGLISH | ROUSTABOUT | $ | 7.25 | $ | 3.62 |
| 40 | JOSE L OCHOA | 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 | REHIRE - 10/04/11 | 09/10/86 | ENGLISH | MAINTENANCE | $ | 1,500.00 | | |
| 41 | JOSHEPH MELANCON | 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 | REHIRE - 08/27/12 | 11/20/69 | ENGLISH | DRIVER | $ | 11.60 | $ | 5.80 |
| 42 | JUAN ALBERTO ALONSO | 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 | 06/11/07 | 04/08/67 | SPANISH | YARDMAN | $ | 8.00 | $ | 4.00 |
| 43 | JUAN DEL AGUA GUERRERO | 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 | 09/28/11 | 01/27/58 | SPANISH | ROUSTABOUT | $ | 7.25 | $ | 3.62 |
| 44 | KALYNN CHEYENNE GASSETT | 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 | 06/17/11 | 11/25/92 | ENGLISH | MAINTENANCE | $ | 8.00 | | $4.00 |
| 45 | LAMBERT J. LEDEAY | 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 | 10/21/12 | 08/04/85 | ENGLISH | MAINTENANCE | $ | 8.00 | | $4.00 |
| 46 | LEON NUNEZ JR. | 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 | 11/17/10 | 05/02/48 | ENGLISH | DRIVER | $ | 11.60 | $ | 5.80 |
| 47 | LEROY F. LONGORIA II | 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 | 10/13/10 | 04/08/93 | ENGLISH | ROUSTABOUT | $ | 7.25 | $ | 3.62 |
| 48 | LEROY LONGORIA | 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 | 10/28/10 | 07/24/55 | ENGLISH | DRIVER | $ | 8.00 | $ | 4.00 |
| 49 | LISA L. ALLISTON | 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 | 12/06/10 | 04/26/80 | ENGLISH | SALES | $ | 1,500.00 | $ | - |
| 50 | LUIS MATEO PERALES | 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 | 10/09/06 | 09/21/56 | SPANISH | ROUSTABOUT | $ | 8.00 | $ | 4.00 |
| 51 | MACARIO G. CORDOVA JR. | 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 | 10/10/12 | 12/15/93 | ENGLISH | MAINTENANCE | $ | 8.00 | $ | 4.00 |
| 52 | MANUEL MARTINEZ | 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 | 10/27/11 | 01/09/52 | SPANISH | ROUSTABOUT | $ | 7.25 | $ | 3.62 |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | REG. PAY RATE | OVT. RATE |
|---|---|---|---|---|---|---|---|---|
| 53 | MARCELO L. ROSAS | 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 | 03/17/08 | 01/16/69 | SPANISH | CARPENTER | $ 9.50 | $ 4.75 |
| 54 | MARTIN JIMENEZ | 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 | 11/05/12 | 08/24/73 | SPANISH | ROUSTABOUT | $ 11.45 | $ 7.42 |
| 55 | MARY M. MURPHY | 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 | 08/20/03 | 11/01/60 | ENGLISH | HR SECRETARY | $ 10.48 | |
| 56 | MATEO VITE | 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 | 04/30/07 | 04/25/80 | SPANISH | ROUSTABOUT | $ 9.00 | $ 4.50 |
| 57 | MAVERICK JAMAAL SMITH | 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 | 07/11/11 | 10/23/90 | ENGLISH | MAINTENANCE | $ 8.00 | $ 4.00 |
| 58 | MELVIN GRIMALDO-LAGOS | 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 | 03/17/08 | 12/16/72 | SPANISH | CARPENTER | $ 10.00 | $ 5.00 |
| 59 | MICHAEL ANGELO LOPEZ | 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 | REHIRE 08/06/12 3/17/2008 | 08/12/89 | ENGLISH | MAINTENANCE | $ 12.20 | $ 6.10 |
| 60 | MICHAEL ANTHONY PATINA | 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 | 09/18/12 | 08/29/83 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 61 | MICHAEL NASER | 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 | 05/31/02 | 08/18/65 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 62 | MIGUEL LERAY ORTIZ | 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 | 08/19/11 | 03/21/68 | ENGLISH | MAINTENANCE | $ 1,500.00 | |
| 63 | PABLO DELA PENA | 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 | 10/22/11 | 10/04/65 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 64 | PETE NUNEZ | 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 | 11/11/11 | 11/14/63 | ENGLISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 65 | REID GASSETT | 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 | 02/23/05 | 12/15/67 | ENGLISH | MAINTENANCE | $ 1,700.00 | |
| 66 | RICHARD E. BRACEWELL - Richard was in a car accident on November 26, 2012 - if or when he can return to work is uncertain at this time. | 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 | 10/08/12 | 05/10/57 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 67 | RICHARD W. BRENNER | 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 | 06/11/12 | 10/28/80 | ENGLISH | OPERATOR | $ 11.60 | $ 5.80 |
| 68 | RIGOBERTO RUBIO | 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 | 07/11/96 | 10/28/78 | SPANISH | FOREMAN | $ 1,600.00 | |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | REG. PAY RATE | OVT. RATE |
|---|---|---|---|---|---|---|---|---|
| 69 | ROBERT LEE BEDFORD | 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 | 10/02/12 | 06/22/50 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 70 | RODY MARTINEZ ROMERO | 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 | 10/12/11 | 10/26/71 | SPANISH | ROUSTABOUT | $ 7.25 | $ 3.62 |
| 71 | SALOMON LOREDO GALLEGOS | 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 | 07/14/03 | 06/22/70 | SPANISH | PUSHER | $ 10.90 | $ 5.45 |
| 72 | SILBANO GUERRA-PALOMO | 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 | 10/04/10 | 02/10/61 | SPANISH | WELDER | $ 10.00 | $ 5.00 |
| 73 | STACY M. METTING | 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 | 08/11/08 | 07/01/80 | ENGLISH | SALES | $ 1,500.00 | $ - |
| 74 | STEVEN L. QUINN | 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 | 10/24/11 | 10/03/69 | ENGLISH | SUPERVISOR | $ 3,269.23 | $ - |
| 75 | TAMMIE MAZANDER | 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 | 10/19/98 | 05/15/62 | ENGLISH | SECRETARY | $ 12.18 | $ - |
| 76 | TANNER ARIC SCHOENER | 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 | 04/09/12 | 05/12/94 | ENGLISH | YARDMAN | $ 8.00 | $ 4.00 |
| 77 | TIFFANY A. (STEINHOFF) HAWES | 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 | 10/20/08 | 01/15/82 | ENGLISH | SALES | $ 1,500.00 | $ - |
| 78 | TREY DELEON CURTIS | 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 | 11/19/12 | 07/23/88 | ENGLISH | MAINTENANCE | $ 1,500.00 | $ - |
| 79 | TROY G. EASON | 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 | 11/05/12 | 07/31/61 | ENGLISH | SUPERVISOR | $ 1,400.00 | $ - |
| 80 | TULIO GUTIERREZ | 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 | 04/28/10 | 03/02/61 | SPANISH | CARPENTER | $ 9.50 | $ 4.75 |
| 81 | VICTOR CARLOS HERNANDEZ ULLOA | 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 | 07/31/12 | 01/12/51 | SPANISH | ELECTRICIAN | $ 10.00 | $ 5.00 |
| 82 | VICTOR H. VELAZQUEZ | 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 | 08/15/11 | 03/11/89 | ENGLISH | DRIVER | $ 11.60 | $ 5.80 |
| 83 | WILLIAM KRPEC | 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 | 04/12/10 | 07/08/48 | ENGLISH | MECHANIC | $ 15.00 | $ 7.50 |
| 84 | YVETTE MOBLEY | 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 | 05/30/89 | 12/28/64 | ENGLISH | OFFICE MANAGER | $ 1,500.00 | |

QL5 -fm - Bonuses

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | 2009 BONUS | 2010 BONUS | 2011 BONUS |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ALEJANDRO ALCANTAR | 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 | 03/17/08 | 01/11/89 | SPANISH | CARPENTER | $100.00 | $200.00 | $200.00 |
| 2 | ALEXANDER S. PENA | 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 | 10/12/09 | 12/25/63 | ENGLISH | MECHANIC | $0.00 | $200.00 | $300.00 |
| 3 | AMANDA N. MOBLEY | 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 | 10/18/10 | 07/10/84 | ENGLISH | SECRETARY | $0.00 | $300.00 | $500.00 |
| 4 | AMY L. EUBANKS | 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 | 09/01/10 | 07/08/75 | ENGLISH | SALES | $0.00 | $300.00 | $1,000.00 |
| 5 | APRIL NICOLE ESCAMILLA GUARDADO | 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 | 12/30/08 | 07/13/93 | ENGLISH | SECRETARY | $0.00 | $500.00 | $600.00 |
| 6 | ATANACIO DEL AGUA GUERRERO | 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 | 09/28/11 | 08/14/66 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 7 | CARLOS RUIZ | 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 | 03/17/08 | 04/11/70 | SPANISH | CARPENTER | $100.00 | $100.00 | $200.00 |
| 8 | CARMEN Z. CHOLOPISA | 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 | 05/31/12 | 12/03/62 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |
| 9 | CHASE D. FARMER | 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 | 12/05/11 | 03/27/85 | ENGLISH | OPERATOR | $0.00 | $0.00 | $200.00 |
| 10 | CODY B. MOBLEY | 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 | 08/01/06 | 02/06/89 | ENGLISH | SALES | $0.00 | $100.00 | $2,500.00 |
| 11 | COURTNEY MOBLEY | 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 | 08/14/09 | 02/28/91 | ENGLISH | OFFICE HELP | $0.00 | $100.00 | $1,500.00 |
| 12 | DAVID J. RIVERA | 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 | REHIRE - 07/01/11 | 07/01/71 | SPANISH | DRIVER | $100.00 | $300.00 | $200.00 |
| 13 | DAVID M. MOBLEY | 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 | 05/01/89 | 08/24/62 | ENGLISH | PRESIDENT | $0.00 | $0.00 | $2,500.00 |
| 14 | DAVID R. MOBLEY | 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 | 02/21/05 | 10/29/83 | ENGLISH | SALES | $0.00 | $500.00 | $2,500.00 |
| 15 | DELFINO V. CHAVELAS | 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 | 03/17/08 | 01/09/71 | SPANISH | CARPENTER | $100.00 | $100.00 | $200.00 |
| 16 | DERRICK L. ROLLINS | 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 | REHIRE - 10/30/11 | 11/15/69 | ENGLISH | DRIVER | $0.00 | $0.00 | $200.00 |
| 17 | ERNESTO BRIONES | 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 | 06/26/06 | 11/07/58 | SPANISH | WELDER | $300.00 | $300.00 | $400.00 |
| 18 | ESMERALDA CAROLINA HERNANDEZ-GODINEZ | 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 | 10/03/12 | 08/19/77 | SPANISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | 2009 BONUS | 2010 BONUS | 2011 BONUS |
|---|---|---|---|---|---|---|---|---|---|
| 19 | ESPERANZA REYNA | 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 | 11/03/08 | 02/13/49 | SPANISH | MAINTENANCE | $0.00 | $100.00 | $200.00 |
| 20 | ESTEBAN MOSQUEDA PARTIDA | 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 | 01/21/12 | 09/02/83 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $0.00 |
| 21 | EVODIO MORALES | 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 | 09/18/06 | 07/1/2/77 | SPANISH | ROUSTABOUT | $0.00 | $200.00 | $400.00 |
| 22 | FERNAN VEGA | 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 | 05/14/00 | 08/04/75 | SPANISH | PUSHER | $500.00 | $500.00 | $1,000.00 |
| 23 | FERNANDO RAMIREZ | 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 | 08/13/07 | 07/27/60 | SPANISH | WELDER | $100.00 | $200.00 | $300.00 |
| 24 | FIDEL GARCIA RAMON | 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 | 10/18/12 | 07/23/57 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 25 | FRANCISCO J. JARAMILLO-RIVAS | 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 | 09/22/11 | 03/11/88 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 26 | GABRIEL MENDOZA-CHAVEZ | 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 | 06/28/10 | 03/05/78 | ENGLISH | DRIVER | $0.00 | $200.00 | $500.00 |
| 27 | GELACIO ALMAZAN | 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 | 09/08/00 | 11/21/65 | SPANISH | PUSHER | $500.00 | $500.00 | $1,000.00 |
| 28 | GERARDO ZAMUDIO | 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 | 02/17/12 | 11/21/80 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $0.00 |
| 29 | GILBERT LEDEAY | 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 | 05/24/06 | 09/27/69 | ENGLISH | DRIVER | $200.00 | $300.00 | $500.00 |
| 30 | J JESUS MESA LUJAN | 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 | 07/07/11 | 01/23/63 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 31 | JACOB E. BRIDGES | 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 | 02/07/12 | 11/22/80 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |
| 32 | JASON MCGRAW | 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 | 07/13/09 | 06/14/79 | ENGLISH | MAINTENANCE | $0.00 | $500.00 | $1,000.00 |
| 33 | JEREMY C. LESLEY | 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 | 04/05/12 | 02/14/84 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 34 | JESSIE BAILEY MOBLEY SR | 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 | 01/16/12 | 06/19/67 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |
| 35 | JIMMY COLE CORMIER | 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 | 10/06/10 | 08/26/85 | ENGLISH | MECHANIC | $0.00 | $100.00 | $200.00 |

| # | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | 2009 BONUS | 2010 BONUS | 2011 BONUS |
|---|---|---|---|---|---|---|---|---|---|
| 36 | JONATHAN LUIS SANTIAGO | 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 | | | | DRIVER | $0.00 | $0.00 | $0.00 |
| 37 | JONATHAN WAYNE STOUT | 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 | 04/05/12 | 03/11/83 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 38 | JOSE C. GONZALEZ CELIO | 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 | 10/22/11 | 02/03/73 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 39 | JOSE L ESPINO PANIAGUA | 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 | 11/1/11 | 07/21/91 | ENGLISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 40 | JOSE L OCHOA | 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 | REHIRE - 10/04/11 | 09/10/86 | ENGLISH | MAINTENANCE | $100.00 | $200.00 | $300.00 |
| 41 | JOSHEPH MELANCON | 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 | REHIRE - 08/27/12 | 11/20/69 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 42 | JUAN ALBERTO ALONSO | 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 | 08/11/07 | 04/08/87 | SPANISH | YARDMAN | $100.00 | $100.00 | $400.00 |
| 43 | JUAN DEL AGUA GUERRERO | 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 | 09/28/11 | 01/27/58 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 44 | KALYNN CHEYENNE GASSETT | 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 | 06/17/11 | 11/26/92 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $100.00 |
| 45 | LAMBERT J. LEDEAY | 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 | 10/21/12 | 06/04/85 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |
| 46 | LEON NUNEZ JR. | 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 | 11/17/10 | 05/02/48 | ENGLISH | DRIVER | $0.00 | $100.00 | $200.00 |
| 47 | LEROY F. LONGORIA II | 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 | 10/13/10 | 04/08/93 | ENGLISH | ROUSTABOUT | $0.00 | $100.00 | $200.00 |
| 48 | LEROY LONGORIA | 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 | 10/28/10 | 07/24/55 | ENGLISH | DRIVER | $0.00 | $100.00 | $200.00 |
| 49 | LISA L ALLISTON | 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 | 12/06/10 | 04/28/80 | ENGLISH | SALES | $0.00 | $0.00 | $1,000.00 |
| 50 | LUIS MATEO PERALES | 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 | 10/08/06 | 09/21/56 | SPANISH | ROUSTABOUT | $250.00 | $250.00 | $400.00 |
| 51 | MACARIO G. CORDOVA JR. | 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 | 10/10/12 | 12/15/93 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |
| 52 | MANUEL MARTINEZ | 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 | 10/27/11 | 01/09/52 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | 2009 BONUS | 2010 BONUS | 2011 BONUS |
|---|---|---|---|---|---|---|---|---|---|
| 53 | MARCELO L ROSAS | 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 | 03/17/08 | 01/16/69 | SPANISH | CARPENTER | $100.00 | $100.00 | $200.00 |
| 54 | MARTIN JIMENEZ | 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 | 11/05/12 | 08/24/73 | SPANISH | ROUSTABOUT | $0.00 | $200.00 | $300.00 |
| 55 | MARY M. MURPHY | 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 | 08/20/03 | 11/01/60 | ENGLISH | HR SECRETARY | $1,000.00 | $1,000.00 | $1,500.00 |
| 56 | MATEO VITE | 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 | 04/30/07 | 04/25/80 | SPANISH | ROUSTABOUT | $350.00 | $350.00 | $500.00 |
| 57 | MAVERICK JAMAAL SMITH | 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 | 07/11/11 | 10/23/90 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $100.00 |
| 58 | MELVIN GRIMALDO-LAGOS | 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 | 03/17/08 | 12/16/72 | SPANISH | CARPENTER | $100.00 | $100.00 | $200.00 |
| 59 | MICHAEL ANGELO LOPEZ | 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 | REHIRE 08/06/12 3/17/2008 | 08/12/89 | ENGLISH | MAINTENANCE | $100.00 | $300.00 | $0.00 |
| 60 | MICHAEL ANTHONY PATINA | 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 | 08/18/12 | 08/29/83 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 61 | MICHAEL NAISER | 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 | 05/31/02 | 08/18/65 | ENGLISH | DRIVER | $500.00 | $500.00 | $800.00 |
| 62 | MIGUEL LERAY ORTIZ | 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 | 08/19/11 | 03/21/68 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $100.00 |
| 63 | PABLO DELA PENA | 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 | 10/22/11 | 10/04/65 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 64 | PETE NUNEZ | 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 | 11/11/11 | 11/14/53 | ENGLISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 65 | REID GASSETT | 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 | 02/23/05 | 12/15/67 | ENGLISH | MAINTENANCE | $500.00 | $500.00 | $800.00 |
| 66 | RICHARD E. BRACEWELL - Richard was in a car accident on November 26, 2012 - if or when he can return to work is uncertain at this time. | 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 | 10/08/12 | 05/10/57 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 67 | RICHARD W. BRENNER | 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 | 06/11/12 | 10/28/80 | ENGLISH | OPERATOR | $0.00 | $0.00 | $0.00 |
| 68 | RIGOBERTO RUBIO | 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 | 07/11/96 | 10/28/76 | SPANISH | FOREMAN | $1,000.00 | $1,000.00 | $1,500.00 |

| | EMPLOYEE NAME | SS # | HIRE DATE | DATE OF BIRTH | PREFERENCE LANGUAGE | TITLE | 2009 BONUS | 2010 BONUS | 2011 BONUS |
|---|---|---|---|---|---|---|---|---|---|
| 69 | ROBERT LEE BEDFORD | 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 | 10/02/12 | 06/22/50 | ENGLISH | DRIVER | $0.00 | $0.00 | $0.00 |
| 70 | RODY MARTINEZ ROMERO | 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 | 10/12/11 | 10/26/71 | SPANISH | ROUSTABOUT | $0.00 | $0.00 | $100.00 |
| 71 | SALOMON LOREDO GALLEGOS | 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 | 07/14/03 | 06/22/70 | SPANISH | PUSHER | $0.00 | $500.00 | $1,000.00 |
| 72 | SILBANO GUERRA-PALOMO | 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 | 10/04/10 | 02/10/81 | SPANISH | WELDER | $0.00 | $100.00 | $200.00 |
| 73 | STACY M. METTING | 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 | 08/11/08 | 07/01/80 | ENGLISH | SALES | $500.00 | $500.00 | $1,000.00 |
| 74 | STEVEN L. QUINN | 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 | 10/24/11 | 10/03/69 | ENGLISH | SUPERVISOR | $0.00 | $0.00 | $200.00 |
| 75 | TAMMIE MAZANDER | 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 | 10/19/98 | 05/15/62 | ENGLISH | SECRETARY | $1,000.00 | $1,000.00 | $1,500.00 |
| 76 | TANNER ARIC SCHOENER | 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 | 04/09/12 | 05/12/94 | ENGLISH | YARDMAN | $0.00 | $0.00 | $0.00 |
| 77 | TIFFANY A. (STEINHOFF) HAWES | 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 | 10/20/08 | 01/15/82 | ENGLISH | SALES | $100.00 | $500.00 | $1,000.00 |
| 78 | TREY DELEON CURTIS | 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 | 11/19/12 | 07/23/88 | ENGLISH | MAINTENANCE | $0.00 | $0.00 | $0.00 |
| 79 | TROY G. EASON | 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 | 11/05/12 | 07/31/61 | ENGLISH | SUPERVISOR | $0.00 | $0.00 | $400.00 |
| 80 | TULIO GUTIERREZ | 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 | 04/28/10 | 03/02/81 | SPANISH | CARPENTER | $0.00 | $100.00 | $200.00 |
| 81 | VICTOR CARLOS HERNANDEZ ULLOA | 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 | 07/31/12 | 01/12/51 | SPANISH | ELECTRICIAN | $0.00 | $0.00 | $0.00 |
| 82 | VICTOR H. VELAZQUEZ | 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 | 08/15/11 | 08/11/09 | ENGLISH | DRIVER | $0.00 | $0.00 | $100.00 |
| 83 | WILLIAM KRPEC | 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 | 04/12/10 | 07/08/48 | ENGLISH | MECHANIC | $0.00 | $200.00 | $300.00 |
| 84 | YVETTE MOBLEY | 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 | 05/30/69 | 12/28/64 | ENGLISH | OFFICE MANAGER | $0.00 | $0.00 | $2,500.00 |

## Disclosure Schedule 3.21(b)

### Collective Bargaining Agreements/Strikes, etc.

QLS -        None

QLRS -       None

Disclosure Schedule 3.21(c)

Employee Actions

QLS -          None

QLRS -         None

## Disclosure Schedule 3.22

### Exceptions to Taxes

QLS -          Texas sales and use tax audit for the periods Jan 1, 2008 through March 31, 2011, which was completed November 22, 2011, resulted in additional tax of $8,066.43, interest of $867.85, which has all been paid.

QLRS -          Texas sales and use tax audit for the periods April 1, 2008 through March 31, 2012, which was completed September 25, 2012, resulted in additional tax of $16,882.40, penalty of $2,448.60, and interest of $2,918.99, which has all been paid.

## Disclosure Schedule 3.22(g)

### Open Tax Returns, etc.

| Company | Open Returns | Audits in Process |
|---|---|---|
| QLS - | See Attachment C (1) (a) | None |
| QLRS - | See Attachment C (1) (b) | None |

**Disclosure Schedule 3.22(g)**

**Open Tax Returns, etc.**

| Company | Open Returns | Audits in Process |
|---|---|---|
| QLS - | See Attachment C (1) (a) | None |
| QLRS - | See Attachment C (1) (b) | None |

## 1st Revised Disclosure Schedule 5.01(a)

### Assets Distributed to Seller (Excluded Assets)

QLS & QLRS –

All personal items belonging to Sellers and/or Employees (memorabilia, pictures, trophies, gifts and other personal items.

All personal items belonging to Sellers located in the yard by agreement between the parties.

Black granite table.

2008 International Tractor/Truck – 5RJSXAFH48W558800 (Mike's personal truck)

2012 Ford F-350 Pickup – 1FT8W3BT8CEB77865  (Cody's personal truck)

2011 Revolution Motor Home – 4VZBT1D91BC074509

2011 GMC Van (Savana RV) – IGDW7LCG0B1134452

2011 Ford F-250 Pickup – 1FT7W2BT5BEB37912

2008 Chevrolet Suburban 1500 – 3GNFC16088G287908

2013 Mack Truck – 1M1AW09Y1DM027041

2013 Mack Truck – 1M1AW09Y3DM027042

2013 Ford F-150 Pickup – VIN #  1FTFW1ET4DKD06257

2012 Dodge Durango – 1C45DHCT2CC300871

1998 Gooseneck Trailer – 17YGN3222WB017096

1991 Hesston Tractor – 6552102706

Caterpillar Tractor C55 & Shredder – 7DMO1284

Schulte Rotary Cutter XH1500 – C30102215208

John Deere Scraper 1812C – T81812C001124

John Deere 5525 Tractor; FR15 Rotary Cutter; 563 Loader NSL – LV5525s150822 & FR1512457 & P00563D010863

## SCHEDULE 5.01(b)

## CONTRIBUTION ASSETS

| Description | Veh. ID Number | Fair Market Value |
|---|---|---|
| Caterpillar | MRT00283 | $170,000.00 |
| Caterpillar | APM02476 | $155,000.00 |
| Caterpillar | AEP00535 | $140,000.00 |
| Gyro-Trac | BCT251163C | $135,000.00 |
| Vermeer | 1VR6110R081000291 | $110,000.00 |
| Caterpillar | PAB06193 | $105,000.00 |
| Caterpillar | PAB02202 | $100,000.00 |
| Caterpillar | TWR03340 | $100,000.00 |
| Caterpillar | 5GR00222 | $100,000.00 |
| Dragon | 1UNSF4536AA063129 | $75,000.00 |
| Dragon | 1UNSF48557A063029 | $75,000.00 |
| Dragon | 1UNSF48557A063001 | $70,000.00 |
| Dragon | 1UNSF48337A063000 | $70,000.00 |
| Caterpillar | TBL00964 | $70,000.00 |
| Caterpillar | TBL01407 | $70,000.00 |
| Caterpillar | TBL01405 | $70,000.00 |
| Mack | 1M1AN07YX8N001947 | $65,000.00 |
| Peterbilt | 1XPTDBEX8D756327 | $65,000.00 |
| Dragon | 1UNSF48505A063070 | $65,000.00 |
| Caterpillar | 72V13411 | $65,000.00 |
| Mack | 1M2AT13C07M001512 | $60,000.00 |
| Caterpillar | FDW0678 | $60,000.00 |
| TL 2000 | 1TTF48206X1060528 | $5,000 |